# EXHIBIT 3

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**  Dept. No. 16

Date: 3/4/2022          Hon. MICHAEL MARKMAN, Judge

KYTCH, INC.,

        Plaintiff,

v.

JONATHN TYLER GAMBLE; J.L. GAMBLE MANAGEMENT LLC; TFGROUP LLC; AND TAYLOR COMMERCIAL FOODSERVICE, LLC DBA TAYLOR COMPANY,

        Defendants.

Case Nos. RG21099155

**ORDER ON PRELIMINARY INJUNCTION**

FILED
ALAMEDA COUNTY
MAR - 4 2022
CLERK OF THE SUPERIOR COURT
By_____
                                 Deputy

    Plaintiff Kytch, Inc. ("Kytch") seeks a preliminary injunction against Defendants Tyler Gamble, TFGroup LLC, and Taylor Commercial FoodService LLC dba Taylor Company ("Taylor") (collectively "Defendants"). On July 30, 2021, the Court granted Kytch a Temporary Restraining Order ("the TRO") against Defendants (while also finding the Court lacked personal jurisdiction as to JL Gamble Mangement LLC dba McDonald's, which is no longer a party). The parties stipulated to a briefing schedule and a hearing date on the preliminary injunction. On December 14, 2021, the Court heard the matter. Kytch and Taylor submitted PowerPoint slides in connection with their oral arguments.

    After careful consideration of the parties' submissions and arguments, the Court GRANTS Kytch's request for a preliminary injunction against Defendant Tyler Gamble. The Court DENIES a preliminary injunction as to Defendants TFGroup LLC and Taylor.

    **I.    OVERVIEW**

    Defendant Taylor makes soft serve ice cream machines. Its machines are used in restaurants across the country, including in McDonald's fast-food restaurants. The machines are complex devices, and they have to comply with health and safety standards. They periodically malfunction. When a Taylor ice cream machine malfunctions, a service provider, like Defendant TFGroup, will come out to fix the machine.

1

Exhibit 3
Page 1 of 18

Kytch contends that it offers a particularly effective diagnostic tool for fixing the temperamental Taylor soft-serve ice cream machines. The tool, called the "Kytch Device," uses a combination of hardware and software. The user connects it to a computer board in the Taylor ice cream machine. It uses the Internet to wirelessly connect to an online system operated by Kytch in California. The system is called the "Kytch Platform." (See Nelson Decl. at ¶¶ 2, 15-19, 35-39.) It receives data from the ice cream machine extracted by the Kytch Device, analyzes the data, and uses a form of artificial intelligence (or expert system) to propose a way to fix any problems it detects. (See Hsiao Decl., Exhs. 14, 23, 37.)

The tool draws on the "Internet of Things," or "IoT," to make it possible for a user to remotely diagnose and fix problems with the machines. A user can access the ice cream machine using the platform, diagnose the problem, and then adjust the ice cream machine's settings to fix the problem remotely. For example, by using Kytch's app on a computer or smartphone, a user can command the ice cream machine to turn on or off, heat up or cool down, or perform other functions without being physically present at or near the machine.

Taylor had been working on its own IoT solution for its ice cream machines, off and on, since 2000. Much more recently, Taylor's recently-acquired sister-company, third-party PowerHouse Dynamics ("PHD"), began adapting its own product to work with Taylor's ice cream machines. Called "Open Kitchen," the PHD IoT system has not yet been the subject of discovery in this case. It appears set to directly compete with, and to replace, Kytch's solution.

In its Complaint, Kytch asserts claims for trade secret misappropriation, tortious interference with contract, and breach of contract. Kytch's arguments in support of its motion for preliminary injunction, however, are based primarily on Kytch's trade secret claim.

Kytch contends that Taylor and TFGroup, which performs maintenance and repair services for Taylor soft-serve machines, conspired to misappropriate Kytch's technology to make its own (or PHD's) competing IoT tool. Defendant J. Tyler Gamble allegedly assisted with this effort. He is a McDonald's franchisee and member/leader of a group, the "National Supply Leadership Council" or "NSLC," which tests and introduces new products into McDonald's restaurants.

Gamble agreed to test Kytch's product in a trial. In order to do so, he entered into a formal "Trial Agreement" with Kytch. Kytch then gave Gamble access credentials – unique username and password pairs – so that Gamble and others working for him could access the Kytch Platform and work with it.

Despite the confidentiality provisions in the Kytch Trial Agreement, Gamble gave TFGroup access to the Kytch Device and Platform. In his role on McDonald's National Supply Leadership Council, Gamble later shared with Taylor, its sister-company PHD, and third party McDonald's, information about the Kytch Platform and its feature-set. According to Kytch, TFGroup had at least one Kytch Device for a period of weeks and may have had access to

2

Exhibit 3
Page 2 of 18

others. TFGroup also gained access to the Kytch Platform under questionable circumstances and, according to Kytch, gave Taylor information based on what TFGroup found there.

TFGroup and Taylor dispute most of Kytch's allegations. They argue that Kytch lacks evidence that either of them actually accessed a Kytch device. They also argue that there is no evidence of any misappropriation. Gamble, they contend, did not share anything that could be considered a trade secret. During a key meeting, in June 2020, in which representatives from TFGroup, Taylor, and third-party McDonald's met to discuss the Kytch device and compare it to a competing device then under development, they argue that the participants did not discuss anything that could be considered a Kytch trade secret was discussed. They claim the same thing with respect to focus-group-like meetings in the Fall of 2020.

## II. LEGAL STANDARDS

As it did in connection with the TRO, the Court is required to re-assess Kytch's likelihood of success on the merits and "the relative interim harm to the parties depending on whether or not a preliminary injunction issues. (*See ReadyLink Healthcare v. Cotton* (2005) 126 Cal. App. 4th 1006, 1016 [quoting *Whyte v. Schlage Lock Co.* (2002) 101 Cal. App. 4th 1443, 1449-50 [quoting *Hunt v. Superior Court* (1999) 21 Cal. 4th 984, 999]].) The primary purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits. (*See O'Connell v. Superior Court* (2006) 141 Cal. App. 4th 1452, 1472.) "The granting or denial of a preliominary injunction does not amount to an adjudication of the ultimate rights in controversy." (*Woods v. Superior Court* (1980) 102 Cal. App. 3d 608, 615-16.)

The Court may enjoin actual or threatened trade secret misappropriation. (Civ. Code § 3426.2.) Under California law, Kytch must show possession of a trade secret, misappropriation by one or more of the defendant(s), and (3) that defendant's conduct damaged Kytch. (*See Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal. App. 4th 1658, 1665.)

A "trade secret" is:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(Civ. Code § 3426.1(d).)

3

Exhibit 3
Page 3 of 18

"Misappropriation" is the:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
   (A) Used improper means to acquire knowledge of the trade secret; or
   (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
      (i) Derived from or through a person who had utilized improper means to acquire it;
      (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
      (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
   (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

(Civ. Code § 3426.1(b).) In this context, "improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. (Civ. Code § 3426.1(a).) Importantly, "Reverse engineering or independent derivation alone shall not be considered improper means." (*Id.*)

California law requires Kytch to identify the trade secrets at issue with "reasonable particularity." (Code Civ. Proc. § 2019.210; *see Coast Hematology-Oncology Assocs. Med. Group, Inc. v. Long Beach Mem. Med. Center* (2020) 58 Cal. App. 5th 748, 756.) Kytch has provided its formal trade secret list.

Kytch's tortious interference claim requires that it show "(1) the existence of a valid contract between" it "and a third party; (2) the defendant's knowledge of that contract; (3) the deffendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (3) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Reeves v. Hanlon* (2004) 222 Cal. App. 4th 1182, 1186.)

III.   ANALYSIS

   A. The Preliminary Injunction Record and the Court's Conclusions

Kytch elected to take only very limited discovery leading up to the preliminary injunction hearing. At the time of the TRO, Kytch sought, and the Court granted, expedited discovery on a number of topics. The Court <u>did not</u> impose any limits on any party's ability to seek additional discovery on a normal time-table. Even after Defendants made a general appearance, however, Kytch chose not to pursue additional discovery. As a result, the record before the

4

Exhibit 3
Page 4 of 18

Court for the preliminary injunction hearing was substantially similar to the record before it in connection with the TRO.

Kytch argues that the Court should draw inferences from the lack of declarations from former Taylor employee Heather Jordan, who helped with Taylor's efforts to develop the user interface for an IoT solution that would compete with Kytch, Mike Zagorski, a McDonald's representative who pushed Taylor and PowerHouse Dynamics to develop a competing system, and Craig Merwin, another Taylor employee. Kytch, however, bears the burden to prove it is likely to succeed on the merits of its trade secret claims. Depositions of these individuals, as well as James Minard, Tyler Gamble, Blaine Martin, Martin Flusberg of PowerHouse Dynamics, and Scott Nicholas all ought to have been taken in preparation for the preliminary injunction hearing. Their testimony may be quite important in any ultimate resolution on the merits, as will be evident below.

The evidence establishes that Kytch is likely to succeed on the merits of its breach of contract claim against Defendant Tyler Gamble. The Kytch Trial Agreement bound Mr. Gamble to unambiguous confidentiality provisions, and the evidence indicates that he violated those provisions by accessing and allowing others to access the Kytch Device and Kytch Platform beyond the scope of the permissions set out in the Trial Agreement.

The lack of additional evidence is, however, fatal to Kytch's request for a preliminary injunction against TFGroup and Taylor, or against Gamble on Kytch's trade secret theory. The limited existing record lacks sufficient evidence from which the Court could conclude that Kytch is likely to succeed on the merits of its trade secret misappropriation claims. Specifically, Kytch lacks evidence that either TFGroup or Taylor acquired a Kytch trade secret.

### B. Kytch's Efforts to Maintain Confidentiality and Accompanying Duty to Maintain Secrecy/Limit Use

The Court begins its analysis by examining factors common to Kytch's trade secret claims against all Defendants. The Court finds that Kytch took reasonable measures to maintain the confidentiality of its systems and information. (Civ. Code § 3426.1(d)(2).) Kytch did so in at least three ways. First, it limited third party access credentials for its devices, systems, and other information – a unique username/password combination – to those who signed its Kytch Trial Agreement, which included strict non-disclosure provisions. Second, it required those who obtained and used access credentials to agree to a further set of Terms of Service. Together, these legal obligations resulted in a duty to maintain the secrecy and confidentiality of the Kytch information they could access. (Civ. Code § 3426.1(b)(2)(B)(ii) & (iii).) Third, Kytch prevented others – incuding at least one Taylor employee, Taylor's legal counsel, and TFGroup – from buying or otherwise getting access to the Kytch Platform without first agreeing to Kytch's confidentiality provisions.

First, the Kytch Trial Agreement provided:

You shall not, and shall not cause or permit others to:

*\*\*\**

Modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute or republish all or any part of the Products, or otherwise access or use the Products in order to build or support, and/or assist a third party in building or supporting, products or services competitive to any Kytch Products;

Disclose results of any benchmark tests or performance tests of the Kytch Products without Kytch's prior written consent;

*\*\*\**

License, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing or service bureau use, or otherwise commercially exploit or make the Kytch Products available to (or use such Products for the benefit of) any third party.

(Nelson Decl., 5/10/21, at Exh. 3.)

Second, the Kytch Terms of Service provided that users could not "make the Products or Services, including any Kytch programs or materials to which you are provided access, available in any manner to any third party." (Nelson TRO Decl., 5/10/21, at Exh. 4.) It also provided a user could not "access or use the services in order to build or support, and/or assist a third party in building or supporting, Products or Services competitive to Kytch" nor "disclose the results of the performance of the Products and Services without Kytch's prior written consent." (Id.)

Third, Taylor representatives were repeatedly prevented by Kytch from buying, or otherwise gaining access to, Kytch's system. Taylor's legal counsel could not procure a Kytch Device or access to the Kytch Platform. Likewise, Taylor developer Heathere Jordan was unable to buy Kytch's device or service.

Together, these findings satisfy a portion of the definition of "trade secret" information and one of the prongs of the test for misappropriation.

### C. Tyler Gamble

Kytch has established a strong likelihood of success on the merits of its claims against Tyler Gamble for breach of contract. Gamble concedes he signed the Kytch Trial Agreement and was bound by its terms. Kytch issued access credentials to Gamble, as it would to any paying customer, under the terms of the Trial Agreement.

6

**Exhibit 3**
**Page 6 of 18**

Gamble had therefore agreed to restrictions on his use of Kytch's system and his disclosure of information about it. He could not "assist a third party in building or supporting, products or services competitive to any Kytch Products." (Nelson Decl., 5/10/21, at Exh. 3.) He also could not "display" or "disclose ... or make the Kytch Products available to (or use such Products for the benefit of) any third party." (Id.)

The evidence indicates that Gamble did both, meaning that Kytch has established it is likely to succeed on the merits of its breach of contract claim against him. Gamble participated in at least one and perhaps more than three separate meetings with Taylor and McDonald's personnel to discuss his experiences and work with the Kytch system. These meetings were focus-group-like. At a meeting in June 2020, Gamble described the Kytch system and noted some of the features that were most useful to him as a McDonald's franchisee and Taylor ice cream machine owner. The evidence establishes it is more likely than not that Gamble breached the Kytch Trial Agreement and the Kytch Terms of Service by doing so. Gamble's liability is not dependent on whether the information he disclosed and access he provided is properly considered a trade secret.

Kytch is also likely to succeed in proving that Gamble violated the Kytch Terms of Service. Gamble made "Kytch programs or materials to which [he was] provided access, available" (Nelson TRO Decl., 5/10/21, at Exh. 4) to representatives of Taylor and McDonalds. During the June 2020 meeting, Gamble accessed the Kytch Platform on his computer and showed the interface to the attendees. Gamble also forwarded a number of text messages to representatives of Taylor and McDonald's, which identified trouble-shooting tactics generated by the Kytch system.

Kytch is also likely to succeed on its claim that Gamble violated his obligation not to "access or use the services in order to build or support, and/or assist a third party in building or supporting, Products or Services competitive to Kytch." Again, the evidence reflects Gamble knew he was participating in what amounted to focus groups about Taylor's development (or PHD's development) of a product that would compete directly with and replace Kytch. The June 2020 meeting, a meeting in November 2020, and other meetings/focus groups all involved Taylor, McDonalds, and sometimes PHD, getting input about the then under-development IoT replacement for the Kytch solution.

Taylor points out that Gamble participated in these focus groups because he was on McDonalds' "National Supply Leadership Council," which helps test equipment for use in McDonald's franchises. (See Gamble PI Decl. at ¶ 10; Balducci Decl. at ¶ 1; Wilson Decl. at ¶ 1.) But this fact alone does not help Gamble, who agreed to the Kytch Trial Agreement and/or Terms of Service.

The Court does not find that Kytch has shown a likelihood of success on the merits of its trade secret misappropriation claim against Gamble. There is, as yet, insufficient evidence that

Gamble misused or otherwise disclosed to others the Kytch trade secrets to which he had access.

### D. Taylor

#### 1. Development of a Competing IoT Solution

Kytch has developed a solid evidentiary record that Taylor was building an IoT system for its ice cream machines to directly compete with Kytch, and that Taylor wanted information about Kytch's device to help build it.

On February 11, 2020, emails reflect ongoing discussions at Taylor about the development of a device called "Open Kitchen" to compete directly against Kytch. ((Watkins Reply Decl., Exh. 19 at p. 137.) Other emails call Kytch a "threat," and copy developers working for Taylor's sister company, Powerhouse Dynamics, which was developing the competing OpenKitchen system. (Watkins PI Decl., Exhs. 1, 11.)

For its part, Taylor alleges it "had been testing an IoT solution internally since 2000 and launched a major field trial in 2015. But IoT was not a priority for Taylor customers, so Taylor never took the last steps to finalize an IoT solution for mass commercialization." (Taylor Hearing Slides at 5, citing Minard PI Decl. at ¶¶ 4-18.)

Evidence concerning a June 23, 2020 meeting between representatives of Taylor, TFGroup, and McDonald's highlights that the desire to replace Kytch's system with one from Taylor (or its sister-company PHD) motivated Taylor's attempts to get access to Kytch's devices, systems, or other information. Emails leading up to the June 2020 meeting, discussed in more detail below, highlight that Taylor was attempting to replicate features of Kytch's system. (See Watkins PI Decl., Exhs. 2, 7, 8; Watkins Reply Decl., Exh. 10 at p. 93.) A McDonalds representative, Mike Zagorski, appears to have convened the meeting. (Watkins Reply Decl., Exh. 13 at p. 115; Exh. 16 at p. 128; Exh. 18.) Taylor's James Minard summarized the meeting in contemporaneous notes sent to the participants, explaining, "The focus of the meeting was to review the overall satisfaction of the Kytch device as it compares to the Taylor Atlas platform." (Watkins Decl., Exh. 7.)

After the meeting, Taylor's Minard wrote in an email, "So how can we do the same thing Kytch is doing as far as sending commands from a remote interface. Please see my report….." (Watkins Reply Decl., Exh. 17.) A few months later, the McDonalds representative apparently told others, "If we don't have a solution to offer, we have no options." (Watkins Decl., Exh. 9.)

Taylor attempts to argue that it wanted access to a Kytch device not to compete with Kytch or help its sister company build a competing system, but rather because it was concerned the Kytch device would harm Taylor's ice cream machines. (Minard Decl. at ¶ 89.) In the media, Taylor argued that it was concerned Kytch's system could impact health and safety by allowing inexperienced users to make mistakes in cleaning the machines that would result in

8

Exhibit 3
Page 8 of 18

jeopardizing the health of ice-cream eaters (e.g., because the system would be improperly sterilized overnight). (See Watkins PI Decl. at Exh. 3.)

### 2. Attempts to Acquire Kytch Devices, System Access, and Information

In order to show a likelihood of success on its trade secret claim, Kytch must show misappropriation – that Taylor actually obtained a Kytch device or got access to Kytch trade secret information via improper means. Use (or further disclosure) of the trade secret information it learned could be enjoined.

Taylor initially sought access to Kytch's device and systems via what would be considered lawful means. On May 16, 2019, Mr. Minard ordered his team to "buy a kit," i.e., the Kytch Device for use with the Platform, "and provide me a written evaluation on the hardware and software." (Watkins Reply Decl., Exh. 1 at p. 7.) Taylor's Heather Jordan informed Mr. Minard and the team that Kytch would not allow Taylor to order Kytch's system. (Watkins Reply Declaration in Support of Preliminary Injunction ("Watkins PI Reply Decl."), Exh. 1 at p. 7.) Taylor's Vice President – Quality & Customer Service, Daniel Domberg, then joked, "I guess we should've ordered in stealth mode :-)." (Id., Exh. 8 at p. 89.) A few days later, Taylor's outside counsel attempted to buy a Kytch Device. (Nelson TRO Decl., Exh. 6 at 205.) They were also unsuccessful. Taylor's efforts continued into 2020.

As noted in the TRO Order, the evidence reflects that Defendants all knew that Kytch considered the means of operating its device and platform to be confidential information, subject to protection under an NDA and by virtue of its terms of service, and accessible only with credentials obtained from Kytch. Mr. Gamble signed the Kytch Trial Agreement, while TFGroup and Taylor both decided not to enter into a formal contractual relationship or informal joint development arrangement with Kytch. (See Minard TRO Decl. at ¶ 84.) TFGroup's Blaine Martin had to agree to the Kytch Terms of Service to access the Kytch Platform. Under these circumstances, proof of acquisition of Kytch confidential information from someone like Gamble or TFGroup – in violation of their Kytch Trial Agreement or the Kytch Terms of Service – would be sufficient for an injunction under section 3426.1(b) of the Civil Code.

Kytch's problem, however, is that it lacks evidence that Taylor ever actually succeeded in getting access to a Kytch device through either lawful or improper means. Taylor denies doing so. (Minard TRO Decl. at ¶¶ 86, 119.) Mr. Minard states Taylor never instructed or advised Gamble to give TFGroup access to a Kytch device, and TFGroup never provided Taylor with a Kytch device or gave Taylor access to one (or to the Kytch Platform). (Id.) Minard and his team did work to "gather ... unit field audit data on the Kytch installations" starting in March 2020, and continued to try to get access to a device. (Watkins Reply Decl., Exh. 14 at p. 120.) But, the evidence in the record indicates that Kytch may have successfully thwarted Taylor's attempts to acquire a Kytch device.

Given Taylor's inability to access a Kytch device on its own, Kytch argues that Taylor was able to obtain trade secret information about the device from others. Kytch's best such

argument is that Gamble and TFGroup disclosed Kytch trade secrets to Taylor during a meeting on June 23, 2020. Representatives of Taylor, McDonald's, and TFGroup were at the meeting, along with Gamble. Durin the meeting, Gamble accessed the Kytch Platform and showed portions of its interface to the attendees. McDonalds' Mike Zagorski appears to have convened the meeting. (Watkins Reply Decl., Exh. 13 at p. 115.) Taylor's James Minard summarized the meeting in contemporaneous notes sent to the participants, explaining, "The focus of the meeting was to review the overall satisfaction of the Kytch device as it compares to the Taylor Atlas platform." (Watkins Decl., Exh. 7.) There is evidence that an earlier February 13, 2020 also took place to discuss Kytch. (Watkins PI Decl. at Exh. 14.) Gamble was an "optional attendee" for that meeting, as was Eric Wilson (a third party who participated with Gamble in a group of restaurant owners who evaluate and make recommendations about equipment to be used at McDonalds franchises).

The big question is whether Gamble shared trade secret information during the June 2020 gathering. Statements from the June 2020 meeting, including that "The ability for the Kytch system to be used for changing setpoints and machine parameters is something newly discovered," are ambiguous. (See Watkins Decl., Exh. 7.) It appears Minard meant that Taylor had not realized the Kytch system was a true IoT device that could manipulate the machine itself. A short time later, on July 8, 2020, Taylor's Minard wrote in an email, "So how can we do the same thing Kytch is doing as far as sending commands from a remote interface. Please see my report….." (Watkins Reply Decl., Exh. 17.)

No one as yet has deposed anyone about the meeting or Mr. Minard's summary of it. In his declaration, Mr. Minard claims the meeting was "to discuss a high level comparison between the Taylor IoT platform and the Kytch platform." (Minard TRO Decl. at ¶ 111.) Minard also represents that he did not:

> have any reason to believe that the type of information shown to me during this meeting would be considered highly sensitive or confidential, especially when all of the information I was shown was either basic features one would expect in any IoT technology, or information already out in the public, or both. For instance, Mr. Gamble showed me the Kytch Platform's "main home page" and control panel, both of which are also on Kytch's website and social media accounts. Mr. Gamble also explained that Kytch used text message alerts, as opposed to e-mail alerts; again, something that I already knew because Kytch highlighted that feature in public materials.

(Minard PI Decl. at ¶ 55 [internal citations omitted].)

Kytch asks the Court to draw more sinister inferences concerning the notes from the June 2020 meeting. Minard's July 8, 2020 email indicates that Taylor wanted very much to build a competing IoT capability so its system could remotely adjust an ice cream machine's settings. An October 16, 2020 email indicates that McDonalds' representative was pushing for

a system to replace Kytch. The email author reports that Mike Zagalski "also stated, 'If we don't have a solution to offer, we have no options." (Watkins Decl., Exh. 9.)

These emails, however, also support a different inference – they indicate that Taylor <u>lacked</u> the capability to be a true IoT device and <u>did not</u> yet have a way to build or implement one. As Taylor puts it, they "never got any 'under the hood' knowledge about Kytch's product." (Taylor Hearing Slides at 8, citing Minard TRO Decl. at ¶ 125.) That Kytch's system could perform these functions was a reality that Kytch itself made public and marketed. The <u>know-how</u> to build a system capable of performing these functions would be a trade secret. But, the evidence indicates Taylor did not have that information yet and was still attempting to develop it.

Beyond the June 2020 meeting, there is little other evidence that Taylor learned information that could be called a Kytch trade secret. An earlier email dated March 18, 2020 relays input from Blaine Martin of TFGroup that the competing IoT system would need "to read mix low and mix out" in order to be competitive with Kytch. (Watkins PI Decl., Exh. 8.) Mr. Gamble had identified the feature as a reason he had purchased the system from Kytch. (Id.) The next day, in a similar email, a Taylor Regional Field Service Manager relayed a request that the competitive system include a text alert feature. (Watkins Reply Decl., Exh. 10 at p. 93.) Later discussions, including at the June 2020 meeting, discuss information gleaned from text notifications sent by the Kytch Platform to Gamble's app explaining steps the system was taking to adjust temperature levels. (See Watkins Decl., Exh. 7.)

The existence of a "mix low and mix out" capability in Kytch's device was not, however, a trade secret. How to implement such a feature may have been a trade secret, and the evidence indicates that Taylor lacked that know-how. (See id.; compare Kytch Trade Secret Designation, filed 6/21/21, Exh. 2 at 58 [the Court will not quote the designation here to avoid requiring redaction of this Order].) Kytch itself marketed the mix feature in materials made available to third parties without a non-disclosure agreement. (See, e.g., Hsiao Decl., Exh. 2.)

Likewise, a "text alert" feature for an IoT device is a known and publicly available idea. The know-how to implement such a feature would be a trade secret but, again, the evidence indicates that Taylor was lacking it. While Kytch points to a January 4, 2021 email from a PowerHouse Dynamics developer to Minard and others to suggest that Minard was helping to "create a flow chart of alerts by 1/8," the email is unclear whether the flowchart is one of alerts sent by the Kytch Platform or the alerts that the new competing software ought to send out once completed. (Watkins Decl., Exh. 2. ) Without more discovery, either inference seems plausible. A flow chrt of Kytch's text alerts could, in the aggregate, constitute a protectable Kytch trade secret. But, the current evidentiary record is too thin for the Court to draw that inference and use it as the sole evidentiary basis for a preliminary injunction against Taylor.

Whether and how Taylor or PHD might have used Kytch's confidential information to do so is a question left unanswered by the evidence adduced by Kytch to date. Had Taylor resorted to trade secret misappropriation in early 2020, however, one might reasonably have

expected that those involved would not be complaining in October 2020 that they "have no options" because they "don't have a solution to offer." (Watkins Decl., Exh. 9.)

Likewise, an email from James Minard to Martin Flusberg, a lead developer at sister-company PowerHouse Dynamics ("PHD") working on a competing system, appears potentially sinister but allows for only limited inferences. Minard wrote:

> Can we have a quick call to review the outstanding items needed to get our equipment onto the PHD connected kitchen platform? I also have attached some meeting notes that I also would like to discuss but please keep them between Taylor and yourself at this time.

(Watkins Reply Decl., Exh. 18.) Minard conveyed a desire for the competing system to be "user friendly," and forwarded screenshots from Kytch's system as examples of how to improve a user interface. (Watkins Reply Decl., Exh. 16 at p. 128.) The screenshot, however, simply shows Kytch's illustration of a Taylor ice cream machine. The outline and shape of Taylor's own machine was not a Kytch trade secret. (See also Taylor Hearing Slide 27 [comparing Kytch user interface with picture of front of Taylor machine at https://kystch.com/features, Hsiao Decl., Exh. 24]; Minard TRO Decl., Exh. 7 & photo at https://taylor-upstate.com/training-videos.)

A November 30, 2020 email from a PHD employee mentions another meeting that included Gamble and other Kytch Trial Agreement signatories. (Watkins Reply Decl., Exh. 20.) Another meeting took place on December 14, 2020. It appears that Kytch users were providing information to PHD's developers about building PHD's new system.

The summary of what was shared at the meeting, however, is insufficient to allow the Court to conclude that the participants passed along Kytch trade secrets. Taylor points out that the email summarizing the meeting does not mention Kytch, and Taylor witnesses allege the meeting in November (and later meetings like it) were intended to get feedback about the Open Kitchen system rather than glean information about Kytch's system. (See Fisk Decl. at ¶ 32; Balducci Decl. at ¶ 9.)

Taylor's explanation is far from conclusive, especially since meeting participants were comparing Open Kitchen against the only viable competing system on the market – to which they had access because they were Kytch customers and were governed by the Kytch Trial Agreement and Terms of Service. Nonetheless, further discovery is needed to draw inferences about the meeting. Again, including signatories to the Kytch Trial Agreement in focus-group meetings for aiding the development of a directly-competing system was not prudent. Kytch might be able to develop further evidence about exactly what information was conveyed. A product developed with trade secrets would need to be scrapped and independently re-built, likely using a clean room procedure with functional specifications first vetted by legal counsel.

Without further discovery, however, the Court is left to speculate about what Minard and Flusberg discussed, and about what happened at the November 30 and December 14, 2020

focus-group-like meetings. The emails and meeting notes themselves do not appear to include Kytch trade secrets. The discussion between the two men, or at larger group meetings, may or may not have been as circumscribed.

Without discovery and more evidence, nothing is known about PowerHouse Dynamics' product development. Taylor says that its "Taylor-specific Open Kitchen solution is ready to go." (Taylor Hearing Slides at 5, citing Minard PI Decl. at ¶ 9.) PHD and its Open Kitchen system were not subject to any discovery. No one has analyzed and compared PHD's IoT solution's features or implementation against Kytch's trade secret list. Whether or not PowerHouse Dynamics received trade secrets from Taylor, TFGroup, or Gamble is unknown, and PHD is not a party. As noted above, if PHD obtained Kytch trade secrets, it may end up needing to use a cleanroom to independently re-design its IoT system. Without evidence analyzing PHD's design and development, or other expert testimony, however, the Court lacks any basis to enjoin Taylor, let alone its sister-company.

Kytch points to other communications between Gamble and Mike Zagorski, with third-party McDonald's, but those communications do not appear to contain Kytch trade secrets. (See Watkins Decl., Exh. 36.) At best, they provide further evidence that Gamble violated the Kytch Trial Agreement and Terms of Service, but they do not support a trade secret misappropriation claim. Unlike Taylor and TFGroup, there is as yet no evidence that Zagorski knew or should have known that Gamble had confidentiality obligations to Kytch and was not supposed to forward things like Kytch text messages to others.

Further, according to Gamble, Kytch itself <u>wanted him</u> to share information about Kytch's system with McDonald's, ostensibly in the hopes that McDonald's would want to use Kytch's system or might encourage Taylor to commercially adopt it rather than to pursue Taylor's own competing system. (See Gamble PI Decl. at ¶ 22.) Moreover, the texts from Gamble to Zagorski themselves are mostly Kytch marketing-oriented, and tout new product features. Kytch marketing updates were not confidential. (See Kytch Reply Br. at p. 6 ["Kytch provided only general descriptions of features … not **how** those features are offered or any specific proprietary information" [emphasis in original]].)

Kytch contends Mr. Gamble went too far, and gave access to his Kytch account to Zagorski. (Watkins PI Decl., Exh. 22.) McDonald's, however, is not a party to this case. There is also as yet no evidence indicating that Zagorski actually accessed Gamble's account with Kytch nor that he obtained any Kytch trade secrets to give to Taylor, TFGroup, or anyone else.

At the hearing, Kytch indicated that it was seeking a preliminary injunction based on its tortious interference claim as well as its trade secret misappropriation claim. Kytch proposed an injunction that would bar TFGroup and Taylor from seeking input in connection with building or developing an IoT device that would compete with the Kytch Platform or Kytch Device from anyone who was subject to the confidentiality provisions of a Kytch Trial Agreement.

13

**Exhibit 3**
**Page 13 of 18**

Defendants objected for at least two reasons. First, Kytch had not described such a prohibition in its preliminary injunction papers. Second, Kytch's new proposal could impair employee mobility and could effectively be a non-compete provision prohibited under California law. (See Bus. & Prof. Code § 16600.)

The Court denies Kytch's proposed injunction concerning obtaining input from third parties subject to a Kytch Trial Agreement for purposes of developing or refining a competing device without prejudice. First, Defendants correctly observe that no one briefed the question of the propriety of such an order. Second, with the possible exception of Defendant Gamble, Kytch has not submitted evidence from which the Court can conclude Defendants are soliciting or obtaining trade secrets from third parties who have used the Kytch Device or Kytch Platform subject to confidentiality and use restrictions. If Kytch were to submit evidence that Defendants were systematically soliciting people with confidentiality obligations under a Kytch Trial Agreement to participate in product reviews, surveys, focus groups, or the like, for purposes of developing or refining a competing product, with the knowledge that they are bound by the Kytch Trial Agreement, the Court would consider revisiting the question. The resulting injunction would likely simply bar such solicitation.

Regarding Defendants' second argument, the Court does not believe that section 16600 of the Business and Professions Code is at all an issue here. Kytch is not suggesting that anyone would be barred from competing against it or from employing someone because they at some point had access to a Kytch Device or the Kytch Platform under a Trial Agreement. But again, no one has had any opportunity to brief the question to the Court.

Finally, Kytch argues that Taylor destroyed evidence relating to the February 13, 2020 meeting because one of trhe attendees, Scott Nicholas, deleted old messages. The record, however, lacks evidence sufficient for the Court to reach any conclusions regarding spoliation. Nor does it allow the Court to draw negative inferences against Taylor, given the explanation for the inability to find the old texts.

### E. TFGroup

Two facts form the foundation of Kytch's argument that TFGroup should be enjoined. First, Tyler Gamble gave TFGroup representatives access to Kytch's system without permission, and TFGroup knew or should have known that access to the proprietary system was subject to confidentiality restrictions. Specifically, a Kytch Device ended up in TFGroup's possession for several weeks, while one of Gamble's ice cream machines was with TFGroup for repairs. Repairs apparently did not go well. In November 2020, Gamble decided to replace the broken machine, and he asked TFGroup to move the Kytch Device to the replacement. (Martin Decl. at ¶¶ 19-21.)

Second, TFGroup's Blaine Martin used an old email address, rather than his work email, to get Kytch to distribute a username/password combination to him. Martin knew or should have known that his access to Kytch's systems was subject to confidentiality restrictions, and he

14

Exhibit 3
Page 14 of 18

knew they were not going to give him access credentials because of TFGroup's close relationship with Taylor. Based on that close relationship, Kytch infers that TFGroup likely passed along Kytch trade secrets to Taylor and/or PHD for the development of their competing IoT solution.

Regardless of whether it was simply accessing the Kytch Platform in order to try to fix Gamble's broken ice cream machine, TFGroup had to agree to Kytch's Terms of Service in order to access the Kytch Platform. Like Gamble, TFGroup could not "make the Products or Services, including any Kytch programs or materials to which you are provided access, available in any manner to any third party." It also could not allow others to "access or use the services in order to build or support, and/or assist a third party in building or supporting, Products or Services competitive to Kytch" nor "disclose the results of the performance of the Products and Services without Kytch's prior written consent."

Unlike Gamble, however, TFGroup did not sign the Kytch Trial Agreement and was not subject to it. Kytch does not allege breach of contract against TFGroup based on the Terms of Service. Injunctive relief against TFGroup is therefore premised only on Kytch's trade secret misappropriation claim.

TFGroup counters that it only accessed the Kytch Device, and logged onto the Kytch Platform, in order to work to fix Gamble's Taylor ice cream machines, which is what TFGroup is hired to do. More importantly, while TFGroup might have been able to access Kytch confidential information (if not trade secret information), TFGroup also argues that it never actually acquired a Kytch trade secret or disclosed one to someone else. In other words, TFGroup argues Plaintiff has failed to show a likelihood of success in proving misappropriation.

Based on the limited evidence available, the Court must agree with TFGroup that Kytch has not yet carried its burden to show it is likely to succeed on its trade secret claim against TFGroup. First, while it might be possible to ascertain or reverse engineer Kytch trade secrets by having a Kytch Device, Kytch presently lacks evidence that TFGroup did so.

Kytch points to data logs for the Kytch Device, asking the Court to infer from those logs (and the memory used on the Kytch Device), that TFGroup was working with the Kytch Device while it was in TFGroup's possession. Kytch developed evidence that the SD card in the Kytch Device used with the Taylor ice cream machine in Mr. Gamble's Brownsville McDonalds was 90% full after it had been in TFGroup's hands for a few weeks. (Nelson Decl. at ¶ 116.) Kytch draws a credible inference that the device may have been unplugged and then plugged back in more than once.

That said, the Court is not able to draw any other inference from the data logs or memory usage information from the Kytch Device to which TFGroup had access. (Nelson Decl. at ¶¶ 114-116, 128-29.) Kytch did not submit an expert declaration concerning the data logs or memory usage. TFGroup denies doing anything with the Kytch Device at all. (Martin Decl. at ¶¶ 19-21, 26-27, 33, 39-41, 53.) The Court is unable to draw a reasonable inference that

TFGroup was analyzing the Kytch Device or otherwise using it to get Kytch trade secrets via the Kytch Platform.

Blaine Martin's use of a non-work email to get access credentials to the Kytch Platform was a serious error of judgment. Mr. Gamble twice electronically invited someone with the alias "Matt Wilson" to access the Kytch Platform. (Nelson TRO Decl. at ¶ 119 & Exh. 8.) The invitation requests triggered Kytch's systems to send email invitations to the address provided for "Matt Wilson." (Id. at ¶ 121.) As explained in the Court's prior TRO decision, "Matt Wilson" was really Blaine Martin of TFGroup. (Id. at ¶¶ 122-125.)

At some point, Martin forwarded Kytch marketing emails from his "Matthew Martin" email account to his TFGroup email. (Watkins Decl., Exh. 31.) The Court concludes that Martin was quite conscious of the fact that he had improperly obtained access to the Kytch system using his Gmail account, as discussed in connection with issuing the TRO. But, the emails he actually forwarded himself appear to be Kytch marketing about new product features rather than anything that could be considered a trade secret. And again, there is no breach of contract claim against TFGroup based on the Terms of Service.

While access to the Kytch platform was improper, the record currently lacks evidence that TFGroup acquired anything that could be considered a trade secret or improperly disclosed information that could be a trade secret to Taylor (or PHD). An email with a screenshot of the Kytch user interface reveals only that Kytch's interface was an image of the control panel from a Taylor ice cream machine. (See Watkins Decl., Exh. 30.)

As noted above in connection with Taylor, individual Kytch text alerts themselves were not trade secrets, though a compilation of them might be considered one. The fact that the Kytch Platform generated text alerts was not a trade secret. And none of the specific text alerts that might have been disclosed by TFGroup (rather than Gamble) to Taylor contain information from which someone might derive, reverse engineer, or somehow learn a trade secret.

Kytch also points out that Mr. Gamble forwarded a number of Kytch text alerts to TFGroup. These alerts were ostensibly to assist with servicing the Taylor ice cream machine. Again, while the terms of the Kytch Trial Agreement barred Gamble from passing along such alerts, there is no evidence from which the Court can confirm either that (1) the alert(s) constituted protectable trade secrets under Civil Code section 3426.1(d)(1) or (2) if so, that TFGroup ever misused the text alerts or information in them.

Kytch's tortious interference claim against TFGroup was not the subject of significant briefing in connection with the request for a preliminary injunction. The Court notes that the record lacks evidence that TFGroup committed "intentional acts designed to induce a breach or disruption of the contractual relationship" between Gamble and Kytch. (See *Reeves v. Hanlon* (2004) 33 Cal. 4th 1140, 1148.)

16

Exhibit 3
Page 16 of 18

### F. Balance of Hardships

The balance of hardship requires the Court to evaluate the potential interim harm to Kytch if an injunction is denied versus the harm Defendants would suffer if an injunction were issued. The balance tips somewhat in Kytch's favor.

Taylor is apparently on the verge of releasing a competing IoT device for use with its ice cream machines. Taylor and/or PHD have McDonalds' blessing to release an IoT device called "Open Kitchen." There is no indication that Taylor, McDonalds, or others are poised to attack Taylor's new IoT system on the basis of health concerns, as Kytch's system has been attacked in the media. To the extent Kytch can continue to operate under current market conditions, the evidence indicates that Kytch will effectively be forced out of business once the Taylor/PHD IoT system is released.

In the final analysis, however, the lack of evidence from which the Court can find Kytch is likely to succeed on the merits is dispositive. Again, there is no evidence that the competing Open Kitchen system was built with or incorporates any Kytch trade secret. Without such evidence, there is no basis to enjoin its release, and an injunction would not be in the public interest.

During the hearing, the Court noted the difficulty associated with proving the independent development of systems where the development has been tainted by access to trade secret information. Such a system would need to be re-developed using a clean room approach, with independent developers who never had access to trade secret information and without reference to any documents, code, or other materials that incorporate a trade secret. The Court is somewhat reassured that, while it is not issuing a preliminary injunction given the lack of evidence, the developers of a competing IoT solution would be taking a serious risk were a tainted system to be released.

### IV.    PRELIMINARY INJUNCTION

The Court Orders: Defendant Jonathan Tyler Gamble must not use, copy, disclose, or otherwise make available in any way information, including a formula, pattern, compilation, program, device, method, technique, or process, obtained via access credentials for the Kytch Platform on or anytime after March 19, 2020.

This preliminary injunction is framed to protect Kytch's contractual interest in its confidential information, and in making its system available to customers like Mr. Gamble for testing, subject to the Kytch Trial Agreement. The preliminary injunction is based on Kytch's strong showing of a likelihood of success on the merits of its breach of contract claim against Defendant Gamble. The injunction is not based on Kytch's claims for trade secret misappropriation or tortious interference with contractual relations.

    The Court will not require a bond because, by agreeing to the Kytch Terms of Service, Mr. Gamble waived the bond requirement of section 529 of the Code of Civil Procedure. (*See Smith v. Adventist Health System* (2010) 182 Cal. App. 4th 729, 744; Watkins Decl., Exh. 3 sec. 15(c) ("Kytch may seek injunctive or other equitable relief to protect its confidential information and intellectual property …. You agree that Kytch may do so without the need to post bond or other surety.")

IT IS SO ORDERED.

March 4, 2022

                                                                _____
                                                                 Michael M. Markman
                                                                 Judge, Superior Court of California
                                                                 Alameda County

**Exhibit 3**
**Page 18 of 18**