# EXHIBIT 4

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
03/24/2022 at 08:38:14 AM
By: Shabra Iyamu, Deputy Clerk

1  Jason Sheasby SBN 205455
   jsheasby@irell.com
2  IRELL & MANELLA
   1800 Avenue of the Stars, Suite 900
3  Los Angeles, California 90067-4267
   Telephone: (310) 277-1010
4  Facsimile:  (310) 203-7199

5  Elizabeth M. Locke, P.C (*pro hac vice*)
   libby@clarelocke.com
6  Daniel P. Watkins (*pro hac vice*)
   daniel@clarelocke.com
7  CLARE LOCKE LLP
   10 Prince Street
8  Alexandria, Virginia 22314
   Telephone: (202) 628-7400
9  Facsimile:  (202) 478-0475

10 John C. Kirke SBN 175055
   jkirke@donahue.com
11 Andrew S. Mackay SBN 197074
   amackay@donahue.com
12 DONAHUE FITZGERALD LLP
   1999 Harrison Street, 26th Floor
13 Oakland, California 94612-3520
   Telephone: (510) 451-3300
14 Facsimile: (510) 451-1527

15 *Attorneys for Plaintiff Kytch, Inc.*

16            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

17                **FOR THE COUNTY OF ALAMEDA**

18 KYTCH, INC.,                          | CASE NO:  RG21099155
19            Plaintiff,                 | ASSIGNED TO ALL PURPOSES TO:
                                         | Hon. Michael M. Markman
20 v.                                    | Department 14
21
22 JONATHAN TYLER GAMBLE; J.L            | **DECLARATION    OF    DANIEL    P.**
   GAMBLE MANAGEMENT LLC DBA             | **WATKINS IN SUPPORT OF KYTCH'S**
23 MCDONALD'S; TFGROUP LLC; AND          | **MOTION FOR LEAVE TO FILE FIRST**
   TAYLOR COMMERCIAL FOODSERVICE,        | **AMENDED COMPLAINT**
24 LLC DBA TAYLOR COMPANY,               |
                                         | Date:      April 26, 2022
25            Defendants.                | Time:      10:00 a.m.
                                         | Dept.:     16
26                                       | Reservation: 418924945503

27

28

_____
D. WATKINS DECL. ISO MOTION FOR LEAVE TO AMEND COMPLAINT

**Exhibit 4**
**Page 1 of 114**

## <u>DECLARATION OF DANIEL P. WATKINS</u>

I, Daniel P. Watkins, declare as follows:

1.      I am an attorney admitted to practice in Virginia.  I am a partner in the law firm Clare Locke LLP and counsel of record for Plaintiff Kytch.  I have entered an appearance in this case *pro hac vice*.

2.      I make this declaration based upon my knowledge of the facts stated herein, and if called to testify, could and would testify competently hereto.

3.      Kytch filed this lawsuit on May 10, 2021, without the benefit of any discovery.

4.      Defendants produced documents pursuant to the Court's July 30, 2021 Order granting limited, expedited discovery.  After reviewing documents produced by Defendants in September, October, and November 2021—and representations made by representatives from McDonald's, Taylor, and Powerhouse Dynamics on November 19, 2021—Kytch obtained additional information that supports the proposed amendments.  This information was not in Kytch's possession before this time.  Consequently, Kytch seeks leave to amend its Original Complaint to plead new theories of liability based on these new facts and facts previously alleged.

5.      Counsel has worked diligently to amend Kytch's pleadings, and there is no undue delay here.

6.      The proposed First Amended Complaint ("FAC") is attached as **Exhibit A.**

7.      A comparison document highlighting the changes between the Original Complaint and the FAC is attached as **Exhibit B.**

8.      The proposed amendments dismiss Defendant J.L. Gamble Management LLC as a Defendant, add new legal claims following Kytch's review of documents produced by Defendants in discovery, add new causes of action based on these facts, and add requests for relief in Kytch's prayer based on the proposed causes of action.  In addition to the exhibits filed with the original complaint, Plaintiff has added Exhibit 4, a December 7, 2020 letter to Timothy FitzGerald.

9.      The amendments are necessary and proper because they seek in good faith to add or amend causes of action that are consistent with the facts pleaded, and failure to plead them now would deprive Kytch of the right to plead meritorious causes of action in this case.

- 1 -

**Breach of Contract**

10.     Kytch asserted this claim in the Original Complaint.  (Compl. ¶¶ 218-39.)

11.     No new parties are added as defendants in this claim.

12.     Kytch sets forth additional facts to show how Gamble breached his contractual duties in the proposed FAC.  (FAC ¶¶ 21-24; 26, 58, 63-65, 71, 73, 75, 76, 80, 83-88, 158-159, 167, 170-173; 177-178; 181-198; 215-222; and Count One.)

**Tortious Interference of Contract**

13.     Kytch previously asserted this claim for Tortious Interference of Contract as **Count Two** in the Original Complaint.  (Compl. ¶¶ 240-46.)

14.     In the Original Complaint, the claim for Tortious Interference of Contract (Count Two) was asserted only against Defendant Taylor.

15.     Kytch seeks amendment to add Defendants TFG and Gamble to the existing claim.

16.     Kytch sets forth further grounds for how Defendants tortiously interfered with Kytch's contracts in the proposed FAC.  (FAC ¶¶ 20-24, 26-34, 37-38, 42-49, 58-65, 68-70, 72-76, 78-88, 139-150, 152-153, 157-159, 166-223, 228, 233-280, 293-338, and Count Two.)

**California Uniform Trade Secrets Act**

17.     Kytch previously asserted this claim as **Count Three** in the Original Complaint. (Compl. ¶¶ 247–65.)

18.     No new parties are added as defendants in this claim.  Kytch sets forth additional facts alleging that Defendants allegedly violated the California Uniform Trade Secrets Act in the proposed FAC.  (FAC ¶¶ 20-24, 26-34, 37-38, 42-49, 58-65, 68-70, 72-76, 78-88, 139-150, 152-153, 157-159, 166-223, 228, 233-280, 293-338, and Count Three.)

19.     Kytch also moved many of the existing misappropriation allegations from the body of the complaint into the text of Count Three.

**False Advertising in Violation of the Lanham Act**

20.     Kytch seeks to add new a cause of action against Defendant Taylor as **Count Four** in the FAC for false and misleading statements in violation of the Lanham Act.

D. WATKINS DECL. ISO MOTION FOR LEAVE TO AMEND COMPLAINT

**Exhibit 4**
**Page 3 of 114**

21.    Kytch sets forth further grounds for why Taylor's and McDonald's statements constitute false advertising in the proposed FAC. (*Id.* at ¶¶ 1-42, 49, 53, 56-65, 74, 76, 93-338 and Count Four.)

**False Advertising in Violation of Cal. Bus. & Prof. Code § 17500**

22.    Kytch seeks to add new a cause of action against Defendant Taylor as **Count Five** in the FAC for false and misleading statements in violation of California Business and Professional Code § 17500.

23.    Kytch sets forth further grounds for why Taylor's and McDonald's statements constitute false advertising in the proposed FAC. (FAC at ¶¶ ¶¶ 1-42, 49, 53, 56-65, 74, 76, 93-338 and Count Five.)

**Trade Libel**

24.    Kytch seeks add a new cause of action for Trade Libel against Defendant Taylor as **Count Six** in the FAC.

25.    Kytch sets forth further grounds for why Taylor is liable for trade libel in the proposed FAC. (*Id.* at ¶¶ 1-42, 49, 53, 56-65, 74, 76, 93-338 and Count Six.)

**Intentional Interference with Business Expectancy**

26.    Kytch seeks to add new a cause of action against all Defendants as **Count Seven** in the FAC for Intentional Interference with Business Expectancy.

27.    The proposed FAC alleges that Defendants intentionally interfered with Kytch's contractual and other business relationships with McDonald's franchise operators. (*Id.* at Count 7.)

**Negligent Interference with Business Expectancy**

28.    Kytch seeks to add new a cause of action against all Defendants as **Count Eight** in the FAC for Negligent Interference with Business Expectancy.

29.    The proposed FAC alleges that Defendants negligently interfered with Kytch's valuable contractual and other business relationships with McDonald's franchise operators. (*Id.* at Count Eight.)

D. WATKINS DECL. ISO MOTION FOR LEAVE TO AMEND COMPLAINT

**Exhibit 4**
**Page 4 of 114**

**California's Computer Data Access and Fraud Act, Cal. Penal Code § 502**

30.    Kytch seeks to add new a cause of action against all Defendants as **Count Nine** in the FAC for violation of the California Computer Data Access and Fraud Act, Cal. Penal Code § 502(e).

31.    The FAC alleges that Defendants violated multiple subsections of California Penal Code § 502(c) when they improperly accessed Kytch's computer systems and networks.

32.    Kytch sets forth further grounds for how the Defendants allegedly violated Penal Code § 502(c) in Count Nine.

**Deceptive Trade Practices, Cal. Bus. & Prof. Code § 17200**

33.    The proposed FAC adds a new a cause of action against all Defendants as **Count Ten** in the FAC for deceptive trade practices in violation of California Business and Professional Code § 17200.

34.    Kytch sets forth further grounds for how the Defendants allegedly violated Cal. Bus. & Prof. Code § 17200 in Count Ten.

**Breach of Contract**

35.    The proposed FAC adds a new a cause of action against TFG as **Count Eleven** in the FAC for violating Kytch's Terms of Service

36.    Kytch sets forth further grounds for how the Defendants allegedly breached the Terms of Service in the proposed FAC. *(Id.* ¶¶ 20, 23, 61, 68, 72, 181-205, 210, 212, 271, 278, 321, 323-326, 334-338, and Count 11.)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 22nd day of March 2022 in Alexandria, Virginia.

By:    *Daniel P. Watkins*

Daniel P. Watkins

- 4 -
D. WATKINS DECL. ISO MOTION FOR LEAVE TO AMEND COMPLAINT

**Exhibit 4**
**Page 5 of 114**

**<u>EXHIBIT A</u>**
**<u>TO THE DECLARATION OF DANIEL WATKINS</u>**

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

**Exhibit 4**
**Page 6 of 114**

Jason Sheasby SBN 205455
jsheasby@irell.com
IRELL & MANELLA
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4267
Telephone: (310) 277-1010
Facsimile:  (310) 203-7199

Elizabeth M. Locke, P.C. (pro hac vice)
libby@clarelocke.com
Daniel P. Watkins (pro hac vice)
daniel@clarelocke.com
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
Facsimile:  (202) 478-0475

John C. Kirke SBN 175055
jkirke@donahue.com
Andrew S. Mackay SBN 197074
amackay@donahue.com
DONAHUE FITZGERALD LLP
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520
Telephone: (510) 451-3300
Facsimile:  (510) 451-1527

*Attorneys for Plaintiff Kytch, Inc.*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| KYTCH, INC., | Case No.  RG21099155 |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL** |
| v. | **REDACTED** |
| JONATHAN TYLER GAMBLE; TFGROUP LLC;  AND TAYLOR COMMERCIAL FOODSERVICE, LLC DBA TAYLOR COMPANY, | 1.  Breach of Contract<br>2.  Tortious Interference of Contract<br>3.  Misappropriation of Trade Secrets<br>4.  Lanham Act<br>5.  False Advertising |
| Defendants. | 6.  Trade Libel<br>7.  Intentional Interference with Business Expectancy<br>8.  Negligent Interference with Business Expectancy<br>9.  Computer Data Access and Fraud Act<br>10. Deceptive Trade Practices<br>11. Breach of Contract |
| | [Filed Concurrently with Plaintiff's Notice of Lodging Conditionally Under Seal] |

**PUBLIC - REDACTS MATERIAL FROM CONDITIONALLY SEALED RECORD**

**PRELIMINARY STATEMENT[1]**

1.      This is a case about corporate espionage and the extreme steps one manufacturer has taken to conceal and protect a multimillion-dollar repair racket.

2.      McDonald's is best known for its world-famous burgers, fries, and broken ice cream machines.



> **McDonald's[7]** ✔ @McDonalds · Aug 11, 2020                                    ...
>
> we have a joke about our soft serve machine but we're worried it won't work
>
> 💬 862          �retweet 4.5K          ♡ 29K                              ⬆

3.      Despite McDonald's Corp. poking fun at its problematic machines, this is no laughing matter to the McDonald's franchise operators forced to shoulder the expensive maintenance and repair costs when the machines are out of commission.

4.      Back in 2003, McDonald's gave an effective monopoly to manufacturing giant Taylor Company ("Taylor") to provide soft-serve machines for its approximate 14,000 retail locations in the United States.  The problem is Taylor designed its software so that only Taylor-certified technicians can service and repair the machines.  Taylor's own documents confirm that in 2017 alone, 6,500 Taylor-certified technicians brought in almost $80 million in revenue for parts and service support.[2]

5.      This may explain why Taylor has failed to identify a global solution to fix the buggy machines.  Especially in light of the fact that McDonald's customers across the country have taken to Twitter and other social media platforms to complain about the machines.  One customer expressed that he was unwilling to go to McDonald's because, "I can't deal with disappointment of [the] ice cream machine being broken today."[3]

---

[1] Kytch pleads the following recitals with knowledge of its own conduct and on information and belief of the behavior of Defendants.

[2] The Middleby Corporation: Taylor Acquisition Overview, (May 18, 2018), https://middlebycorporation.gcs-web.com/static-files/5bd70207-96b1-48bd-a4a2-70dce00a247a.

[3] Bakari Sellers (@Bakari_Sellers), Twitter (April 16, 2021, 3:39 p.m.) https://twitter.com/Bakari_Sellers/status/1383143104941801474?s=20.

1

2

3

4

5

6

7



**Bakari Sellers** ✓
@Bakari_Sellers

It's been a long week. I'm about to go sit at @Wendys and dip my fries in a Frosty.

I would go to McDonalds but I can't deal with disappointment of ice cream machine being broken today.

3:39 PM · Apr 16, 2021 · Twitter for iPhone

**402** Retweets   **92** Quote Tweets   **11.2K** Likes

8    6.    For almost two decades, it appeared that Taylor's broken machines would never be

9    fixed. Until a small California tech startup called Kytch, Inc. cracked the code in April 2019. During

10   product testing and development, Kytch used a proprietary combination of hardware, software, and

11   machine learning to demystify the finicky machines.

12   7.    Kytch soon uncovered a repair racket whereby Taylor designed flawed code that

13   ***caused the machines to malfunction***. Whether Taylor intentionally designed these flaws or merely

14   did not care enough to ensure bug-free code will become clear during discovery. Either way,

15   Taylor's web of partners profited millions in repair fees for the malfunctions that it manufactured.

16   8.    A number of Taylor's customers at McDonald's have reported that Taylor's

17   technicians made unauthorized changes to software that frequently resulted in expensive—and

18   otherwise unnecessary—repairs. Some franchise operators have reported shelling out thousands of

19   dollars per month in service fees to Taylor through its many franchised distributors (including

20   Defendant TFGroup, LLC ("TFG")).

21   9.    To maintain its lucrative repair and service market, Taylor employs a hidden

22   "Technician's Menu" to conduct even basic maintenance on the machine. Until Kytch entered the

23   marketplace, only Taylor-certified technicians had the tools and know-how to navigate the

24   machines' volatile operations and software.

25   10.    That changed when Kytch launched its flagship device Kytch Solution in spring 2019

26   as part of a confidential product trial to limited fast-food restaurants. Kytch spent years developing

27   a trade secret man-in-the-middle technology to unlock the cryptic machines ("Kytch Solution

28

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 9 of 114**

Device" or "KSD"). Kytch also designed an online system ("Kytch Solution Platform" or "KSP") for its customers to manage and monitor their machines. The Kytch Solution Platform is equipped with a user-friendly interface to finally simplify the difficult Taylor machines that were designed to fail.

11.    Kytch originally agreed to provide its top-secret technologies and user interface to trial participants under strict non-disclosure and non-use agreements (the "Kytch Trial Agreement" and "Terms of Service"). The Kytch Trial was an overnight sensation, and media outlets reported on the innovative technology that promised to reduce the machines' downtime and to consistently deliver more frozen treats to McDonald's customers.

12.    In 2019, Kytch launched a confidential product trial (the "Kytch Trial") after dedicating significant capital to develop the solution. The product trial allowed Kytch to aggregate and analyze machine hours to create automated adjustment that reduce the machines' downtime. By analyzing this customer data in real-time, Kytch created and fine-tuned a proprietary alert and notification system wildly popular with customers, launching Kytch's rapid market growth and instant success.

13.    By contrast, Taylor has spent twenty years—since 2002—attempting to develop its own IoT solution for its broken machines. But Taylor's product (unlike Kytch's) will not permit users to fix its broken machines—only to monitor them in a limited fashion. This arrangement enables Taylor to retain the revenue from its lucrative repair business. Regardless, Taylor's limited IoT product, called "Open Kitchen," has never launched—because Taylor is not a software company and, until very recently, it lacked the knowhow.

14.    Recognizing these limitations, in April 2019, Taylor's parent company, The Middleby Corporation, purchased a tech company called Powerhouse Dynamics ("PHD") to try to modernize Taylor's machines. But these efforts to date, have faltered.

15.    By the end of 2019, Taylor stopped "further development on its own IoT platform" after McDonald's tabled Taylor's proposed solution as premature for its restaurants. Taylor and PHD's IoT project remained dormant until a February 2020 *Business Insider* article about Kytch

- 4 -

1  highlighted many of the problems with Taylor's machines and described Kytch as a viable solution

2  to "correct[] unnecessary malfunctions" that cause downtime.

3        16.      The article described Kytch's success and explains that McDonald's operators were

4  relying on the Kytch Solution to manage Taylor's finicky machines.  The positive coverage about

5  Kytch angered Taylor and McDonald's.  So the two companies joined forces to drive Kytch out of

6  the marketplace.

7        17.      Because Kytch Solution reduces the need for Taylor service technicians to repair the

8  machines, Kytch's leadership was not surprised when Taylor attempted to obtain the

9  Kytch Solution.  First, one of Taylor's technology distribution managers tried to purchase a device,

10  but Kytch's security protocol flagged and blocked the purchase.  Then, a lawyer employed by

11  Taylor's outside counsel attempted to purchase the Kytch Solution.  Kytch blocked this second

12  attempt.  After that, two private investigators associated with Taylor used aliases and dummy email

13  addresses to get their hands on the device.  Once again, Kytch canceled the orders.

14        18.      As Kytch's product trial expanded in 2020, it became the largest independent

15  IoT/connectivity software vendor for the shake machine in the McDonald's system.  By all

16  appearances, the Kytch Solution Device modernized the outdated soft-serve machines that had

17  frustrated customers for years.

18        19.      Based on this rapid growth, Kytch built a reputation as an emerging leader in the

19  fast-growing IoT industry.  Kytch was barreling towards a $50 million valuation, and the company

20  kicked off a $10 million Series A fundraising round in October of 2020.

21        20.      Unable to compete fairly with Kytch, McDonald's and Taylor enlisted a group of

22  Kytch Trial participants to develop a competing product that would prevent Kytch from fixing the

23  machines.  McDonald's and Taylor relied on Taylor's franchise distributors—including TFG—to

24  identify and solicit Kytch's customers to obtain Kytch's innovative technology.

25        21.      Taylor and McDonald's held bi-weekly meetings devoted to copying Kytch's

26  technology from the Kytch Trial participants.  Meeting minutes describe focus group sessions with

27  Kytch customers and confirm that Taylor accessed valuable and nonpublic insights into Kytch's

28

features, user experience, customer preferences, and alert management protocols—"[f]eatures from Kytch" that McDonald's and Taylor admitted "we're lacking."

22.    Taylor COO James "Jim" Minard accessed the password-protected portions of Kytch's online interface, the KSP, during a Zoom conference call on June 23, 2020.  He did so by using Tyler Gamble's confidential login credentials, just months after Kytch refused to sell or license its product to Taylor without an NDA.

23.    TFG improperly obtained a physical KSD from Tyler Gamble in May 2020, and Gamble provided TFG his login credentials to the KSP the following month.   Using this unauthorized access, TFG sent Taylor screen captures depicting password-protected portions of the KSP.  And McDonald's, Taylor, PHD, and TFG coordinated to add features to Open Kitchen using feedback from Kytch's customers based on their user experience with Kytch.

24.    Despite this insider access to Kytch's confidential product trial, Taylor's Open Kitchen could not keep up with Kytch.  In mid-October 2020, after having access to the Kytch Solution for months—Open Kitchen was still "not ready to commercialize."

25.    Kytch was the only product on the market that was positioned to fix Taylor's soft-serve machine.  Kytch soon gained market dominance after the largest organization of independent McDonald's operators—the National Owners' Association ("NOA")—endorsed Kytch at its national conference.

26.    Taylor and McDonald's took note.  McDonald's Director of Global Equipment, Mike Zagorski, directed that "[t]hings need to go much faster" with Taylor's Open Kitchen development, which was moving at a "turtle[']s pace."  And McDonald's warned Taylor that independent restaurant operators were demanding that McDonald's integrate Kytch into the McDonald's system.  This threatened to undermine Taylor's longstanding service and repair racket that the new Open Kitchen device was being designed to protect.  Taylor and McDonald's needed to buy more time to get Open Kitchen to the market.

27.    To that end, Taylor and McDonald's worked together to create a stall tactic. Together they fabricated bogus "safety" claims to mislead Kytch's customers into believing that

1  safety testing determined that the Kytch Solution would cause "serious human injury" to users—

2  claims that are, and that Taylor and McDonald's both knew at the time to be, demonstrably false.

3

4  **Dear Operators,**

5  We are pleased to share that the McDonald's GSSS-Equipment Team, in partnership with the NSLC Equipment Sub-
Team, has been working on a strategic connectivity solution with Taylor for their Shake Sundae machine. This solution

6  will allow operators to receive text updates from their machine when it's down, and provide data on products
dispensed, as well as other relevant information, to help restaurants keep the machine running in its optimal

7  condition. This solution is being designed with long term benefits in mind, and would enable future connection with
other equipment in the restaurants.

8  *The Taylor Shake Sundae Connectivity (TSSC) is currently in test with NSLC operators and the current target for release
to the US market is by the end of Q1, 2021.*

9
   IMPORTANT NOTE: We have become aware that a few operators may be using an unapproved aftermarket

10  technology, Kytch, on their Shake Sundae machine. As a reminder, any operator that is using this aftermarket "add-
on" to any of their machines, will completely void any existing OEM equipment warranty. Additionally, any machine

11  failures that are associated with the installation of Kytch during or after warranty expires, will be the sole
responsibility of the operator, not the OEM supplier. The Kytch device allows complete access to all aspects of the

12  equipment's controller and confidential data, including areas where only certified technicians should have access,
creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it. Even more

13  concerning, McDonald's has recently determined that the Kytch device creates a potential very serious safety risk for
the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the

14  device to change its operation or continue running during cleaning or maintenance, in a manner that can cause
serious human injury. As such, McDonald's strongly recommends that you remove the Kytch device from any

15  machines and discontinue all use, and is reminding you that any continued use is not approved and is at your sole risk.

    For any immediate questions or concerns, please contact any one of the following individuals below:
16      •    Taylor – Scott Nicholas, scott.nicholas@taylor-company.com
        •    McDonald's GSSS - Equipment Engineering, Mike Zagorski, mike.zagorski@us.mcd.com
17      •    McDonald's GSSS – Equipment Supply Chain, John Sulit, john.sulit@us.mcd.com

18         28.    Taylor was surprised that McDonald's was so willing to go out of its way to disparage

19  and defame the KSD. But the reason for McDonald's eagerness was clear—the false safety alert

20  was a pretext to "promote the new connectivity platform" that Taylor and McDonald's needed time

21  to develop and market to McDonald's independent owners that were clamoring for an affordable fix

22  to Taylor's soft-serve machines.

23  **From:** Nicholas, Scott
    **Sent:** Tuesday, October 27, 2020 7:18 AM

24  **To:** Dobrowolski, Jeremy <Jeremy.Dobrowolski@Taylor-Company.com>
    **Subject:** Re: US Comm to Operators on Taylor SS Connectivity

25
    I am a bit in shock that they are willing to take such a strong position. Beyond their Kytch statement, I think we want to

26  be promote the new connectivity platform as a PHD concept. If the names Kytch and Taylor are the only names used, I
    feel there will be unnecessary hard feelings towards us.

27

28

                                         - 7 -

29.     The claims in the ad about Kytch are demonstrably false and materially misleading to consumers.  ***First,*** contrary to their assertions, Taylor has filed sworn declarations that they never tested the Kytch Solution.  Both McDonald's and Taylor tried to obtain the devices through Kytch, but they were unwilling to sign binding NDA/non-compete agreements to do so.  ***Second,*** Intertek, an industry leader in quality and safety product testing, has certified that Kytch satisfies all electrical safety requirements in accordance with Underwriters Laboratories (UL) and FCC regulations. These are the same standards that apply to ***Taylor's*** soft-serve machines used in McDonald's locations throughout North America.  ***Third,*** Kytch was founded for the very purpose of, and has been in fact, ***improving*** the safety and reliability of the soft-serve machines at McDonald's, and Kytch has never received a single report of injury caused by the Kytch Solution.  ***Fourth,*** far from being comparatively more dangerous than Taylor's competing device, the Kytch Solution integrates (and is constrained by) the soft-serve machines' safety mechanisms.  For example, when the freezer door is removed exposing interior parts of the machine that might create a safety risk, a magnetic interlock system disables motor function to protect the operator from injury, and Kytch cannot operate the machine remotely.  Thus, while Kytch does have the ability to remotely control the machine, it is limited by Taylor's existing control mechanisms—including this magnetic interlock system—to ensure safety.  ***Fifth***, Kytch's interface gives users complete monitoring and control, in real-time, of the Kytch Solution's functions.

30.     Because of these safeguards and certifications, there is compelling direct evidence that conclusively disproves McDonald's claims that the Kytch Solution is unsafe and uncontrollable.

31.     Taylor and McDonald's knew that their claims were false because Tyler Gamble— Taylor and McDonald's primary source for intelligence about Kytch—told them so.  In the days before Taylor and McDonald's false and deceptive ads were published, Gamble sought safety information from Kytch's founder, Jeremy O'Sullivan, and unbeknownst to Kytch, forwarded O'Sullivan's explanation for why any safety concerns were baseless:

"There are a number of layers of protection.  First, the machine should be powered

off and unplugged before any work is started.  This is a standard safety for any

equipment.  Second, there is a sensor on the freezer door that when the freezer door is removed prevents the motor from turning on.  Third, we do have a mechanism in place that disables any automation when a user takes control of the front panel by pressing any buttons.  Also the product has been tested and certified for safety to UL standards by Intertek labs."

32.     Taylor and McDonald's received and understood these facts, but intentionally and recklessly disregarded them and falsely accused Kytch of being prone to cause "serious human injury."  Taylor and McDonald's published these false claims to all of Kytch's current customers and many of its potential customers, including to all McDonald's operators in North America (and to Coca-Cola and Burger King).  At the same time, Taylor and McDonald's announced that Taylor would be launching its competing Open Kitchen device in Q1 2021 despite knowing all along they could never meet this deadline.  The purpose: to convince McDonald's restaurant owners to cancel their contracts with Kytch and thwart Kytch's forward momentum in the market giving Taylor and PHD time to develop their competing Open Kitchen system.

33.     Indeed, a full eight months before Taylor's and McDonald's false ads, McDonald's insiders informed Kytch that Taylor and McDonald's would fabricate safety concerns to destroy Kytch's business: "If they don't want [Kytch] in the market, they're going to throw that [safety] stuff at you [to throw you] under the bus.  And keep putting that at you until you go away eventually."

34.     Those words were prescient.

35.     Taylor's advertisements fail to provide substantive details regarding Kytch's supposed operational safety risks or what "potential equipment reliability issues" the KSD causes—because these are complete fabrications.  Rather, *Taylor* has intentionally created "equipment reliability issues" for years, and its service department has charged hundreds of millions of dollars in fees for repairs that Taylor itself caused.

36.     To date, Taylor still has not released Open Kitchen but its Chief Operating Officer has represented to this Court that it is "nearly complete."  As alleged in the original complaint,

Taylor improperly obtained Kytch's confidential and trade secret information to assist in the development of a competing device. This, in combination with the false advertising attacking the safety of the Kytch device allowed Taylor and PHD to gain a head start to launch Open Kitchen using proprietary insights that came from years of Kytch's costly product development.

37.    The damage to Kytch was instant and monumental. Customers contacted Kytch in the days following the ads and canceled their subscription because of McDonald's false assertions that Kytch was unsafe and prone to cause serious human injury. Kytch had been barreling towards a $50 million valuation in 2020 as it quickly expanded to fast-food restaurants throughout the country—and its valuation in the following year was expected to be exponentially more.

38.    That all changed after the false ads, and Kytch was soon unable to court investors to help fund its exponential growth trajectory. Taylor and its co-Defendants' unlawful conduct had dire financial consequences for Kytch, its founders, investors, and its employees.

39.    Nine months earlier, Gamble approached Kytch and explained that he was the head of McDonald's Equipment Team, the committee responsible for recommending new products to McDonald's Corp.

40.    At first, Gamble appeared to support Kytch's mission; Gamble even indicated that he would push McDonald's to purchase Kytch Solution Device for all of its U.S. locations.

41.    Kytch is informed and believes this was a ruse.

42.    In reality, Kytch is informed and believes that Gamble was working hand-in-hand with Kytch's competitor Taylor to steal Kytch's trade secrets. As part of this unlawful scheme, Gamble breached the Kytch Trial Agreement and Terms of Service last summer by soliciting Kytch's most sensitive information, only to share it with Taylor through one of its distributors.

43.    Kytch is informed and believes that Taylor's distributor shared Kytch's trade secrets with the manufacturing giant to enable Taylor to monitor Kytch's development. With insider access to Kytch's trade secret information, Taylor could stay one step ahead of Kytch's diagnostic capabilities.

44.    On November 1, 2020, Kytch sent a message to Gamble (and no one else) ███████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

45.    Kytch is informed and believes that news of Kytch's operating system led to Taylor's decision to launch its own competing device rapidly to preserve its repair racket.

46.    Tyler Gamble knew he was acting improperly. In February 2021, Tyler Gamble and his father tried to delete the electronic invitations they sent out to unauthorized third parties providing access to the Kytch Solution Platform.

47.    These uses of Kytch's confidential information were unauthorized, they have cost Kytch untold millions of dollars, and they will certainly cause Kytch further damage in the future; Defendants have also been unjustly enriched through violating contractual obligations and by exploiting Kytch's confidential information.

48.    Defendants' conduct has come close to destroying Kytch.

49.    Accordingly, Defendants must make Kytch whole for the damage caused by their unlawful conduct, and the Court should, as required by the Kytch Trial Agreement and the Terms of Service, enjoin them from further using Kytch's confidential information and trade secrets.

## PARTIES

### *Kytch's Background.*

50.    Plaintiff Kytch, Inc. is a Delaware corporation with its principal place of business in Alameda County, California. Kytch is a subsidiary of Frobot, Inc. At all times relevant, Kytch operated in Fremont, California, which was the site of its system, intellectual property, and trade secrets. Kytch considered the Kytch Solution and aspects of the KSP to be confidential trade secrets that it would only disclose under a confidentiality agreement.

- 11 -

51.    Kytch's data-driven product testing ultimately yielded next-generation IoT technology that cemented the company's status as a leader in the industry.

52.    Kytch launched its flagship device, the Kytch Solution, in Spring 2019 as part of a confidential product trial to limited fast-food restaurants (the Kytch Trial).  Kytch spent years developing a trade secret man-in-the-middle technology (known as the KSD), to unlock Taylor's cryptic soft-serve machines.  Kytch also designed an online system, the KSP, for its customers to manage and monitor their machines.  The KSD and the KSP are referred to collectively as the "Kytch Solution." The KSP is equipped with a user-friendly interface to simplify the non-user-friendly Taylor machines.

53.    Kytch uncovered a repair racket whereby Taylor designed flawed code that *caused the machines to malfunction.*  One of Taylor's service partners described this arrangement as a "money trap," and further explained that Taylor's "service department will reap the benefits of [the] steady stream of repair bills" to keep the machines up-and-running.

54.    Kytch originally agreed to provide its confidential technologies and user interface to trial participants under strict non-disclosure and non-use agreements (the "Kytch Trial Agreement" and "Terms of Service").  The Kytch Trial was an overnight sensation, and media outlets reported on the innovative technology that promised to reduce the machines' downtime and to consistently deliver more frozen treats to McDonald's customers.

55.    As the Kytch Trial expanded in 2020, it became the largest independent IoT/connectivity software vendor for the shake machine in the McDonald's system.  By all appearances, the KSD modernized the outdated soft-serve machines that had frustrated customers for years.

56.    Through years of development, Kytch has built expertise, proprietary insights, diagnostic tools, and notification systems for the growing "smart kitchen" marketplace.

57.    Kytch's founders, Jeremy O'Sullivan and Melissa Nelson have worked with Taylor's executive team for years.  Taylor shipped soft-serve machines to Kytch in California, and Defendants knew that Kytch was operating in California and that it was actively protecting its

1  proprietary information through non-disclosure agreements and industry-leading security measures
2  described in more detail below.

3      58.    Defendants' misconduct injured Kytch.  Kytch suffered significant loss of revenues
4  and profits because of Taylor and McDonald's misconduct, which caused, among other things, a
5  decline in Kytch's sales.  Kytch will suffer significant loss of revenues and profits in the future due
6  to Defendants' misconduct, which has caused, among other things, a decline in Kytch's sales
7  compared to prior years and earlier forecasts.  And Kytch lost valuable intellectual property and
8  suffered reputational damage because of Defendants' unlawful acts.

9              ***Background of Taylor, McDonald's and Their Co-Conspirators.***

10     59.    Defendant Taylor Commercial Foodservice, LLC DBA Taylor Company is
11  incorporated in Delaware, and it manufacturers soft-serve machines for McDonald's and other
12  commercial kitchens.  Taylor's CEO Jeremy Dobrowolski, its COO James Minard, and its Senior
13  Business Manager for McDonald's Scott Nicholas directed, supervised, oversaw, and participated
14  in the misappropriation of Kytch's trade secrets and the unlawful competition alleged herein.

15     60.    McDonald's Corporation is a Delaware corporation with its principal place of
16  business in Oak Brook, Illinois.  McDonald's Director of Global Equipment Development,
17  Mike Zagorski, and its Global Director of Strategic Sourcing, John Sulit, directed, supervised, and
18  oversaw the misappropriation of Kytch's trade secrets and the unfair competition campaign alleged
19  herein.

20     61.    TFGroup LLC ("TFG") is a Louisiana limited liability company that is a franchised
21  distributor for Taylor.  TFG describes itself as utilizing "analytical advances to ensure speed of
22  service, reduction of equipment downtime and labor savings."  TFG, through its principal
23  Blaine Martin, its repair technician Ben Rhodes, and others, misappropriated Kytch's trade secrets
24  and attempted to reverse engineer the KSD.

25
26
27
28

- 13 -
REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 19 of 114**

62.    Jonathan "Tyler" Gamble operates ten McDonald's restaurants in Tennessee and Mississippi. Gamble is an independent franchise owner, and at all times relevant he served as the Equipment Team Lead for McDonald's National Supplier Leadership Council.[4]

63.    Gamble enrolled in the Kytch Trial after executing the binding Kytch Trial Agreement and after representing that he and his company would not use Kytch's trade secrets to "build or support, and/or assist a third party in building or supporting products or services competitive" to Kytch. (Kytch Terms of Service, § 1(g).)

64.    The Kytch Trial Agreement incorporates Kytch's binding Terms of Service, and those provisions, among other things, prohibit Gamble from "providing unauthorized access or exceeding authorized access to [Kytch's] products, services or any account." (Kytch Terms of Service, § "Notice.")[5]

65.    Kytch is informed and believes in committing the acts or omissions alleged in this First Amended Complaint, each of these parties conspired with, aided and abetted, or acted in concert with each other. Under principles of *respondeat superior* and similar doctrines, Defendants are liable for the acts and omissions of their employees and agents.

## JURISDICTION & VENUE

66.    This Court has already correctly concluded that Defendants Taylor, Gamble, and TFG are properly subject to this Court's jurisdiction. Defendants conduct business in California. Defendants have sufficient minimum contacts with California, and otherwise purposefully avail themselves of the markets in this State through the research and development of products in California, thereby rendering the exercise of jurisdiction by California courts permissible under traditional notions of fair play and substantial justice.

67.    The Court has jurisdiction over Defendants because they spent significant time and resources obtaining information about the Kytch Solution from Kytch in California. Taylor worked

---

[4] This complaint refers to the National Supply Leadership Counsel as the "NSLC," and the NSLC's Equipment Team as the "McDonald's Equipment Team."

[5] Copies of the Kytch Trial Agreement and the Terms of Service that bind Gamble, TFG, and the other Kytch Trial participants are attached as **Exhibit 1.**

with McDonald's to direct Gamble, Eric Wilson, and others to secure a KSD and to obtain access to the KSP.  Defendants consented to jurisdiction and venue in the court of Alameda County, California as the proper forum to litigate any disputes arising from and relating to the Kytch Trial Agreement and the Terms of Service.

68.    Taylor repeatedly contacted Kytch's founders in Fremont, California, as part of its efforts to misappropriate Kytch's trade secrets and to confirm the KSDs were shipped out from Kytch in California.  Taylor and TFG were able to access the online Kytch Solution Platform in Fremont, California, using login credentials that they knew were not theirs, and to intercept hard-to-detect errors and problems on Taylor's soft-serve machines.

69.    Taylor's years-long efforts to obtain a KSD from Kytch in California are indisputable.  Taylor dispatched its Technology Distribution Manager Heather Jordan and others to complete purchase orders for KSDs.  Taylor hired outside counsel and utilized private investigators using assumed names to try to circumvent Kytch's security protocol.  Taylor and the remaining Defendants have reviewed Kytch's Terms of Service and its website, both of which identify Fremont, California, as Kytch's headquarters and nucleus of operation.

70.    Taylor targeted Kytch's California-based customers and its California-based proprietary technology to unlawfully compete with Kytch and to drive the startup out of the "smart kitchen" industry.

71.    This Court has jurisdiction over Gamble because this action arises out of his business activities with Kytch in California, including that Gamble has transacted business and has caused injury to Kytch in California.  Gamble consented to jurisdiction and venue in the court of Alameda County, California, as the proper forum to litigate any disputes arising from and relating to the Kytch Trial Agreement and the Terms of Service.

72.    TFG consented to jurisdiction and venue in California for any disputes or litigation arising from and relating to Kytch's Terms of Service.

73.    Each Defendant had actual notice that it was dealing with a California company whose system resides on servers in California, and Kytch considered aspects of the Kytch Platform

- 15 -

to be confidential trade secrets that it would only disclose under a non-disclosure agreement. This Court has personal jurisdiction over Defendants because they committed many of the acts that form the basis of Kytch's claims—including misappropriating Kytch's California-based trade secrets and disseminating false advertisements—in Alameda County, California.

74.    Taylor directed false advertisements and libelous statements to Kytch's customers and potential customers throughout the state of California.

75.    Defendants intentionally committed torts against Kytch in Alameda County, and they intended to harm California, and to damage Kytch in its residence.  Kytch suffered the financial and reputational consequences of Defendants' conduct in Alameda County, in part because the false advertising and misappropriation of trade secrets occurred here.

76.    The acts alleged in this First Amended Complaint occurred and the damages to Kytch were inflicted and occurred in substantial part in California and within Alameda County.

## **BACKGROUND FACTS**

***To Protect the Company's Trade Secrets and Confidential Information, Kytch's Trial Agreement Contains Non-Disclosure and Non-Use Provisions.***

77.    Kytch's data-driven product testing ultimately yielded next-generation IoT technology that cemented the company's status as a leader in the industry.

78.    Through years of development and $1.3 million of effort, Kytch has built expertise, proprietary insights, diagnostic tools, and notification systems for the growing "smart kitchen" marketplace.

79.    In February 2020, Tyler Gamble first contacted Kytch and asked to enroll in the Kytch Trial.  Because one of Kytch's key strategic advantages lies in its proprietary information, Kytch required Gamble to enter into a non-disclosure agreement to protect Kytch's trade secrets and confidential information.  Gamble executed the Kytch Trial Agreement (the "NDA") on March 19, 2020.[6]

---

[6] The NDA refers to the Kytch Trial Agreement and the Terms of Service incorporated in that document.

1

This Agreement is effective as of ___03 / 19 / 2020___, 2020 (the "Effective Date"), by and between:

*J Tyler Gamble*

2

3

4

5    80.    The NDA reflects the fundamental nature of the business relationship Kytch has with

6  its customers.  Kytch is in the midst of developing its solution to the broken machines with the need

7  to collect more data for the Kytch Trial.  Gamble is in charge of identifying new and innovative

8  products for McDonald's, and the ice cream machines in his ten stores were constantly breaking

9  down.

10    81.    Kytch's customers sought out Kytch's data-driven approach to fixing the machines.

11  Kytch, on the other hand, needed to make sure that one of its chief assets—its innovative hardware

12  and software were protected from competitors.

13    82.    Kytch would never just give away its trade secrets for free or so that Gamble could

14  use them for his benefit, much less to benefit Kytch's competitors in the rapid-paced IoT industry.

15  The NDA memorializes how the parties came together around these competing interests: Gamble

16  was obligated and agreed to keep confidential the information and devices Kytch provided, and he

17  could use it only in furtherance of the Kytch Trial.

18    83.    The NDA states that Kytch Trial participants and those who accepted the Terms of

19  Service "may not and may not directly or indirectly cause, permit, or allow others to . . . make

20  [Kytch's] Products or Services, including any Kytch programs or materials to which you are

21  provided access, available *in any manner to any third party*."  Terms of Service §1(g).

22    84.    The NDA also prohibits "access[ing] or us[ing] [Kytch's] services in order to build

23  or support, and/or assist a third party in building or supporting, Products or Services competitive to

24  Kytch."  Likewise, Kytch Trial participants and users must not "disclose the results of the

25  performance of [Kytch's] Products and Services without Kytch's prior written consent."  *Id.*

26    85.    Further, Kytch Trial participants "shall not, and shall not cause or permit others to .

27  . . distribute or republish all or any part of [Kytch's] Products or otherwise access or use the Products

28

in order to build or support, and/or assist a third party in building or supporting products or services competitive to any Kytch Products." To avoid doubt, the NDA expressly forbids "display[ing] . . . or mak[ing] the Kytch Products available to (or use such Products for the benefit of) any third party." Kytch Trial Agreement § D.

86.     Finally, the NDA limits use of Kytch's products to the Kytch Trial, and Kytch Trial participants and users must not utilize "the Products for any business other than" the Kytch Trial, and they cannot use the Products or disclose any of Kytch's confidential information "for any purpose other than [] evaluat[ing] the [Kytch] Solution" as part of the Kytch Trial. Kytch Trial Agreement § J.

87.     With these contractual protections in place, Kytch gave customers access to a substantial amount of proprietary information and confidential documents. Kytch also sent several Kytch Solution Devices—each protected by the NDA—for Gamble and the other Kytch Trial participants to use at their McDonald's locations for one purpose: to support and further the Kytch Trial.

88.     Kytch shared its confidential and proprietary hardware and software designs with Gamble and the other Kytch Trial Participants. As explained further below, Kytch is informed and believes that Gamble and other Kytch Trial participants, betrayed Kytch, and their contractual obligations, when they used Kytch's own confidential information to compete against the company. This has caused irreparable harm to Kytch.

89.     Kytch required that this information be protected with the NDA because this confidential information is at the heart of Kytch's business model and is what sets it apart from its competitors, specifically Taylor and TFG.

90.     Kytch's proprietary materials offer a roadmap for a strategy that has never before been attempted in the soft-serve machine industry: using man-in-the-middle technology to communicate with the finicky machines and to stabilize volatile software, all while providing real-time notifications to customers. This offering reduced the need for restaurant operators to pay costly repairs fees to Taylor and TFG.

REDACTED VERSION - FIRST AMENDED COMPLAINT
Exhibit 4
Page 24 of 114

91.     Kytch introduced the industry to the revolutionary notion that these industrial machines should be controlled by the restaurant owners and artificial intelligence, and that by demystifying the complicated machines and reducing the need for costly service technicians, Kytch could save its customers millions of dollars in recaptured revenue and reduced overhead. Kytch's cohesive strategy promises enormous returns, far in excess of current outputs from Taylor's technology.

92.     Successfully executing this strategy would require a combination of innovative thinking, expertise in the fast-food industry, and sensitivity to customer needs, together with a willingness to invest significant time and resources into creating the analyses and conducting the product testing to turn the strategy into a thriving business. Since its inception, Kytch has invested time and effort building out, in painstaking detail, the Kytch Solution Device and the Kytch Solution Platform.

### Taylor's Ice Cream Machines Are Notorious for Always Breaking Down.

93.     The majority of McDonald's restaurants are equipped with Taylor Model C602 soft-serve machines.

94.     Although Taylor occupies a substantial share of the market, its machines have been described as unreliable and "notorious for constantly breaking down."

95.     The machines' reputation for breaking led *The Wall Street Journal* to explain in a recent story that "[t]he interruption in ice cream, milkshake, and McFlurry service is so widespread that it has spawned an avalanche of social media complaints in the U.S. and abroad—and conspiracy theories."

96.     In response to the criticism, Taylor has tried to deflect responsibility despite widespread complaints across the world. Taylor's COO James Minard has referred to news coverage about the machine malfunctions as "Fake news," in what appears to be an attempt to discredit *The Wall Street Journal's* headline bearing the question, "Why is the McFlurry Machine Down Again?"

97.     The ridicule McDonald's has received from the media because of the defective ice cream machines is more serious than the whimsical headlines suggest because some of the problems have alarming public health implications.

98.     A recent study conducted by Dateline, for example, assessed the cleanliness of top fast-food chains, including McDonald's.  According to that NBC News report, "[m]ore than 120 people were sickened after eating ice cream at their local McDonald's."[7]



**Dirty Dining: The investigation**

NBC News producer Jack Cloherty shares the story behind Dateline's cleanliness survey of top fast food chains.

More than 120 people were sickened after eating ice cream at their local McDonald's. The health department says the restaurant's dairy mixture somehow was contaminated with staphylococcus, and a mechanical malfunction in the soft serve machine allowed the bacteria to grow. So many people became so ill, so quickly, the director of the local emergency room told me he at first thought there was some kind of bioterrorism incident in the town.

99.     That is not surprising.  Proprietary data Kytch has developed about McDonald's ice cream machines from an analysis of its customer data revealed that many of the Taylor machines, including the C602, have a manual switch allowing users to bypass mandatory pasteurization and brush cleanings.  A significant portion of the machines in the Kytch Trial operated with this bypass, in violation of public health agency and food safety regulations.

---

[7] Jack Cloherty, *Dirty Dining: The investigation NBC News producer Jack Cloherty shares the story behind Dateline's cleanliness survey of top fast food chains*, NBC News (Mar. 10, 2005), https://www.nbcnews.com/id/wbna7149927.

- 20 -

100.     Indeed, for years, Taylor's service manuals contained step-by-step instructions to bypass the regulations.[8]

101.     Despite these issues, and in complete disregard of state and county inspection reports confirming that Taylor's machines breach safety protocols, Taylor's pattern of denialism continued for years.

102.     Separate from the serious public health concerns created by Taylor's machines, there are also significant anti-competitive concerns raised by Taylor's and McDonald's conduct in requiring Taylor soft-serve machine owners to have their machines serviced and repaired only by Taylor technicians.

103.     Any remaining plausibility to Taylor's denial campaign evaporated after a software engineer launched www.McBroken.com to compile statistics reflecting the number of McDonald's ice cream machines that are out of commission at any moment.

104.     At the time this lawsuit was filed, McBroken.com reports that more than 11% of the soft-serve machines at McDonald's restaurants in the United States are out of service.  These machine outages have cost franchise operators millions of dollars in lost revenue.

105.     Consequently, McDonald's franchisees have gone on record to explain that Taylor's "machines are temperamental and expensive to repair."  McDonald's franchisees have also reported that some of the software updates installed by Taylor technicians cause even more glitches and expensive outages.

***Kytch's Product Testing Reveals that Defects Were Built-in to Taylor's Machines.***

106.     Kytch's approach to fixing the problematic Taylor machines has always been a data-driven, iterative process that relies on the collection and analysis of large amounts of data.

---

[8] Many Taylor machines have a jumper placed on the W2 pins on the rear of the machine that disables necessary safety mechanisms.  Taylor has been aware of this hazard for years but has taken no action to correct this defect.  This violates NSF International's food safety requirements and may endanger consumers.

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**

107.    Before launching Kytch, founders Jeremy O'Sullivan and Melissa Nelson started Frobot, Inc. back in 2011.  Frobot is a fully robotic frozen yogurt dispenser that produces made-to-order frozen confections.  Frobot is designed to interact with soft-serve machines made by Taylor.

108.    Through that venture, Frobot informed Taylor's leadership about its device that promised to augment the capabilities of Taylor's machines, including automation and increasing safety offerings.

109.    This innovation required years of product development and additional safety testing given that the process involves serving dairy products to the general public.  Taylor's response to Frobot's prototype was positive, and years—and hundreds of thousands of dollars—of product development followed.

110.    Frobot had a small fleet of Taylor machines, and Nelson and O'Sullivan soon learned that the only way to keep the machines up and running is through frequent and expensive service visits.

111.    After only a few months of gathering data, it became clear to Kytch that Taylor's machines were not very robust, and the finicky software was constantly causing outages.

112.    Kytch was founded in 2018 as a subsidiary of Frobot, and its original purpose was a safety add-on to the automated soft-serve machines.  In contrast to Frobot's focus on automation capabilities, Kytch focused on data and software to optimize the soft-serve machines and reduce outages.

113.    The Kytch Solution officially launched in July 2019 at Tesla's factory in Lathrop, California, before expanding to fast-food restaurants in the broader San Francisco area a short time later.

114.    Kytch learned that Taylor machines are designed to prohibit users from accessing the fulsome "Technician's Menu" that operates the machines.  Taylor's menu contains confusing messages that leave McDonald's franchisees frustrated and unable to operate the machine, causing them to "call the technician" for even minor problems with their Taylor machines.  One example of Taylor's cryptic error messages is below.



*Kytch's Innovative Technology, Trade Secrets, and Confidential Information*

115.    Kytch's flagship invention is known as the Kytch Solution Device: powered by a tiny Raspberry Pi computer with software to understand the communication between the machine's logic board and interface system.

116.    There is nothing like the Kytch Solution Device on the market, and the ability of a competitor to access and test the device would allow the competitor to obtain an extraordinary head start in the creation of a competitive device.

117.    The Kytch Solution Device is an easy-to-install device that can be bolted on the soft-serve machines.  When mounted on the machine and connected to Kytch's software and online platform, Kytch's IoT technology and data retrieval processes enable restaurant operators to see exactly what is going on with their machines.  Kytch's intensive data-analytics and automated processes work in tandem to optimize machine performance, and Kytch can actually detect errors in the machines and notify users in real-time before the machines malfunction.

118.    When the Kytch Solution is connected to the internet, the software sends messages to www.Kytch.com.

119.    Working in tandem with Kytch's data retrieval and data analytics systems, Kytch's proprietary and confidential online platform at www.Kytch.com ("Kytch Solution Platform") provides customers with more ways to understand and interact with the soft-serve machines.

120.    There is nothing like the Kytch Solution Platform on the market, and the ability of a competitor to access and observe in how the Kytch Solution Platform operates in real time would allow a competitor to obtain an extraordinary head start in the creation of a competitive device.

***The Kytch Solution Is Safe and Certified by Intertek to Comply***

***with FCC Regulations and UL Standards.***

121.    Kytch's central mission is to improve the safety and reliability of soft-serve machines. Kytch spent years and many hundreds of hours monitoring the soft-serve machines and creating a solution that incorporates Taylor's existing safeguards.

122.    The Taylor machine's marketing materials say that Taylor has "gone to extreme efforts to design" mechanisms to keep users safe. The Kytch Solution complements and incorporates these safety efforts.

123.    One example is the magnetic lock system. When the freezer door is removed, users can be exposed to moving parts of the soft-serve machine, such as the beater depicted below.



(Taylor Model C602 Beater)

124.    Rotating blades attached to the beaters scrape soft serve mix from the walls of the machine's cylinder as it freezes. Taylor's magnetic interlock system is triggered whenever the freezer door has been opened or removed (and the beater is exposed). This system disables the motor and prevents users from inadvertently engaging the beater or other moving parts within the machine while the door is open. Removing the freezer door also automatically disables the buttons on the control panel to ensure that the motor is not turned on.

125.    Kytch operates within these critical safety functions, and Kytch cannot and does not override the magnetic interlock system or the disabled control panel. Kytch also disables its

- 24 -

automation features when users are cleaning the interior of the machine and when anyone presses the physical buttons on the control panel.

126.    On top of these safety features, the Kytch Solution Device ("KSD") cannot operate when machines are unplugged or turned off.  Taylor's operations manuals state that technicians must turn off and unplug the soft-serve machines before completing any maintenance or service repairs.[9] These safety steps are standard in the industry.

127.    Far from endangering customers, Kytch made the C602 machines *safer* by allowing users to monitor their machines and by flagging when employees miss cleaning or heating cycles required by food safety regulations.  For example, Kytch discovered that many of the C602 machines have a jumper installed on the W2 pins on the rear of the machine.  This jumper disables necessary safety mechanisms related to mandatory pasteurization and heating cycles.  Taylor has been aware of this hazard for years, but it has taken no action to correct this defect.  This violates NSF International's food safety requirements and may endanger consumers.

128.    Kytch instructs customers how to avoid this dangerous condition.

129.    The data Kytch gathered demonstrates that the KSD actually *improves* the C602 and other Taylor machines by *increasing* uptime and preventing common errors before they occur.

130.    In addition to Kytch's in-house safety testing, Intertek—an independent lab designed to test and certify products to North American safety standards—has certified that Kytch's products comply with the same safety standards as Taylor's products.

131.    Manufacturers like Kytch that sell radio transmitters in the United States must have their products tested by FCC accredited labs and certified by the FCC for electromagnetic compatibility ("EMC") compliance.  Radio devices like the KSD are subject to a series of FCC regulations, commonly referred to as "Part 15."  47 C.F.R. Part 15.  To obtain certification for such devices, a company must submit a representative sample device to an independent testing facility

---

[9] The manual states: "The main power supplies to the machine must be disconnected prior to performing any repairs."

that determines, among other things, whether the power output levels for the devices comply with FCC Part 15 regulations.

132.    That is precisely what Kytch did.  In June 2019, Kytch contracted with Intertek to subject the KSD to rigorous safety testing at Intertek's laboratory.  Intertek completed those tests and confirmed that the KSD complied with FCC regulations and that it did not present a safety hazard for end-users.

133.    Intertek issued a report explaining its findings.  "Based on the results of our investigation we have concluded the [KSD] complies with the requirements of [FCC Part 15 Subpart B and Industry Canada ICES-003 Issues 6]."  Intertek also confirmed that the KSD satisfies radiated emissions standards and that it "met the radiated disturbance" and "conducted disturbance" FCC requirements.[10]

134.    This EMC compliance testing was not the only safety testing Intertek completed.  The KSD was also certified through Intertek's Extract-Transform-Load ("ETL") testing.  ETL testing ensures that data is accurately loaded from the machines and transmitted to the Kytch device.  ETL testing also verifies the data at various middle stages of the communications process between source and destination.

135.    Intertek completed additional testing including input tests, marking tests, temperature tests, and tests to classify electrical energy sources.  Kytch passed these tests with flying colors.  After this independent testing, Intertek concluded that the KSD "has been evaluated and found to comply with the applicable requirements" and standards developed by UL.  (UL is a corporation that promulgates and certifies compliance with safety standards for thousands of consumer and other products.)

136.    Through this testing, Intertek confirmed:

_____

[10] Radiated emissions are unintentional energy that escape the equipment in the form of electric, magnetic, or electromagnetic fields.  Conducted emissions are unintentional energy carried out of the equipment on the equipment's power cables or attached signal cables.

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 32 of 114**

1

2

- The KSD "**does not pose a risk of shock hazard**" because its power source is "not accessible to an end user."

3

4

- "All uninsulated live parts in primary circuitry are [] housed within a[n] enclosure" and are "not accessible to end users."

5

6

- "All ferrous metal parts are protected against corrosion."

7    137.    These are just a few examples of Intertek's findings confirming that the KSD is safe.

8    Indeed, Intertek would not have certified the KSD if it determined that it presented a serious risk of

9    human injury as McDonald's and Taylor later claimed.  Each KSD is marked with Intertek's

10    certification explaining that it conforms with UL standards.

11    138.    Kytch displays this certification label prominently to notify users that it has passed

12    rigorous—and time consuming—safety testing.  Thus, McDonald's had actual knowledge that

13    Kytch had passed safety tests.  Kytch has always prioritized product safety: not a single customer

14    has ever reported an injury using the KSD or the Kytch Solution Platform ("KSP").

15    ***Taylor Tries to Intercept the Kytch Solution to Access Kytch's Trade Secrets.***

16    139.    Kytch launched the Kytch Solution Device in April 2019.  Taylor started making

17    efforts to obtain the device almost immediately.

18    140.    During routine monitoring of its website (www.kytch.com) in April 2019, Kytch

19    discovered that Taylor representatives were trawling Kytch's home page, including its Terms of

20    Service.  This and other communications notified Taylor that Kytch's operations—including its

21    proprietary information, and computers—were based in Fremont, California.

22    141.    After scraping information from Kytch's website, Taylor attempted to purchase a

23    KSD.  On April 23, 2019, Taylor VP of Quality and Customer Service Dan Domberg instructed

24    Taylor Service Technology Manager Heather Jordan to order a KSD through www.kytch.com.

25    Kytch flagged, and then canceled, Ms. Jordan's order after matching her shipping address to

26    Taylor's headquarters.

27

28

- 27 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 33 of 114**

142.    When Taylor learned Kytch blocked its order, Taylor's VP of Quality and Customer Service told Heather Jordan that Taylor "should've ordered [the Kytch Solution] in stealth mode," adding a smiley face emoji for emphasis.

**From:** Domberg, Daniel P
**Sent:** Tuesday, April 30, 2019 5:42 PM
**To:** Jordan, Heather
**CC:** McWilliams, Kelly A
**Subject:** Re: Kytch Order

I guess we should've ordered in stealth mode :-).

143.    This marked the beginning of Taylor's attempts to secure a KSD. A short time later Taylor COO James Minard admitted that Kytch's technology was more advanced than Taylor's and PHD's. In a May 16, 2019 email, Minard directed Taylor's Controls Manager Joseph Beard to buy a Kytch Solution device because it "[s]eems we might be missing something in our approach to our connected equipment." Taylor's CEO Jeremy Dobrowolski is copied on the message.

**From:** Minard, Jim
**Sent:** Thursday, May 16, 2019 8:39 PM
**To:** Beard, Joseph T; Jordan, Heather; Demel, Tim
**CC:** Dobrowolski, Jeremy
**Subject:** Please investigate this.

Joe-

Please buy a kit and provide me a written evaluation on the hardware and software. Seems we might be missing something in our approach to our connected equipment.

Www.kytch.com

144.    Taylor followed through on Minard's instruction, this time opting to proceed against Kytch using "stealth mode." Taylor ordered KSDs through its outside counsel at Brinks Gilson to try to circumvent Kytch's security protocols. But Kytch identified the prospective buyer as Taylor's legal counsel and blocked the order.

145.    Taylor doubled down on its efforts and its counsel hired at least two private investigators using assumed names to try to avoid raising suspicion. Just like the previous orders, Kytch's security precautions flagged and thwarted these attempts from Taylor to obtain KSDs.

Exhibit 4
Page 34 of 114

Taylor's mission to covertly retrieve Kytch Solutions—and the attention Kytch received from Taylor's c-suite—is further evidence that Kytch's technology has substantial economic value.

146.    In May 2019 Taylor's CEO Jeremy Dobrowolski wrote in an email that Taylor was "continu[ing] to pursue the acquisition of one of [Kytch's] devises [*sic*]."  At the same time, Taylor and PHD were trying, albeit unsuccessfully, to invent a competing solution for McDonald's.

147.    Unable to compete with Kytch, Taylor changed tack in June 2019 and directed its outside counsel to send Kytch a cease-and-desist-letter.

148.    After spending the previous six months trying to secretly obtain a KSD, Minard emailed and called Kytch in October 2019 to discuss a potential licensing arrangement.  Minard told Kytch that Taylor was interested in purchasing rights to some of Kytch's technology.

149.    These discussions ended, however, after Kytch informed Taylor that it would not share any proprietary information about the KSD or KSP unless, and until, Taylor signed an NDA.

150.    According to Minard, by the end of 2019—***less than four months after Middleby acquired PHD—***"Taylor decided to stop further development on its own IoT platform" because Taylor lacked the "resources and expertise" necessary to "devote to the development of IoT technology."

151.    Kytch's security precautions flagged and thwarted these initial attempts from Taylor and its confederates to obtain the Kytch Solution.  But these efforts to obtain Kytch's intellectual property provide further evidence that Kytch's innovative product has substantial economic value.

***The Kytch Trial Expands to McDonald's in Fall 2019 as McDonald's***

***Rejects Taylor and PHD's Open Kitchen.***

152.    While Taylor was trying to secure a KSD, demand for Kytch continued to grow throughout the spring and summer of 2019 as more restaurant operators adopted the KSD and KSP. The earliest participants in the Kytch Trial were based in California.  But by fall, Kytch spread to McDonald's restaurants across the United States.

153.    Just as Kytch was gaining momentum with independent McDonald's operators, Taylor and PHD's Open Kitchen efforts were failing.  McDonald's rejected Open Kitchen as

- 29 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**

**Page 35 of 114**

premature to place into the McDonald's system, and Taylor and PHD were forced to sideline their IoT efforts.

154.    Kytch customers were overjoyed to see their volatile Taylor machines modernized. Customer goodwill grew as Kytch reduced the cost of ownership by minimizing Taylor repair costs. Franchise operators reported increased revenue from their frozen offerings, and Kytch continued to spread like wildfire.

155.    As explained above, the iterative nature of Kytch's innovations made the Kytch Solution smarter as it gathered more data about Taylor's machines.  This means that with more runtime, the Kytch Solution becomes *more* efficient at reducing downtime and associated service costs.

156.    Kytch spread to McDonald's in the fall of 2019.  In October of that year, Kytch was featured at the National Owners Association conference in Dallas, Texas, and it showcased the Kytch Solution in front of the largest association of independent U.S. McDonald's franchise operators.

157.    These independent franchisees control and operate several trade organizations, including the NSLC.  The NSLC collaborates with McDonald's supply chain leadership and its "Equipment Team"—led by Tyler Gamble—provides valuable insight to McDonald's concerning product innovations to integrate into McDonald's system.

158.    One of the key focus areas for the Equipment Team is to identify solutions for McDonald's soft-serve machine problem through the "McFlurry Task Force," also known as the "Shake Machine Reliability Project."

159.    Taylor and McDonald's leveraged the NSLC and the Equipment Team to access Kytch's Confidential Information and trade secrets.  Specifically, Taylor coordinated with NSLC Equipment Team Lead Defendant Tyler Gamble, NSLC Chair and Vice Chair Jon Kelley and Eric Wilson, NSLC Competitive Advantage Team Lead Larry Miller, and Logistics Team Lead Laura Bucar.

REDACTED VERSION - FIRST AMENDED COMPLAINT
Exhibit 4
Page 36 of 114

*February 2020: After Reading News Reports of Kytch's Success,*

*Defendants Infiltrate Kytch's Product Trial to Misappropriate Kytch's Trade Secrets.*

160.    By 2020, McDonald's franchise operators enrolled in the Kytch Trial to test the Kytch Solution at restaurants in Arkansas, California, Connecticut, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Washington, and Wisconsin.

161.    As a result of this massive expansion, Kytch is informed and believes that it became the largest independent IOT/connectivity software vendor for the shake machine in the McDonald's system.  By all appearances, the Kytch Solution was a viable remedy to many of the problems that had troubled Taylor soft-serve machines and frustrated customers for years.

162.    In February 2020, news outlets reported on Kytch's success.



LICK OF TIME **McDonald's ice cream machines may never break down on you again – thanks to new machine**

Feb 12 2020, 19:42 ET I Updated: Feb 12 2020, 23:07 ET

New device may prevent McDonald's ice cream machines from breaking

By WWAY News - February 12, 2020 11:28 AM

**McDonald's and Burger King franchisees are raving about a new device that can update their notoriously broken soft-serve machines**

Shelby Court

**A New Device Promises to Keep McFlurry Machines Up and Running**

Already popping up in some restaurants, Kytch is hoping to end the scourge of broken-down McDonald's soft-serve machines.

By **Mike Pomranz**    Updated February 13, 2020

163.    A February 11, 2020 *Business Insider* article discussing Kytch's innovative product was an inflection point.  The article—titled "McDonald's and Burger King franchisees are raving

- 31 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 37 of 114**

about a new device that can update their notoriously broken soft-serve machines"—highlights many of the problems at McDonald's. It also describes Kytch as a viable solution to this problem because the new technology "corrects unnecessary malfunctions" that cause downtime.

164.    On February 12, 2020, McDonald's mentioned Kytch in its "Daily Briefing." The Daily Briefing describes some of the news coverage and explains that McDonald's competitors—specifically Burger King, Tim Horton's and Popeyes—are "'doubling down' on [their] modernization strategy."

165.    Customers contacted McDonald's and Defendants that same day asking how to sign up for Kytch. This created a problem for Taylor and McDonald's because Kytch was highlighting the problem with the broken soft-serve machines, and Taylor and PHD lacked the technology to compete with their own IoT solution.

166.    Taylor and PHD exchanged emails describing their plan to take Kytch's Confidential Information and trade secrets. One such email says that Taylor and PHD were trying to develop a "Kytch Replacement" and the central question for their competing product was: "How does it compare with Kitch's [*sic*] solution?"

167.    On February 12, 2020, Taylor's CEO, Jeremy Dobrowolski, and its COO, James Minard, scheduled a one-hour teleconference for the following day to discuss "Kytch, and Options for Data Collection for McDonald's Equipment." Senior leadership from McDonald's and Middleby were invited to the call, along with two independent McDonald's franchise operators, Defendant Gamble (McDonald's Equipment Team Lead) and Eric Wilson (who previously served the same position).

168.    By this point, Taylor had been trying to circumvent Kytch's security protocols to obtain KSDs for ten months.

169.    Because Taylor was unable to obtain the Kytch Solution through its employees, its lawyers, or its private investigators, Kytch is informed and believes that Taylor worked with McDonald's franchisees, including Tyler Gamble, to infiltrate the Kytch Trial.

170.    Taylor and McDonald's scheduled the February 13, 2020 call to direct McDonald's operators—including Gamble—to infiltrate the Kytch Trial and to obtain Kytch's proprietary insights and confidential information.

171.    Gamble and others would then share these insights and trade secrets with McDonald's, Taylor, and PHD so they could copy Kytch's technology.

172.    Before the meeting, Taylor sent a memo to McDonald's, Gamble, and Wilson providing "a summary of the Kytch device."

173.    The presentation contains pictures of KSDs from a South Carolina McDonald's franchise operator.  Taylor admits in the document that it "*attempted to obtain a Kytch device through multiple channels and has been unsuccessful in doing so,*" and explained that Taylor was "*continuing their efforts to obtain a unit from Kytch.*"

174.    A short time later, Kytch CEO Jeremy O'Sullivan had a conversation with Gamble and Eric Wilson, NSLC's Vice Chair and prior McDonald's Equipment Team Lead.

175.    During this conversation, Gamble said he was familiar with Kytch's ability to navigate, search and fine-tune the inner workings of Taylor's machines.  Gamble, along with NSLC Chair and Vice Chair Jon Kelley and Eric Wilson participated in the Kytch Trial a short time later.

176.    Tyler Gamble was eager to obtain the Kytch Solution.  Gamble also offered to serve as the liaison between Kytch and the fast-food giant, promising to solidify Kytch's relationship with McDonald's.



**Tyler Gamble**
NSLC Equipment Team Lead



**Eric Wilson**
NSLC Vice Chair



**Jon Kelley**
NSLC Chair

177.    Unbeknownst to Kytch, after Tyler Gamble contacted Kytch, but before he signed the Kytch Trial Agreement, Taylor COO James Minard asked McDonald's leadership to "[p]lease

- 33 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 39 of 114**

let me know when you and your team have secured access to a Kytch unit and I will have my team

available for a complete review."

178.    On March 12, 2020—approximately one month after he first emailed Kytch—

Gamble called Kytch's founder Jeremy O'Sullivan.  During the call, Gamble said that he would

leverage his position with McDonald's Equipment Team to encourage McDonald's to adopt Kytch's

technology.  He also said Taylor and McDonald's were offended that Kytch did not approach them

directly, and that Taylor intended to manufacture safety concerns to make Kytch "go away" and

leave the marketplace.

179.    At the same time, Taylor and PHD continued to struggle to develop their competing

product.  Taylor tasked its "Technology Manager" Heather Jordan to develop the user interface for

"Open Kitchen."

180.    On March 13, 2020, Jordan complained that PHD lacked the capacity to compete

with Kytch.  Taylor was trying to develop Open Kitchen, but PHD was unable to pull data from

Taylor's soft-serve machines.  Thus, PHD could not identify when machines experienced errors,

when buttons were pressed, or when functions were engaged to display on a user-friendly interface:

> "I think we need to have a heart-to-heart conversation with [PHD].  I'm
> concerned they don't have the resources to support us.  I sent them U[ser]
> I[nterface] feedback a week ago and have not been able to confirm when the
> changes will be made.  I know they're probably in the same situation we are, but
> we need to understand their capacities before we can make a decision to move
> forward with them."

***Gamble Breaches His Contractual Obligations To Kytch.***

181.    On March 19, 2020, Kytch and Gamble entered a valid and binding contract

whereby, in exchange for Gamble's covenants of nondisclosure and secrecy, Kytch agreed to

provide its trade secrets and Confidential Information—including Kytch Solution and

Kytch Solution Platform—to Gamble to use for the sole purpose of furthering the Kytch Trial.

182.    When he signed the Kytch Trial Agreement, Gamble agreed that he would not—nor

permit others to—"access or use the Solution in order to build or support, and/or assist a third party

1  in building or supporting, products or services competitive to any Kytch Solution." (Kytch Trial

2  Agreement § N.)

3       183.    Despite these covenants, Gamble enrolled in the Kytch Trial to misappropriate

4  Kytch's trade secrets to benefit Taylor and McDonald's.  Gamble shared Kytch's trade secrets and

5  Confidential Information with TFG and Taylor.  Specifically, Gamble provided a KSD to TFG, and

6  he even gave TFG his login credentials after sending screenshots of the KSP and forwarding

7  notifications from Kytch.

8       184.    On May 19, 2020, Gamble text messaged TFG principal Blaine Martin and TFG

9  technician Ben Rhodes (1) copies of notifications he received from the KSP and (2) a screenshot of

10 the password protected portion of the KSP.  Gamble's text messages show that Gamble repeatedly

11 forwarded KSP notifications or screenshots to Martin, Rhodes, and other unauthorized third parties.

12      185.    TFG principal Blaine Martin and TFG employee Ben Rhodes unlawfully accessed

13 the Kytch Solution Platform after trafficking Tyler Gamble's passwords despite reading and

14 accepting the Kytch Terms of Service.

15      186.    On June 3, 2020, Blaine Martin asked Tyler Gamble if TFG could "access" the KSP

16 "to see the data it provides."

17
> **RE: Kytch Health Alert: Stonebrook 1**
>
> Blaine Martin <bmartin@tfgroupllc.com>
> Thu 6/4/2020 12:55 PM
> To: Gamble Tyler (US Partners) <tyler.gamble@partners.mcd.com>
> Would it be possible for us to have access to the system to see the data it provides
>
> Thanks,
> Blaine Martin
> TFG Companies
> Louisiana – Mississippi – Tennessee – Arkansas
> 504-415-2795
> bmartin@tfgroupllc.com

24      187.    Gamble agreed.  Text messages with Gamble and TFG demonstrate that Rhodes

25 "logged in" to the KSP "with Blaine [Martin]'s credentials."  In another text exchange with Rhodes,

26 Gamble admits that he gave TFG principal Blaine Martin "a login to the [K]ytch device."  (This

27

28

1  "login" references the KSP.)  Later that day Taylor started receiving notifications that the KSP sent

2  to Gamble's account.

3      188.    A short time after Gamble provided a KSD to TFG, Gamble invited someone named

4  "Matt," using the telephone number for Blaine Martin to access the KSP.  Martin used the registered

5  name "Matt" as an alias to try to hide the fact that he was accessing the KSP without permission.

6      189.    This account, tied to TFG, obtained access to Kytch's Confidential Information and

7  trade secrets through the KSD and KSP.  This includes access to all historic notifications, the remote

8  control—and ultimately Kytch Rewind—using Gamble's account.  The confidential customer data

9  from the KSP, which Gamble allowed the TFG to access, and the information represented by these

10 data is attached as **Exhibit 3**.  For Gamble or Taylor to obtain these data would have taken years,

11 millions of dollars, and a vast trial program.

12     190.    Kytch has forensically confirmed that the fake account associated with the TFG was

13 used to access the Kytch Solution Platform on multiple occasions.  (Nelson Decl. (May 6, 2021) ¶

14 128.)

15     191.    There is also other significant forensic evidence that TFG accessed Kytch's

16 confidential technology. The KSD Gamble provided to TFG was disconnected from the internet

17 beginning in June of 2020 until February 2021.  However, its SD card was 90% full when it was

18 finally re-connected to the internet.  The device log indicates that someone at TFG had been

19 accessing the KSD, and that the device was powered on and used for weeks after going offline.

20     192.    ***Two days*** after Gamble gave TFG access to the KSP, TFG sent a screenshot of the

21 password-protected portions of the KSP to Taylor's Technology Manager Heather Jordan.  Martin

22 wrote: "[t]his is a picture of the Kytch screen.  Wasn't sure if anyone ever shared what it looked

23 with you."

24     193.    Heather Jordan led the development of Open Kitchen, specifically the user interface

25 experience.

26

27

28

**Exhibit 4**
**Page 42 of 114**

***Throughout 2020, Gamble Continues to Share Kytch's Trade Secrets***
***with Taylor and McDonald's.***

194.    Gamble continued to leak Kytch's trade secrets to Taylor, TFG and McDonald's in Summer 2020.  Taylor, McDonald's, and PHD pressured Gamble and other Kytch Trial participants to violate their binding NDAs by sharing Kytch's proprietary insights and helping them develop Open Kitchen.

195.    Gamble has admitted that Scott Nicholas, Taylor's Business Manager for McDonald's, "was asking franchisees" enrolled in the Kytch Trial "about the relative advantages" between Kytch's product and Open Kitchen.

196.    Likewise, Gamble has admitted that he was talking with "McDonald's engineers" about the confidential Kytch Trial throughout 2020.

197.    TFGroup LLC is a franchised servicer and distributor for Taylor and its machines. On its LinkedIn page, TFG describes itself as "[a] leader in the foodservice equipment segment, TFGroup utilizes analytical advances to ensure speed of service, reduction of equipment downtime and labor savings."[11]

198.    Kytch's investigation determined that on May 27, 2020, Tyler Gamble's Kytch Solution identified as "Brownsville" went offline.  The device remained offline for eight months, and when Kytch questioned Gamble about its downtime, he claimed that the Taylor machine had an issue with one of its compressors.

199.    One week after Gamble's Brownsville Kytch Solution Device went offline, Kytch issued a real-time alert from Gamble's Kytch Solution identified as Stonebrook 1.  The alert stated "L PRODUCT TOO VISC" was occurring frequently.

200.    Kytch ██████████████████████████████████████
████████████████████████████████████████████████████████

---

[11] "TFGROUP EXPANDING TAYLOR BRAND INTO ARKANSAS AND N. LOUISIANA MARKETS," LinkedIn, April 16, 2021, https://www.linkedin.com/posts/tfgcompanies_tfgroup-expanding-taylor-brand-into-arkansas-activity-6788613873491603456-1Zam.

1 ██████████████████████████████████████████ Kytch also provided

2 specific tips on how to correct the problem.

3      201.    Tyler Gamble shared the message with TFG, and Taylor subsequently adjusted its

4 programming to account for the error.

5      202.    When Gamble's Brownsville device was connected to the internet again in February

6 2021, its SD card was 90% full.  The device log indicates that someone had been accessing the

7 Kytch Solution Device, and that the Device was powered on and used for weeks after going offline.

8 However, according to the device log, the Kytch cables were disconnected periodically so the device

9 could not retrieve information or connect to the internet.  The uninterrupted reverse engineering of

10 the Kytch Solution Device evidenced by this behavior would provide Taylor and TFG with a

11 dramatic head start in designing a competing device.  There is nothing like the Kytch Solution in

12 the marketplace.  Kytch restricts who has access to its devices because the ability to reverse engineer

13 the device exposes Kytch's trade secrets.

14      203.    In April 2021, a spokesperson from Middleby Corporation—Taylor's parent

15 company—confirmed that a "Tennessee distributor reported to Taylor that its servicer removed a

16 Kytch device" from one of Kytch's trial participant's stores.

17      204.    Upon information and belief, this "Tennessee distributor" is TFGroup LLC, and the

18 trial participant is Tyler Gamble.

19      205.    Kytch has forensically confirmed that the fake account associated with TFG was used

20 to access the Kytch Solution Platform on multiple occasions and the unauthorized access from

21 TFG's account continued through January 17, 2021.

22      206.    Kytch's investigation also determined that Gamble unlawfully invited

23 Mike Zagorski to access Kytch's trade secrets and Confidential Information.

24      207.    The invitation was sent from Gamble's account and it says "Kytch invite for

25 Gamble."

26

27

28



208.   Mike Zagorski is the Director of Global Equipment Development at McDonald's

Corp. and Kytch did not authorize Gamble to invite Zagorski to access Kytch's interface.  Kytch's

investigation has not uncovered evidence that Mr. Zagorski accepted the invitation.

209.   On January 29, 2021, right around the time they were contacted about another

Business Insider article covering Kytch, Tyler Gamble and his father Jeff Gamble both logged in to

the Kytch Platform and deleted the users (including Blaine Martin and william_p@eplus.net) that

they had invited to access Kytch's trade secret information.

210.   Despite registering his Kytch devices for use in Tennessee and Mississippi, Kytch's

forensic records confirm that the Kytch Solutions Gamble ordered have been accessed—likely by

Taylor and TFG—in Little Rock, Arkansas; Ponchatoula, Louisiana; and New Orleans, Louisiana.

211.   By using the Kytch Solution at these unauthorized locations, Gamble breached the

Kytch Trial Agreement.

212.   While contractually partnering with Kytch, Gamble was, in fact, stealing Kytch's

Confidential Information and trade secrets in the marketplace and passing them to Taylor and TFG.

REDACTED VERSION - FIRST AMENDED COMPLAINT

Exhibit 4
Page 45 of 114

213.    In June 2020, Tyler Gamble sent text messages to McDonald's Director of Global Equipment Development Mike Zagorski about the Kytch Solution device. Zagorski followed-up with Gamble via email, and asked Gamble to meet with Taylor's leadership—including Taylor's CEO and COO—to "catch up [] and understand what [he's] learned, like[s], dislike[s], etc. so far about [his] experience" with Kytch.

From: Zagorski Mike <Mike.Zagorski@us.mcd.com>
Sent: Thursday, June 18, 2020 12:54 PM
To: Zagorski Mike; Gamble Tyler (US Partners); Dobrowolski, Jeremy; Minard, Jim; Nicholas, Scott
Subject: Kytch/Shake Machine Connectivity
When: Tuesday, June 23, 2020 10:00 AM-10:30 AM (UTC-06:00) Central Time (US & Canada).
Where: WebEx

Tyler –

I had a call with the Taylor team this morning about multiple topics, and mentioned your text about the Kytch device. We'd love to take a few minutes to catch up with you and understand what you've learned, like, dislike, etc. so far about your experience.

Let me know if this time doesn't work for anyone and we can reschedule. Thanks!

214.    The following people were invited to join Tyler Gamble on that June 23, 2020 call: Jeremy Dobrowolski (Taylor's CEO), James Minard (Taylor's COO), Scott Nicholas (Taylor's Senior Business Manager for McDonald's), Mike Zagorski (McDonald's Director of Global Equipment Development), and John Sulit (McDonald's Director of Global Strategic Sourcing).

215.    Gamble disclosed Kytch's Confidential Information and trade secrets during the call, and he described "the overall satisfaction of the Kytch device as it compares to Taylor['s] competing device." Gamble also shared his reaction and thoughts concerning Kytch's technology, proprietary information, and customer experience. Taylor COO James Minard has admitted that Gamble "showed the Kytch platform" via screenshare so that Taylor and McDonald's representatives could access the password-protected portions of the KSP.

216.    Minard captured images of Gamble's screenshare reflecting password-protected portions of the KSP. Minard screenshotted the portion of the KSP that controls one of the KSDs that Gamble was assigned as a Kytch Trial participant.

217.    Another one of Minard's screen captures shows the portion of the KSP where Kytch customers input a code to access their KSD and remotely control their Taylor soft-serve machines.

218.   A third screenshot Minard captured shows notifications of the KSP displays including the machine's fault and lockout and heat cycle histories.

219.   Minard's screenshots also show that Gamble shared screens of Taylor's more limited online interface to compare it with the KSP.

220.   McDonald's Director of Global Sourcing thanked Gamble in an email for providing confidential, trade secret information about Kytch: ***"In regards, to Kytch, we appreciate that you've been keeping us informed of your findings on this aftermarket technology that you had installed in your Taylor Shake Sundae machine."***

221.   Taylor and PHD tried to ramp up product development after receiving feedback from Gamble. But instead of coming up with their own innovations, Taylor's COO James Minard emailed Taylor engineer Joseph Beard to ask him, "So how can we do the same thing Kytch is doing as far as sending commands from a remote interface[?]"

**From:** Minard, Jim
**Sent:** Wednesday, July 8, 2020 2:23 PM
**To:** Beard, Joseph
**Subject:** Remote Access
**Attachments:** Kytch Review Conference Call 6-23-2020.docx

So how can we do the same thing Kytch is doing as far as sending commands from a remote interface. Please see my report.....



Sincerely,



**James J. Minard | Chief Operations Officer**
**Taylor Company**

222.   In another email, dated July 15, 2020, Minard says to "[t]ake today's design" of the Open Kitchen "[a]nd make it more 'user friendly' (Kytch Screenshot below)."

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 47 of 114**



*The Largest Group of Independent McDonald's Franchise Operators*

*Endorses Kytch in October 2020.*

223. Despite these sustained efforts to misappropriate Kytch's trade secrets, Kytch continued to grow throughout 2020. Kytch customers gave positive reviews, praising Kytch for reducing unnecessary service fees and for finally bringing clarity to Taylor's finicky machines. Its customer retention rate exceeded 90%.

224. Restaurant operators' interest in Kytch spread like wildfire, and by October 2020, hundreds of McDonald's restaurants across the country relied on Kytch to keep their soft-serve machines up and running. Kytch—through the Kytch Trial—demonstrated that its technology was outpacing its peers in the competitive smart kitchen industry.

225. On October 7, 2020, the National Owners' Association endorsed Kytch at its annual conference.

226. The NOA endorsement brought more unwanted attention to Taylor's soft-serve machines. *Business Insider* published a story the next week explaining that because of Kytch,

1 "McDonald's franchisees are taking matters into their own hands to fix the chain's notoriously
2 broken soft-serve machines."[12]

3     227.    The article also reported that McDonald's "soft-serve dilemma is not something that
4 can be ignored any longer" because "a software company called Kytch has put out a device that
5 corrects for machine error and helps machine users understand the details of the machine's
6 behavior."

7     228.    McDonald's acknowledged that it could not compete with Kytch because
8 development of Open Kitchen had stalled. Taylor and McDonald's had "been hung up with
9 Technology team since June to work on [their] platform," and McDonald's leadership complained
10 about the lack of progress, explaining "[t]hings need to go much faster."

11     229.    Less than a week after the *Business Insider* article was published, a software engineer
12 launched McBroken.com, a website that compiles statistics reflecting the number of Taylor soft-
13 serve machines that are out of commission at any one moment.



26     [12] Shoshy Ciment, "McDonald's franchisees are taking matters into their own hands to fix
the chain's notoriously broken soft-serve machines," Business Insider (Oct. 16, 2020),
27 https://www.businessinsider.com/mcdonalds-franchisees-will-tackle-soft-serve-machine-
problems-alone-2020-10.
28

230.    Public backlash against McDonald's was swift.



***Taylor and McDonald's Launch a False Advertising Campaign to***

***Unlawfully Compete Against Kytch.***

231.    Shortly after the NOA conference, Kytch quickly gained market share as it spread to hundreds of McDonald's locations throughout the country. This sent Taylor, McDonald's, and PHD into crisis: Open Kitchen was nowhere near ready to launch but Taylor and McDonald's were desperate to drive Kytch from the marketplace.

232.    They knew they had to create a stall tactic to interrupt Kytch's rapid growth and customer acquisition trajectories.

233.    On October 16, 2020, Gerard Giustino–Chief Customer Officer at Middleby–sent an email to Jeremy Dobrowolski (CEO at Taylor), James Minard (COO at Taylor), and Scott Nicholas (Taylor's Senior Business Manager for McDonald's) acknowledging that the Kytch Solution works: "Many operators who are testing the solution feel that the Kytch solution actually eases operations and helps to reduce complexities of the machine."

234.    The email continues, "Mike [Zagorski] (McDonald's Director of Global Equipment Development) mentioned that without an alternate option [] to consider" McDonald's would be forced to go with Kytch. Mike Zagorski explained, "If we don't have a solution to offer, we have no options."

235.    Three days after this email, Gamble text messaged Jeremy O'Sullivan and asked him if there was "a way to ensure that no one using the Kytch device remotely accesses the machine while a technician may be working on it?  This is a big concern with MHQ for safety reasons."

236.    As a preliminary matter, Taylor and McDonald's did not have "a big concern . . . for safety reasons."  Indeed, Gamble, himself, had warned Kytch six months earlier that McDonald's would fabricate safety concerns to disparage the Kytch Solution and disrupt Kytch's business.

237.    Nonetheless, O'Sullivan responded and explained why the concern because of "safety reasons" was baseless:

> "There are a number of layers of protection.  First, the machine should be powered
> off and unplugged before any work is started.  This is a standard safety for any
> equipment.  Second, there is a sensor on the freezer door that when the freezer door
> is removed prevents the motor from turning on.  Third, we do have a mechanism in
> place that disables any automation when a user takes control of the front panel by
> pressing any buttons.  Also the product has been tested and certified for safety to
> UL standards by Intertek labs."

238.    Jeremy O'Sullivan explained these facts to McDonald's Equipment Team Leader Tyler Gamble less than two weeks before Taylor's false advertisement.  This, alone, should have resolved any safety concerns about Kytch somehow causing serious human injury.

239.    But Taylor intentionally disregarded these facts to pursue its preconceived narrative disparaging Kytch's products.

240.    Indeed, Taylor and McDonald's already knew that Intertek—the same organization that tests Taylor's products—had certified the Kytch Solution; Intertek's seal of approval is displayed prominently on the KSDs.

241.    Several independent McDonald's restaurant operators contacted Gamble and Taylor to try to sign up for the Kytch Trial, and they expected McDonald's to approve the Kytch Solution and incorporate it into the McDonald's system.

242.    But Gamble explained that Kytch "will likely never be approved" because of "[b]ad blood between [Kytch] and Taylor."  Gamble acknowledged that Kytch had the superior product but he told operators to be patient because he was "getting very close to a version of the same type technology by powerhouse dynamics, a division of Middleby.  Taylor's parent company."

243.    Gamble sent text messages to several other franchise operators warning them that McDonald's was about to issue an advertisement attacking Kytch.  In response, an operator named Danielle Marasco said that she thought Kytch was an effective product.  Gamble agreed and said that Taylor and McDonald's "are ***supposedly*** concerned with the safety issue of being able to remotely control the machine."

244.    Marasco replied with the true motivations for the disinformation campaign against Kytch: ***"They are upset they didn't invent it and they can't profit off it."***

245.    A few days later, Taylor and McDonald's made good on their promise to drive Kytch from the marketplace by fabricating safety concerns about the KSD.  On November 2, 2020, Taylor and McDonald's launched their false and deceptive disinformation campaign against Kytch.  Instead of promoting Open Kitchen through traditional advertising channels, Taylor issued a so-called "IMPORTANT NOTE" to publish false and disparaging statements of fact about the quality and nature of Kytch's product and services.

246.    On November 2, 2020, Taylor directed and published the following false and defamatory statements about Kytch. [13]

> We are pleased to share that the McDonald's GSSS-Equipment Team, in partnership with the NSLC Equipment Sub-Team, has been working on a strategic connectivity solution with Taylor for their Shake Sundae machine. This solution will allow operators to receive text updates from their machine when it's down, and provide data on products dispensed, as well as other relevant information, to help restaurants keep the machine running in its optimal condition. This solution is being designed with long term benefits in mind, and would enable future connection with other equipment in the restaurants.

---

[13] Taylor contributed to McDonald's advertisements by knowingly inducing and causing the false advertisements to be published, and Taylor materially participated in McDonald's false advertising.  Likewise, McDonald's contributed to Taylor's advertisements by knowingly inducing and causing the false advertisements to be published, and McDonald's materially participated in Taylor's false advertising.

*The Taylor Shake Sundae Connectivity (TSSC) is currently in test [sic] with NSLC operators and the current target for release in the US market is by the end of Q1, 2021.*

**IMPORTANT NOTE:** We have become aware that a few operators may be using an unapproved aftermarket technology, Kytch, on their Shake Sundae machine. As a reminder, any operator that is using this aftermarket "add-on" to any of their machines, will completely void any existing OEM equipment warranty. Additionally, any machine failures that are associated with the installation of Kytch during or after warranty expires, will be the sole responsibility of the operator, not the OEM supplier. The Kytch device allows complete access to all aspects of the equipment's controller and confidential data, including areas where only certified technicians should have access, creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it. Even more concerning, McDonald's has recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury. As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use, and is reminding you that any continued use is not approved and is at your sole risk.

247. On November 2, 2020, Taylor's directed and published the following false and defamatory statements:

Taylor Shake Sundae Connectivity & Kytch Technology Update

McDonald's US Equipment Team, in partnership with NSLC, has been developing a strategic connectivity solution with Taylor for their Shake Sundae machine. The solution will allow operators to receive text updates when their machine is down, view number of products dispensed, and get other information to keep the. Machine running on optimal condition. *The Taylor Shake Sundae Connectivity (TSSC) is currently in test with NSLC operators and the current target for release to the. US market is by the end of Q1, 2021.*

*IMPORTANT SAFETY NOTE:* We have become aware that a few operators may be using an unapproved after-market technology, Kytch, on their Shake Sundae machine. This action will completely void any existing OEM equipment warranty. More importantly, McDonald's and Taylor have recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine due to its remote operation capability. *As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use. Any continued use is not approved and is at your sole risk.*

248. Taylor and McDonald's advertisements contain false claims about the Kytch Solution and Taylor's own products and services, including: (1) "the Kytch device creates a potential

- 47 -

very serious safety risk for the crew or technician attempting to clean or repair the machine due to its remote operation capability"; (2) "the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury"; (3) the Kytch Solution is either not secure or is defectively designed such that its remote operation capabilities pose a safety risk; (4) the KSD presents an increased safety risk to Taylor machines vis-à-vis Taylor machines without the KSD; (5) Taylor and McDonald's "recently determined" that the KSD poses a safety risk, even though no determination was made because Taylor and McDonald's deny ever having access to KSD, and their internal records show no evidence of safety risks; (6) the Kytch Solution "creat[es] potential equipment reliability issues without the restaurant's knowledge or ability to stop it"; (7) the hidden and uncontrollable "potential equipment reliability issues" Kytch creates are materially different or more problematic than those caused by Taylor's machines generally, or from repairs performed by a Taylor-certified technician; (8) Taylor was ready for commercialization and planned to release the "Taylor Shake Sundae Connectivity" project (Open Kitchen) by Q1 2021; and (9) Taylor's competing device had similar functionality to the Kytch Solution without presenting the supposed safety or reliability risks. These statements are either expressly contradicted or unsupported by Taylor's internal records.

249.    Taylor and McDonald's published multiple versions of this advertisement during the first week of November.  One version makes the additional false claim that "the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury."

250.    Taylor and McDonald's sent these false advertisements to all McDonald's restaurant operators and Taylor's distributor network.  This constituted the majority of Kytch's then-customers, and it was a large portion of Kytch's potential customer pool associated with McDonald's.  The false advertisements and defamatory messages destroyed Kytch's goodwill with these third parties.

**Exhibit 4**
**Page 54 of 114**

251.   Taylor and McDonald's also sent these and similar messages to RBI Brands and Coca-Cola in 2020 to further disparage and defame the Kytch Solution.

252.   Taylor and McDonald's knew that their accusations were baseless and that they would mislead consumers.  But Taylor issued the false advertisements as part of a stall tactic to buy more time to develop the Open Kitchen concept.

253.   The advertisements about Kytch are literally false and misleading in multiple respects.  **First**, Taylor and McDonald's misled consumers into believing that they tested the KSD and factually "determined" that Kytch operates in an unsafe and dangerous manner.  This is false.  Taylor has claimed in this litigation that it did not test the KSD; Taylor COO James Minard stated that neither he nor "[any]one else at Taylor, has obtained or possessed a Kytch device, nor had access to Kytch's software platform."  McDonald's has also denied obtaining the KSD for testing.

254.   **Second**, the advertisements are literally false because they state that the KSD is unsuitable or unsafe for use in kitchens, even though Intertek—one of the leading independent testing laboratories in the world—confirmed and certified that Kytch's products are safe for consumers and that they comply with both FCC requirements and safety standards promulgated by UL.

255.   **Third,** far from being a safety hazard or creating "reliability issues," the KSD improves the effectiveness of Taylor's machines.  And, as explained above, Kytch's safety record is unblemished; the company has never received a single report of injury caused by the KSD.

256.   **Fourth**, the KSD was designed to incorporate the safeguards Taylor designed in its machines.  This includes the magnetic interlock system and other safety features that prevent users from inadvertently engaging the machine's motor during cleaning and repair.

257.   **Fifth,** there is no basis for Taylor and McDonald's assertion that Kytch functions "without the restaurant's knowledge or ability to stop it."  As Taylor knows from accessing the KSP, Kytch's interface gives users complete monitoring **and control** of the KSD's functions.  This monitoring is not available on Taylor's machines.

- 49 -

258.    Taylor intentionally disregarded these facts to convince customers to "remove the Kytch device from any machines and discontinue all use" of Kytch's products.

259.    The context and framing of Taylor's advertising further show that Taylor intended to make—and did make—false statements of facts about Kytch.

260.    Taylor purposefully used the words **"IMPORTANT NOTE"** in bold, capital letters to describe the "serious safety risk" and "serious human injury" to create the overall impression in the mind of reasonable consumers and readers alike that Taylor and McDonald's "determined"— through product safety testing or through other scientific findings—that the KSD posed a substantial hazard to health and safety.

261.    Taylor intentionally communicated to consumers that the KSD was technically unreliable, unsuitable to use in commercial kitchens, and dangerous to human health and safety.

262.    Taylor and McDonald's false statements about Kytch had their intended effect.

263.    Shortly after receiving the false advertisement, Kytch's customers started canceling their subscriptions and cutting ties with Kytch.  Several Kytch subscribers said they believed McDonald's false and deceptive claim that the Kytch Solution "poses a safety risk" and is known to cause human injury.  They also stated that they had no choice but to wait until Spring 2021 to purchase Taylor's competing device.

264.    Taylor and McDonald's false advertisements created these consumer reactions and permanently damaged Kytch's ability to compete in the marketplace.

***After Urging Consumers to Boycott Kytch, Taylor Directed Gamble and Others to Continue to Use the KSD to Help Taylor Incorporate Kytch's Technology into Open Kitchen.***

265.    Taylor's and McDonald's advertisements describe Kytch as a dangerous, unreliable product.  Privately, however, Taylor and McDonald's relied on Kytch's active users to gain access to Kytch's proprietary insights.

266.    Taylor and McDonald's enlisted several Kytch customers to test Open Kitchen beginning in November 2020.  Taylor had promised to commercialize its Open Kitchen concept by Q1 2021, but Taylor and PHD never intended to meet this deadline.

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 56 of 114**

267.    Rather, Taylor intentionally misrepresented Open Kitchen's release date to mislead consumers into believing that a solution to Taylor's broken machines was imminent.  By telling prospective purchasers that the Open Kitchen would be available soon, Taylor persuaded consumers to stop using—and to refrain from buying—Kytch's device.

268.    Desperate to appear that they would launch Open Kitchen during Q1 2021, Taylor, McDonald's and PHD targeted Kytch users—including Gamble, Eric Wilson, and David Balducci—to attend bi-weekly focus groups to jumpstart the development of Open Kitchen. Meeting minutes from the focus groups confirm that McDonald's and Taylor solicited "feedback from operator[s] using Kytch" to identify "[f]eatures from Kytch that [Open Kitchen] lack[ed]."

269.    Taylor, McDonald's and PHD continued to direct restaurant operators to use the Kytch Solution for at least three months after the November 2020 false advertisements.  Taylor and McDonald's received feedback from Kytch's customers explaining that the Kytch Solution was safe, reliable, and that it would not cause "serious human injury."

270.    The documents further demonstrate that Taylor and PHD copied Kytch's design, user interface, features, and customer preferences.  If Taylor actually believed that Kytch was unreliable and unsafe, it would not have systematically copied Kytch's technology and product offerings.

***Defendants Misappropriate Kytch's Trade Secrets.***

271.    After Taylor's distributor TFGroup LLC gained access to Kytch's trade secrets and Confidential Information, Kytch is informed and believes that Taylor benefitted from the misappropriation of trade secrets because TFG shared the information with Taylor.  Taylor and TFG knew that the information was subject to secrecy agreements and, Kytch is informed and believes, Taylor and TFG induced Tyler Gamble to breach his secrecy obligations to gain access to Kytch's confidential information and trade secrets.

272.    Once its distributor had obtained the Kytch Solution Device, Taylor targeted Kytch's customers—who Taylor knew to be bound by NDAs—and induced them to enroll in Taylor's product trial.  Specifically, according to Taylor's own statements, the McDonald's Equipment Team was developing Taylor's competing product.  Three of Kytch's customers have served on the

Equipment Team: David Balducci, Eric Wilson, and Tyler Gamble.  Additionally, Jon Kelley—another Kytch customer who oversees the equipment team—is also testing Taylor's competing product.

273.    Separately, Kytch's investigation revealed more suspicious activities from trial participants connected to McDonald's NSLC.  Sellia Group executed the Kytch Trial Agreement on August 17, 2020, and it operates 18 locations in Massachusetts and Rhode Island, not far from the headquarters of Powerhouse Dynamics.

274.    David Balducci works through the Sellia Group, and they are members of McDonald's Equipment Team.

275.    On March 20, 2021, Sellia Group's Kytch account was accessed from the Chicago, Illinois, and the Bronx, New York, using a VPN, before logging in from Milford, Massachusetts, the area where the account was registered.

276.    On November 1, 2020, Kytch sent the following message to Gamble.

277.    Kytch would later learn that TFG had access to Tyler Gamble's account and, thus, this message.  Taylor knew that Kytch's operating system "KytchOS" presented an existential threat to Taylor's service and repair scheme.

278.    TFG is a distributor for Taylor, but Taylor maintains control over software development and updates related to the machines.  Kytch is informed and believes that TFG was, at all times, working in concert with Taylor to misappropriate Kytch's trade secrets.

279.    Potential investors and customers alike have pointed to Taylor's conduct as a primary basis for why they will not invest in Kytch.  Kytch's communications with at least one investor—Benhamou Global Ventures—stalled after news of Taylor's misconduct became public.

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 58 of 114**

1    280.    And one of Kytch's most trusted advisors—Narbeh Derhacobian—was forced to pull

2    back conversations with other investors based on the uncertainty flowing from Defendants'

3    misappropriation of trade secrets.

4            ***Taylor's Competing Product Is Markedly Similar to the Kytch Solution.***

5    281.    Although initial reports indicated that Taylor would be releasing its Taylor Shake

6    Sundae Connectivity ("TSSC") in Q1 of 2021, the device has not yet been released.

7    282.    The TSSC product is being rolled out through a Taylor-affiliate entity called

8    Powerhouse Dynamics and its "Open Kitchen" concept.

9    283.    In January of 2021, Powerhouse Dynamics released images of the new device, and

10   its offerings and trade dress is similar to the machine depicted in a Kytch user-video that was

11   released years earlier.

12   284.    Specifically, of the hundreds of device functions within the respective products, the

13   three functions Powerhouse Dynamics decided to animate in its marketing materials are identical to

14   the functions depicted in Kytch's rendering.





REDACTED VERSION - FIRST AMENDED COMPLAINT

Exhibit 4
Page 59 of 114

285.    Additionally, although the competing device from PHD has not yet been released, information about the product that is available demonstrates that all of the features in the PHD device are already within Kytch's product offerings.

| Features | Kytch.com | Powerhouse Dynamics |
|---|---|---|
| Servings Reports | ✓ | ✓ |
| Real-Time Text Alerts | ✓ | ✓ |
| Machine Status Updates | ✓ | ✓ |
| Machine History | ✓ | ✓ |

286.    PHD's product offers servings reports which resemble Kytch's method for programmatically opening the menu to retrieve the data at a specified time each day, saving the data, and displaying the data on a website or email notification.

287.    Beyond the similarities in the names of the two products, PHD's Kytch replacement device resembles the Kytch Solution's Rewind feature; PHD offers a visual representation of the machine's time on various modes.

288.    PHD also offers real time alerts via text message on soft and hard locks presented on the front panel of the machine.  Kytch's innovations involve reading messages on the screen and sending real-time alerts regarding those messages.

289.    In its current form, the Taylor machine is incapable of connecting to the internet. Therefore, Powerhouse is likely adding a computing module (raspberry pi or the like) that has wifi capabilities.  Just like the Kytch Solution.

290.    Powerhouse Dynamics's version of Kytch references all Kytch's landmark features, its design, and several components that were subject to binding non-disclosure agreements and that were not publicly available.

291.    The fact that Powerhouse Dynamics graphics highlight the display of the hopper temperatures provides further evidence of overlap from Kytch's earlier offering.  Displaying hopper temperatures is *not* permissible in the default setting of the Taylor machines.  Indeed, the display of hopper temperatures deviates from Taylor service manuals.  Kytch's innovation was delivering its

REDACTED VERSION - FIRST AMENDED COMPLAINT
Exhibit 4
Page 60 of 114

1  users information related to hopper temperatures, and this fact was only shared as Confidential
2  Information to trial participants.

3       292.   Finally, Powerhouse Dynamics's website indicates that the competing device is
4  being tried out with McDonald's franchise operator and Equipment Team co-lead Louis Buono, Jr.

5  ***Taylor, McDonald's and Middleby Have Repeatedly Misled Consumers with Empty Promises***
6  ***About the "Imminent Release" of Workable IoT Solutions.***

7       293.   In addition to misrepresenting the quality and nature of the Kytch Solution, Taylor
8  and McDonald's assured consumers that they would launch Open Kitchen during Q1 2021.  But
9  Open Kitchen is still not on the market as of the time of this filing.

10       294.   Text messages from Gamble demonstrate that in January 2021—two months after
11  the Open Kitchen announcement—Taylor knew it would be unable to meet the advertised release
12  date. Instead of the Q1 2021 deadline, Gamble hedged and assured restaurant operators that Open
13  Kitchen "***should be*** made available by summer 2021."

14       295.   This is not the first time that Taylor, McDonald's, and Middleby have lied about their
15  ability to fix Taylor's soft-serve machines.  Taylor and McDonald's contend that a fix is right around
16  the corner whenever media outlets report on their broken machines.  But year after year, those fixes
17  never materialize, and Taylor continues to reap the benefits of its repair racket.

18       296.   For example, *Business Insider* published a story in March 2017 about the broken
19  soft-serve machines.  A spokesperson for the company said that McDonald's was "finally replacing
20  its ice cream machines, after years of complaints from customers."[14]  Four years later, McDonald's
21  has not replaced its machines and the machines are still broken.

22       297.   Taylor marketed "an addition to" its supposed IoT platform, Taylor ATLAS (the
23  precursor to Open Kitchen), throughout 2018.  Taylor promised that this new product would
24  "provide[] customers the ability to monitor data and initiate service to avoid downtime with Taylor
25  equipment."  But Taylor ATLAS had only rudimentary data acquisition and analysis capabilities

26

27      **[14]** Kate Taylor, *McDonald's is making a big change after years of complaints from customers*, Business Insider, (Mar. 3, 2017), ://www.businessinsider.com/mcdonalds-is-getting-new-ice-cream-machines-2017-3.
28

and, unlike the Kytch Solution, did not allow users to fix malfunctioning soft-serve machines *or to monitor the soft-serve machines in real-time*.



298.    Taylor never released this product.

299.    As Taylor touted the ATLAS platform in Spring 2019, Middleby started advertising another IoT solution called Middleby Connect.    Middleby's marketing materials describe Middleby Connect as an "IoT-based equipment management system for the food service and baking industries" that provides "one point of access to all [] equipment across Middleby brands [and] orders."    Middleby Connect also promised to "save [customers] money on many aspects of operation" such as "updating programs and software."

300.    Middleby Connect supposedly "g[i]ve[s] [users] a quick and easy overview of all [their] equipment and can notify [them] before operational problems arise . . . [and allows] technician[s] . . . to see the service status of [] equipment and which components need replacement soon," facilitating "preventative maintenance, and more efficient service calls."



301.    These claims are false.  If Middleby Connect had the connective diagnostic and over-the-air update capabilities Middleby claimed, Taylor could have competed with the Kytch Solution—and it would not have developed Open Kitchen in the first place.

302.    Much like Taylor ATLAS, Middleby appears to have abandoned its Middleby Connect technology, and the Middleby Connect website (www.MiddlebyConnect.com) was deactivated around the time Kytch filed this lawsuit.

303.    In April 2019, Middleby acquired PHD, and later that year began marketing PHD's SiteSage technology as a "[c]onnected [k]itchen" "IoT [s]olution" for addressing, among other things, "equipment performance."

REDACTED VERSION - FIRST AMENDED COMPLAINT

Exhibit 4
Page 63 of 114

304.    SiteSage, like Taylor ATLAS, is a low-tech platform incapable of performing many of the complex diagnostic functions carried out by the Kytch Solution, and without the man-in-the-middle technology that allows users of the Kytch Solution to remotely interact with, and repair, Taylor soft-serve machines.

305.    SiteSage failed to provide a solution and it never launched as advertised.

***Taylor Published the False Advertisements with Reckless Disregard for the Truth.***

306.    Before publishing its false advertisements, Taylor knew—but intentionally misrepresented, disregarded, and concealed—facts that disproved its false preconceived narrative that Kytch is unsafe or unreliable.  The facts include:

- The KSD successfully completed Intertek's rigorous, independent laboratory testing and satisfied applicable safety standards promulgated by the UL and the FCC.  These are the same standards that govern Taylor machines.

- Intertek's seal of approval is featured prominently on the KSDs that Taylor accessed and viewed beginning in February 2020.

- The KSD integrates and is constrained by Taylor's existing safety mechanisms.  For example, the KSD utilizes Taylor's magnetic interlock system to disable the machines' control panel.  This immobilizes motor function to protect operators or technicians from being injured.

307.    Tyler Gamble provided this information to Taylor in October 2020.  Taylor also knew the following facts before publishing the false statements about Kytch:

- Kytch improves the reliability of Taylor's machines, as evidenced by numerous news reports reviewed by Taylor's CEO and COO, customer feedback Taylor received describing the increased uptime and improved functioning made possible via the KSD, and because Kytch's customers reported fewer machine outages and their service requests decreased.

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 64 of 114**

- Despite its representations to the contrary, Taylor never actually "determined" that Kytch was unsafe or unreliable. It fabricated those concerns to drive Kytch out of the marketplace as a stall tactic to buy more time to develop Open Kitchen.

- Taylor knows the "reliability issues" are caused by its own machines. For decades Taylor and McDonald's have admitted that the machines are notorious for breaking down.

308.    Taylor manufactured the safety concerns as part of its preconceived narrative to destroy Kytch's business. Taylor created this narrative in February of 2020 a short time after *Business Insider* reported on Kytch's early successes. Kytch was Taylor's only competition in the marketplace, and Taylor knew that restaurant operators would adopt Kytch's innovative technology to reduce overhead and increase revenue by improving ice cream sales. In February 2020, Taylor's leadership explained to McDonald's franchise operators Gamble and Wilson that it would deploy the false safety claims about the KSD when Kytch gained traction in the market.

309.    Taylor also intentionally avoided obvious sources of information that contradicted its statements. For example, Taylor did not contact Intertek or the FCC to raise these safety concerns. Taylor has also never communicated with Kytch founders Jeremy O'Sullivan or Melissa Nelson to discuss Kytch's safety even though they have a longstanding working relationship dating back to 2014 when Nelson and O'Sullivan first started developing products to improve the safety of Taylor's machines.

310.    Taylor's accusations are also inherently improbable. The largest organization of independent McDonald's franchise operators in the world endorsed Kytch as an effective and reliable solution to fix Taylor's soft-serve machines. Taylor knew that many of these franchise operators were directly involved in McDonald's product development efforts, and that they had spent thousands of hours using and observing the KSD. The National Owners Association would not have endorsed Kytch's product if Taylor's explosive safety claims were true.

311.    Indeed, the October 2020 endorsement from the National Owners Association triggered Taylor's false advertisements against Kytch. As demand for Kytch grew, McDonald's

1  informed Taylor that its independent owners were pressuring corporate leadership to adopt Kytch

2  into the McDonald's system to alleviate the exorbitant repair fees they were being forced to pay

3  Taylor.

4       312.    Taylor's solution was not ready for market so Taylor needed a stall tactic to buy more

5  time to develop Open Kitchen.  So it manufactured the false ads attacking Kytch's safety record and

6  reliability.  It also falsely claimed that Open Kitchen would be released in Q1 of 2021 despite

7  knowing that it needed more than a year to develop its technology.

8       313.    Taylor also had a strong financial motive to misrepresent the facts about Kytch's

9  products.  Taylor's business model relies on a massive web of distribution partners who repair,

10  maintain, and service Taylor's soft-serve machines.  Kytch threatened this lucrative arrangement

11  when it entered the marketplace because Kytch gave customers the ability to control their machines

12  without needing to hire a Taylor-certified technician.

13      314.    Separate and apart from these pre-publication indicators of its actual malice, Taylor's

14  conduct **after** publication provides even more evidence of its actual malice and disregard for the

15  truth.  Despite instructing users to "discontinue use" of Kytch's products based on the false safety

16  claims, from November 2020 through January 2021, Taylor directed a subset of customers to

17  continue to use KSDs so that Taylor could incorporate Kytch's innovations into Open Kitchen.

18                      ***Taylor Doubled Down on Its False Claims***

19                  ***Even After Kytch Provided Formal Written Notice of the Facts.***

20      315.    Kytch tried to mitigate the harm caused by Taylor and McDonald's false

21  advertisements by demanding a full retraction on December 7, 2020.  The letter provided "written

22  notice of the falsity of Taylor's claims about Kytch" and explained why Taylor's claims are false

23  and defamatory:

24              There is absolutely zero support, whatsoever, for Taylor's claim that Kytch
               "creates a potential very serious safety risk" or its accusation that Kytch
25             "can cause serious human injury."  Tellingly, Taylor has failed to even
               attempt to corroborate its prevarications about Kytch's safety record.  In
26             fact, Kytch underwent extensive product testing and certification at Intertek
               during product development to ensure that it satisfies all Underwriters
27             Laboratories (UL) electrical safety requirements. Kytch conforms to ULL

28

STD 62368-1 and has successfully completed EMC testing consistent with the requirements of 47CFR Subpart B§§ 15.101 -15.123. There have not been any reported "human injur[ies]" of any kind that were caused by Kytch's devices.  To be clear, Kytch does not permanently alter the machine, and it certainly does not disable or otherwise negate any of the machine's factory-installed safety mechanisms.  The opposite is true: Kytch warns the user when a particular component of the machine may fail and it monitors how often and effectively each machine is cleaned, thus optimizing operating conditions.

Moreover, Kytch was designed to complement the existing safety tools, including but not limited to quality control of the ice cream's temperatures. The "IMPORTANT NOTICE" fails to provide substantive details regarding what supposedly makes Kytch unsafe to operate.  It does, however, claim that Kytch is "creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it."  This is a complete fabrication. Rather, Taylor has intentionally created "equipment reliability issues" for years, and its service department has charged hundreds of millions of dollars in fees for repairs that Taylor itself caused.  Taylor's claim that Kytch's remote-control capabilities present a safety hazard is also manifestly false. Kytch's functionality only permits users to control a machine in the same way that the machine is operated without Kytch.  For example, just like a human operator, Kytch can only utilize the same functions that are available to workers using a Taylor machine without Kytch.  In other words, Kytch is restricted by all of the same safety mechanisms that constrain human operators.

316.    A copy of the December 7, 2020 letter is attached as **Exhibit 4.**

317.    Taylor disregarded Kytch's retraction demand and failed to respond to the merits of Kytch's letter.  To date, Taylor has refused to retract its false and damaging accusations against Kytch.

***Despite Threatening Legal Claims Against Kytch in June 2019 and December 2020, Taylor Systematically Destroyed Documents Until June of 2021.***

318.    Kytch's retraction demand notified Taylor that litigation regarding these issues was imminent.  The letter also included detailed document preservation language, set forth below:

[U]ntil all issues regarding Taylor's unlawful conduct are fully resolved, we require that you ***preserve and retain all documents, data, and electronically stored information relating in any way to Frobot, Kytch, their products, or your attempts to damage Kytch's business reputation and professional standing.  These items should be preserved regardless of the medium, format, or device on which they are stored or hosted, and regardless of whether they appear in documents, drafts, notes, emails,***

- 61 -

*text messages, voicemail messages, social media posts, or in any other*
*form.  Failure to adhere to this request could subject you to significant*
*penalties, including claims and sanctions for spoliation.  Please let us*
*know if this request is in any way unclear.*

319.    Despite this clear directive, Taylor failed to take any precautions to instruct employees—including key witnesses in this case—to preserve documents until after this case was filed.

319.1   According to a sworn declaration Taylor's executive Scott Nicholas systematically deleted "work text messages" about Kytch as recently as June 2, 2021—one month *after* Kytch filed this case and *six months* after Kytch's document preservation notice.

319.2   Nicholas text messaged Gamble and others "about the relative advantages" of the KSD and KSP compared to Open Kitchen.  But Taylor deleted these and other text messages of Nicholas discussing the facts at the heart of this litigation.

319.3   Taylor communicated with counsel about potential claims against Kytch in February 2020—further showing that Taylor anticipated litigation while it systematically deleted documents that are relevant to this litigation.

320.    Taylor anticipated litigation with Kytch as early as June of 2019 when it sent Kytch a cease-and-desist letter based on Kytch referencing Taylor in marketing materials.  But Taylor deleted Heather Jordan's entire email account in August 2020, and there is no backup.

321.    Jordan was central to Taylor's attempts to misappropriate Kytch's technology.  She was Taylor's "Distributor Technology Manager" responsible for "manag[ing] development and support of technology solutions."  Documents show that Minard tasked Jordan with attempting to secretly obtain a KSD, TFG sent Jordan screenshots of the KSP, and Jordan (together with Nicholas) worked with Gamble to compare Open Kitchen to Kytch's products.

322.    Taylor has also admitted that it deleted Heather Jordan's *entire* email account in August 2020—and there is no backup.  Jordan was a key player in Taylor's efforts to obtain Kytch's

KSD (and access to its KSP) and steal Kytch's technology. In 2019, Taylor COO Minard tasked Jordan with attempting to secretly obtain a KSD. Jordan (together with Nicholas) communicated with TFG and Gamble to compare Kytch's products to the competing device Taylor was developing.

323. For example, in March 2020, TFG principal Blaine Martin emailed Jordan to urge Taylor to add ████████████████████████ Open Kitchen. TFG informed Jordan that this alert was "the entire reason" an operator "purchased the Kytch system." Jordan relayed the message to PHD, and she later explained that she was *working to "collect feedback" from Tyler Gamble "to make decisions on our IoT solution going forward."*

324. This is clear evidence that the Jordan email account contains highly relevant information evidencing the misappropriation. But Taylor failed to produce *any* communications between Jordan and Gamble even though the two worked closely to misappropriate Kytch's trade secrets. That is likely because Taylor deleted Jordan's emails demonstrating Taylor's tortious actions.

325. The graphic below depicts the timeline of Taylor's document preservation obligations from June 11, 2019 (when Taylor first sent a cease-and-desist letter to Kytch) to June 2, 2021 (when Taylor finally stopped deleting communications about Kytch that go to the heart of this case).



***Defendant's Tortious and Unlawful Conduct Destroyed Kytch's Business.***

326.    Defendants' tortious conduct grievously injured Kytch—a fast-growing company with devoted customers—at a critical time in its development, destroying the business.

327.    Kytch's enterprise value is a fraction of what it was before Taylor's disparaging ads. Kytch's reputation has become tainted by Taylor's false claims that the KSD is unsafe, known to cause human injury, and unreliable.

328.    Taylor's statements have undermined trust and consumer confidence in Kytch and in the security and reliability of its hardware and software solutions.

329.    The statements go directly to the heart of Kytch's trade.  Kytch spent years in product development to create a safe solution to modernize Taylor's soft-serve machines.

330.    Taylor is primarily engaged in the business of selling goods and services, its false advertisements consist of misrepresentations of fact about Taylor's and Kytch's products, and the intended audience of Taylor's statements was actual and potential buyers or people likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer.

331.    Kytch entered the market in late 2019 and roughly doubled its customer base each quarter over its first year of operation. As of October 2020, Kytch had 425 subscribers and a 93% customer retention rate.  Due to the significant value the Kytch Solution offered to franchise owners, the company was able to successfully raise prices three times in its first year of operation—from a $0 activation fee and $10 per month, to a $250 activation fee and $29 per month, to a $250 activation fee and $39 per month.  Kytch further anticipated raising prices one more time to charge $49 per month.

332.    Beyond the activation fee and subscription fee revenues it was already collecting from its customer base, in October 2020 Kytch had four additional products in development.  ***First***, Kytch was testing a remote diagnosis service, offering basic service and advice via telephone and online chat.  ***Second***, Kytch's planned e-commerce business would sell replacement parts for Taylor machines and connect them with qualified repair technicians outside the Taylor network.  ***Third***, Kytch planned to launch an "API and Data" business, which would monetize the treasure trove of

data Kytch was gathering by observing the Taylor machines.  This product relied upon the growth of the Kytch Solution to gather data.  ***Fourth***, Kytch planned its own operating system, which would be licensed to commercial grade appliance manufacturers like Taylor.

333.    Kytch was also in serious talks with prominent Silicon Valley Venture Capital firms to raise a $10 million Series A, on a $50 million dollar valuation.

334.    Defendants' conduct radically changed the business landscape for Kytch—its good will among restaurant franchise owners has been destroyed, its business has dried up, and Kytch's innovative solutions are now in Taylor's hands.

335.    Beginning in November 2020, Kytch lost nearly all its existing customers, cratering to just 83 renewing devices in 2021. Despite its prior growth, Kytch has attracted essentially no new customers.

336.    Kytch's plans to develop new product lines were crushed when the Defendants decimated Kytch's client base—the product lines are no longer a viable model without subscribers.

337.    Kytch has lost millions in profits to date and will lose many millions in profit in the years to come.  Kytch's valuation has plummeted to as low as $3 million.

338.    By contrast, Taylor has continued to rake in $75 million in annual revenue from its repair racket at McDonald's and other restaurants.

**FIRST CAUSE OF ACTION[15]**

**Breach of Written Contract (Gamble)**

339.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

340.    The Kytch Trial Agreement was a valid and existing contract at all times during and after Gamble's involvement with Kytch and imposed binding contractual obligations on Gamble at all relevant times and as a condition of Gamble's participation in the Trial.

341.    The Kytch Trial Agreement also contains the following confidentiality undertaking: "You agree, both during the term of this Agreement and for a period of five years after termination

---

[15] The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these claims all readings that might otherwise be construed to be outside of their scope.

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 71 of 114**

of this Agreement, to hold Kytch's Confidential Information in strict confidence using no less than a reasonable degree of care, not to disclose Kytch Confidential Information to any third party (other than your users) and not to use Kytch Confidential Information for any purpose other than your evaluation of the Solution as part of the Trial."

342.    The Agreement defines "Confidential Information" as "aspects of [Kytch's] Products and information relating to its features, specifications, functionality and performance."  Gamble breached this clause by: (a) participating in the development of the competing Taylor device known as TSSC/Open Kitchen; (b) assisting in the disassembly, reverse engineering, and distribution of at least the Brownsville Kytch Solution Device; (c) granting Taylor, TFG, and McDonald's access to the Kytch Solution Platform.

343.    The Kytch Trial Agreements further prohibits Gamble from taking any of the following actions:

- "remove or modify any Solution markings or any notice of Kytch's or its licensors' proprietary rights;

- modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute or republish all or any part of the Solution, or otherwise access or use the Solution in order to build or support, and/or assist a third party in building or supporting, products or services competitive to any Kytch Solution;

- disclose results of any benchmark tests or performance tests of the Kytch Solution without Kytch's prior written consent;

- perform or disclose any of the following security testing of the Solution (or associated systems, services or infrastructure): network discovery, port and service identification, vulnerability scanning, password cracking, remote access testing, or penetration testing; and

- license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing or service bureau use, or otherwise commercially exploit or make

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 72 of 114**

1          the Kytch Solution available to (or use such Solution for the benefit of) any third

2          party."

3          344.    Gamble breached this clause by: (a) participating in the development of the

4    competing Taylor device known as TSSC/Open Kitchen; (b) assisting in the disassembly, reverse

5    engineering and distribution of at least the Brownsville Kytch Solution Device; and (c) granting

6    TFG and McDonald's access to the Kytch Solution Platform.

7          345.    Gamble improperly took and continues to retain Kytch "Proprietary Information" to

8    develop products and to otherwise compete against Kytch.

9          346.    Gamble and his company improperly took and continue to retain Kytch's

10   Confidential Information for the additional purpose of enriching themselves in breach of the Kytch

11   Trial Agreement.

12         347.    Kytch is entitled to recover from Gamble the damages he caused by breaching the

13   Kytch Trial Agreement and the Terms of Service.

14         348.    The amount of such damages cannot be determined at this time but will be proven at

15   trial.  Kytch is further entitled to recover from Gamble the gains, profits, and advantages that Gamble

16   obtained as a result of these breaches.  Kytch is currently unable to ascertain the full extent of these

17   gains, profits, and advantages but will prove the value thereof at trial.

18         349.    Kytch is informed and believes that Gamble is continuing to breach the Kytch Trial

19   Agreement.

20         350.    By reason of the ongoing breaches, Kytch has and will suffer great and irreparable

21   harm and damage, which harm and damage will be difficult to ascertain, and Kytch will be without

22   an adequate remedy at law.

23         351.    Gamble acknowledged in the Terms of Service contract that: "Kytch may seek

24   injunctive or other equitable relief to protect its confidential information and intellectual property

25   rights or to prevent loss of data or damage to its servers in any court of competent jurisdiction and

26   You agree that Kytch may do so without the need to post bond or other surety."

27

28

352.    Kytch's ability to provide comprehensive explanations of the machines' errors is made possible through years of product testing and through hundreds of machines connected to Kytch's platform.  The data yield from these interactions provides Kytch a competitive advantage because Kytch was testing and evaluating Taylor's machines to a greater extent than Taylor, even before the trials expanded to McDonald's locations.

353.    Kytch has flagged defects and bugs with Taylor's software, including the daylight savings bug that causes heat cycle failure, a software version that makes the barrels too cold and causes interruptions of functionality, and the tendency of the machines' heat cycle target temperatures to change on a nightly basis.

354.    Maintaining this information as confidential is essential to Kytch's ability to compete in the market of IoT technology.  These fields are characterized by rapid technological advances and intense competition.  If a competitor were to obtain details about Kytch's technology or related commercial information, that competitor could significantly harm Kytch by using Kytch's own technology, know-how, and other details about these products to compete directly with Kytch without having to spend the capital or time that Kytch invested in developing such technologies.

355.    If Kytch's competitors continue to obtain access to Kytch's Confidential Information, those competitors will benefit significantly from the knowledge gained through that access by directing their product development and marketing efforts to frustrate Kytch's plans.  This strategic advantage to Kytch's competitors could, in turn, severely harm Kytch.

356.    Kytch's research and development is conducted under rigorous conditions to maintain the secrecy of those activities and the products themselves.  Kytch carefully controls all information relating to these projects.  The Kytch development teams expend substantial time and energy to ensure that the process remains secret.  Further, Kytch has spent multiple years working on secret products and methods that have never been discussed publicly.

357.    The information and physical devices misappropriated by Defendants are comprised of confidential information about Kytch technology, its online interface and security processes, and confidential Kytch documentation.  All of this material comprises Kytch trade secrets.  In violation

of Kytch's rights, the Defendants misappropriated Kytch's confidential information in the improper and unlawful manner as alleged herein.

358.    Defendants' misappropriation of Kytch's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Defendants have attempted and continue to attempt to conceal their misappropriation.

359.    As the direct and proximate result of Defendants' conduct, Kytch has suffered and, unless Defendants' conduct is stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.

360.    Because Kytch's remedy at law is inadequate, Kytch seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Kytch's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

**SECOND CAUSE OF ACTION**

**Tortious Interference of Contract (All Defendants)**

361.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

362.    Kytch entered into NDAs with the Kytch Trial participants including but not limited to: Tyler Gamble; Eric Wilson; David Balducci; Kevin Moore; Jon Kelley; and others.

363.    The NDA is incorporated into the Kytch Trial Agreement through the Terms of Service and constitutes a valid and enforceable contract pursuant to which Kytch provided Kytch Trial participants and Authorized Users access to the Kytch Solution in exchange for covenants of confidentiality, non-disclosure, and agreements for the sole purpose of furthering the Kytch Trial.

364.    The NDA expressly prohibits Kytch customers and Authorized Users from aiding or assisting any third-party in developing or testing a product or service competitive to Kytch.

365.    In exchange for the Kytch Trial participants' covenants of nondisclosure and secrecy, Kytch agreed to provide its trade secrets and Confidential Information—including Kytch Solution and Kytch Solution Platform—for them to use for the sole purpose of furthering the Kytch Trial.

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 75 of 114**

366.    Defendants had knowledge of the Kytch Trial Agreement and intentionally selected Kytch's customers to develop Taylor's competing product in breach of the NDA.

367.    Defendants had knowledge of these contracts—Taylor solicited Kytch customers based on their participation and Tyler Gamble and others publicly discussed their participation in Kytch's product trial, and upon information and belief, discussed the same with Taylor and TFG.

368.    Defendants acted intentionally to interfere with and induce Gamble and the others (including but not limited to those referenced above) to breach the Kytch Trial Agreement by providing it with access to the Kytch Solution Device and Platform.

369.    Taylor and TFG pushed Trial Participants to breach the Kytch Trial Agreement, using their corporate influence over McDonald's franchisees.  Likewise, Gamble used his leadership position on the NSLC to induce other Kytch Trial participants to breach their contracts with Kytch. This includes Gamble's efforts to develop Taylor and PHD's competing product by using Kytch's customers and the proprietary insights they obtained by virtue of the Kytch Trial.

370.    Defendants' intentional actions caused Kytch considerable damage by disrupting its contractual relationships with Gamble, caused Kytch's performance under the contract to be more expensive and difficult, and resulted in breaches of the Kytch Trial Agreement.

371.    Taylor and TFG's intentional actions caused Kytch substantial damage by disrupting its contractual relationship with Gamble and the Kytch Trial participants identified above, allowing Taylor to launch a competing device and driving investors away from Kytch.

372.    As a direct and proximate result of these actions, Kytch has suffered severe and substantial economic harm.

### THIRD CAUSE OF ACTION

### Violation of California Uniform Trade Secrets Act (All Defendants)

373.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

374.    There is nothing like the KSD on the market, and the ability of a competitor to access and test the device would allow the competitor to obtain an extraordinary head start in the creation of a competitive device.

375.    When the Kytch Solution is connected to the internet, the software sends messages to www.Kytch.com.

376.    The Kytch Solution is depicted below in the "Kytch Kit."



377.    The KSD works with custom-made ███████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████

378.    ████████████████████████████████████████████████████████
████████████████████████████

379.    Kytch's technology and wrap-around software and online platform improve the limited and simplistic interfaces of many appliances.  Taylor machines are designed so that only technical experts can navigate their internal workings.  Kytch disrupted this approach by creating user-friendly interfaces that are accessible to people without any technical training.

380.    Generally, Kytch collects three types of proprietary data for the soft-serve machines.

381.    *First,* ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Exhibit 4
Page 77 of 114

1   ████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7     382.    The second datatype is related to machine settings, including: ███████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ██████████████████████

12     383.    Both datatypes reflect unique selections of data for at least two reasons. Taylor makes

13 it extremely difficult, if not impossible, for owners of the device to be able to access this data without

14 the assistance of a trained technician. Moreover, it was only after extensive analysis of massive

15 amounts of data that Kytch identified the above factors as relevant for making decisions on the

16 machine.

17     384.    The third datatype is production data. This includes ████████████████

18 ██████████████████████████ To capture the necessary data, Kytch employs scripts to

19 programmatically enter the menu without human assistance. This is unique because normally a

20 human operator must press a ***minimum of 12 buttons*** just to open the Manager's Menu.

21     385.    Another innovative component of Kytch's trade secrets is the remote method for

22 interacting with kitchen devices that Kytch pioneered using a universal master operating system to

23 serve as the user interface and communication system with kitchen appliances. This is made possible

24 through a man-in-the-middle cable and software for securely inserting the Kytch Solution for

25 reading and writing data to and from the control panel assembly of the appliance, without exposing

26 users, employees, and technicians to the potential of high voltage shocks or other related hazards.

27

28

Exhibit 4
Page 78 of 114

386.    The man-in-the-middle ("MITM") software code allows Kytch ███████████

████████████████████████████████████████████████████████████████████████████

█████████████████████    The software then communicates messages from the device to

Kytch's cloud system for data analytics and navigation.

387.    Kytch constantly reviews customers' reported errors, and these readings and related

notifications Kytch provides concerning the issues are available for customers to review on Kytch's

online platform.  By detecting anomalous appliance behavior, Kytch builds preference models and

enhances its business analytics to predict the needs of its customers.

388.    Part of Kytch's proprietary technology is discriminating between the substantial

amounts of data that it gathers from customers' machine usage.  Kytch sends only select machine

metrics, typically based on thresholds that Kytch has set based on the historic performance and error

rates of the machines plugged into Kytch's systems. This information includes: ██████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████    warning of

potential damage to equipment due to human error; ██████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████    (7) identifying lack of training

and improper use of the machines; and (8) advanced troubleshooting based on customer data across

the Kytch platform.

389.    If the machine's AUTO function is disabled, ███████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████

REDACTED VERSION - FIRST AMENDED COMPLAINT

Exhibit 4
Page 79 of 114

1    390.    The machines' heat cycle commonly fails, and this is often not addressed by

2  restaurant staff quickly enough.  Alternatively, the staff lacks the technical know-how to mitigate

3  this failure.  Kytch Assist functions as a human-assisted automation service.  Kytch manages heat

4  cycle

5

6

7

8    391.    The machines' heat cycle commonly fails

9

10

11

12    392.    Taylor's glycol holding temperature is set at 165

13

14    393.    Kytch's data has determined

15

16

17

18                                    Kytch informs customers

19

20    394.    Kytch also sends productivity alerts

21

22

23                                                        , Kytch sends a message to the user

24

25    395.    Kytch provides real-time alerts on

26

27

28

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 80 of 114**

396.    Kytch also provides informative warning alerts in order to prevent damage to the machine ████████████████████████████████████████████

### *The Kytch Online Platform & Notification System*

397.    Working in tandem with Kytch's data retrieval and data analytics systems, the KSP is Kytch's proprietary and confidential online platform at www.Kytch.com that provides customers with more ways to understand and interact with the soft-serve machines.

398.    There is nothing like the KSP on the market, and the ability of a competitor to access and observe in real time the operation of the KSP allows a competitor to obtain an extraordinary head start in the creation of a competitive device.

399.    Kytch sends its customers daily reports regarding machine usage. One example is the Servings Summary, which contains the number of shakes and soft-serve products that were produced each day. This information can only be produced using the proprietary script used to programmatically open the menu employed by the Kytch Solution. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

Exhibit 4
Page 81 of 114



400.    Another function available on Kytch.com is "Kytch Rewind." ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The visualization is
similar to a video rewind function.

401.    The genesis for Kytch Rewind took place during product testing.  Kytch needed a
way to correlate the data from the machines to identifiable recurring events—either with the
machine itself, or through human interactions.

402.    So Kytch ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ This monitoring enabled Kytch to troubleshoot errors in a data-driven manner.

403.    Specifically, ▮▮▮▮▮▮▮▮▮▮▮▮▮ whether a particular outage was caused by human
error—such as loading frozen ice cream mix into the machine—or a software bug.

404.    When Kytch realized how useful this tool was, it developed Kytch Rewind to further
empower its customers to better understand their machines.

405.    Kytch Rewind allows the user ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

REDACTED VERSION - FIRST AMENDED COMPLAINT

Exhibit 4
Page 82 of 114

1  ████████████████████████████████████████████ ██

2  ████████████████████████████

3  406.  ████████████████████████████████████████████

4  ████████████████████████████████████████████

5  ██████████████████

6  407.  Reviewing these patterns subsequently allows Kytch to continue to optimize the

7  machines and select the optimal parameters for functioning, and to avoid outages and costly service

8  appointments.  A screenshot of the rewind function is below:



18  408.  In this exemplar, Kytch Rewind shows the user the contents of the machine's menu

19  at 5:59 a.m. ET.  The machine was in "HEAT MODE" while the right hopper had low mix.

20  409.  Another feature of Kytch's notification system is Kytch Assist.  Kytch Assist uses

21  human-assisted experience to make decisions to keep Taylor machines up and running.  ████

22  ████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████

25

26

────────────────

27  [16] The JP2 pin of Taylor's C713 machine hides the hopper temperature by default.  ████

28  ████████████████████████████

Exhibit 4
Page 83 of 114

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3      410.    The interaction of these files and the methodology and processes for keeping the

4 system stable and functional have taken a substantial amount of time and money to develop and

5 perfect.  An example notification from Kytch Assist is depicted below.



**Kytch Assist**                                                    9:30 AM

Heat cycle failed because the left hopper reached 135.7 degrees instead
of the required 151 degrees during the HEAT phase. Kytch restarted the
heat cycle to reduce downtime. Potentially caused by overfilling the
hopper.

11      411.    This notification describes a common error that frustrates many Kytch clients: the

12 heat cycle fails because the hopper missed the target temperature required by the heating phase by

13 approximately one degree.

14      412.    Based on ███████████████████████████████████████████

15 ██████████████████████████████████████████████████████

16 ██████████████████████████ Kytch Assist ████████████████

17 ███ to avert machine outages.  If Kytch takes action on the machine,

18 ██████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████

22 ████████████████████████████ The purpose of these notifications is to educate

23 the user about their machine's issues, ██████████████████████████

24 ███████████████████████████

25      413.    This is important because Kytch's data analysis has confirmed ████████

26 ██████████████████████████████████████████████████████

27

28

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4
Page 84 of 114**



1      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This means less

2 downtime than waiting for an employee to get around to pressing the button during a lunch rush.

3         414.    Additionally, Kytch's data capture exposes when employees misuse the soft-serve

4 machines. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮

12         415.    Kytch notifies the user ▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮▮▮▮▮▮ Kytch notifies the user ▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮ Kytch has developed the ability to ▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Kytch examines ▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮ to warn customers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮

22         416.    Kytch also notifies users when there is a potential issue with ▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 85 of 114**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



417.    Kytch also notifies users when

22

23

24

For example, Kytch notifies the user

25

The notification also directs the user to use the Kytch.com web application

26

27

28

1   ██████████████████████████████ Kytch may notify ████████████████

2   ████████████████████████████████████████████████████

3      418.    One of the most important features of Kytch's platform is the Remote Control

4   application and interface.   This permits Kytch's customers to access Taylor's machines and to

5   optimize the functionality of their machines even when they are not on site.

6      419.    The Remote Control creates a power shift, as one operator or their in-house

7   technician can now access all of their machines from one location.

8      420.    Kytch's innovative solutions reduce franchisees' need to hire Taylor technicians by

9   providing, for the first time, previously unavailable data and control mechanisms in the palm of each

10  user's hand.

11     421.    Kytch's Remote Control is designed to capture the front panel of the Taylor

12  machines, and it allows users to quickly understand how to use the equipment.   Kytch also provides

13  ███████████████████████████████████████      The image below

14  depicts the remote-control feature on Kytch's online platform.



15

16

17

18

19

20

21

22     422.    After many hundreds of hours of data analysis on hundreds of machines, Kytch has

23  determined that many of the issues with the machines can be corrected by simply using the controls

24  and menu on the Taylor machine.

25     423.    For example, thermistor probes measure temperatures within the machine.   Kytch

26  discovered that ████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28

1

2

3       424.   Kytch also discovered a cryptic message, "E7," that displayed on the "brush clean"

4 counter, because Taylor's software was unable to display a three-digit number. Kytch's software

5 determined that "E7" indicated that 147 machine hours had passed since the freezer door was last

6 removed. However, despite this cryptic message, the machines continued to operate and serve

7 customers. In simple terms, this means that the machines were designed to serve ice cream without

8 complying with the mandatory brush-cleaning schedules required by public health and safety

9 standards.

10

11      425.

12

13

14

15      426.

16

17

18

19

20      427.   Customers often praise the proactive flagging of software bugs Kytch provides

21 through Kytch's notification systems and data analytics. Additionally, Kytch tracks all temperatures

22 and alerts across each machine connected to its system. Because of the hundreds of devices on its

23 network, Kytch can analyze the data and flag software errors within Taylor's product.

24      428.   When Kytch uncovers common or disruptive bugs, it notifies its customers about the

25 issues, and it attempts to identify and implement automation features to counteract the errors.

26 Kytch's ultimate goal was to create a stable software version that was direct-to-consumer and

27 included updates to eliminate these bugs.

28

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 88 of 114**

1    429.    One such error is ███████████████████████

2    ████████████████████████████████████████████

3    ████████████████████████████████████████████

4    ████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████████████████████████████████████

7    ██████████████████████████████████████

8    430.    Kytch flags this problem for its customers in advance, providing them with detailed,

9    user-friendly instructions on how to fix the issue. ████████████████████

10   ████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████████████

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 89 of 114**



431.

REDACTED VERSION - FIRST AMENDED COMPLAINT

Exhibit 4
Page 90 of 114



432.    Kytch's real-time notifications, sent via text and email, include mix alerts, Kytch Health Alerts, alerts for heat cycle failures, downtime, weekly summaries, and issue-spotting alerts. Kytch Health Alerts explain malfunctions and provides tips on how to address each issue.

433.    Kytch also provides explanations for heat cycle failures ███████████████

█████████████████████████████████████████████████████████

███████████████████████████████████  Kytch sends ██████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████

434.    One of Kytch's Weekly Summary notifications is depicted below. The weekly summary email tallies ████████████████████████████████████ that appear on the front panel of the machine.

435.    Through the Kytch.com platform, users are able to see ███████████████ ████████████████████  This information, alone, is incredibly valuable. And in

- 85 -

the aggregate, it enables Kytch to identify problems and potential issues long before Taylor and its certified technicians.

436.    Importantly, Kytch.com also allows customers to invite team members to manage and navigate the online interface.

437.    The data Kytch has collected has enabled the company to perform market assessments to anticipate shifting demands, to develop pricing strategies, to decide when and where to launch products, and it informs Kytch's investments in product development and new technologies.

438.    Indeed, based on Kytch's robust data retrieval and analytics capabilities, Kytch possessed considerably more data about Taylor's machines, performance histories, and performance optimization than Taylor itself.

439.    Kytch Solution's proprietary design and software, as alleged above, in Kytch's statement of trade secrets,[17] and the Declaration of Melissa Nelson at Exs. 1-2,[18] and at Paragraphs 92, 171, 172, 238, 239, 241, 242, 272, 322, 323, 326, 327, 329, 331, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 344-80, constitute trade secrets under the California Uniform Trade Secrets Act.

440.    Kytch is informed and believes that Gamble provided a Kytch Solution Device and access to the Kytch Solution Platform to Taylor and TFG for at least eight months, during which time Kytch's trade secrets were misappropriated.

441.    Kytch has not disclosed its trade secret information and the information has actual or potential independent economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

442.    Kytch has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue.

---

[17] Kytch has filed and served its statement of trade secrets pursuant to California Code of Civil procedure section 2019.210.

[18] The Declaration of Melissa Nelson is attached as **Exhibit 2** to this proposed First Amended Complaint.

- 86 -

443.    Defendants knew or should have known under the circumstances that the information they misappropriated were confidential trade secret materials.

444.    Defendants knew or should have known under the circumstances that the information they misappropriated were trade secret materials.

445.    The California Uniform Trade Secrets Act ("CUTSA") prohibits the unfair competition—and associated irreparable harm to business interests—that is caused by product trial participants improperly using or disclosing documents, information, inventions, and business strategies that require substantial investment, innovation, and countless hours to develop.

446.    Defendants have misappropriated Kytch Trade Secrets by: (1) viewing Confidential Information and trade secrets on the Kytch Solution Platform during the June 23, 2020 Zoom meeting with Gamble and Taylor; (2) repeatedly interviewing Gamble and other Kytch customers during regularly schedule focus group sessions to obtain proprietary insight into Kytch's confidential activities and findings; and (3) directing Tyler Gamble and other Kytch customers to use Kytch's Confidential Information to help Taylor and PHD develop its competing product.

447.    As a direct and proximate result of Defendants' conduct, Kytch is threatened with injury and has been injured in an amount more than the jurisdictional minimum of this Court, and that will be proven at trial.

448.    Kytch has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorney's fees, as a result of Defendants' misappropriation.  As a further proximate result of the misappropriation and use of Kytch's trade secrets, Defendants were unjustly enriched.

449.    Defendants acted willfully, maliciously, and fraudulently.  Kytch is therefore entitled to exemplary damages under California Civil Code § 3426.3(c).  Defendants' conduct constitutes transgressions of a continuing nature for which Kytch has no adequate remedy at law.

450.    Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use Kytch's trade secret information to enrich themselves and divert business from Kytch. Pursuant to California Civil Code § 3426.2, Kytch is entitled to an injunction against

the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain Defendants from using all trade secret information misappropriated from Kytch and to return all trade secret information to the company.

451.    Pursuant to California Civil Code § 3426.4 and related law, Kytch is entitled to an award of attorneys' fees for Defendants' misappropriation of trade secrets.

452.    As the direct and proximate result of Defendants' conduct, Kytch has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.

453.    Because Kytch's remedy at law is inadequate, Kytch seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.

454.    Kytch's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

455.    Kytch has been damaged by all the foregoing and is entitled to an award of exemplary damages and attorney's fees.

**FOURTH CAUSE OF ACTION**

**False Advertising in Violation of the Lanham Act (Taylor)**

456.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

457.    Beginning on November 2, 2020, Taylor and McDonald's arranged for false and deceptive advertising to be distributed in interstate commerce via the internet to thousands of McDonald's franchise operators and thousands of Taylor customers, factory-trained technicians, and distributors, across the world.

458.    Taylor directed these advertisements to consumers.

459.    The advertisements contain false claims about the Kytch Solution and Taylor's products and services, including:

459.1  "the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine due to its remote operation capability";

459.2  "the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury";

459.3  the Kytch Solution is either not secure or is defectively designed such that its remote operation capabilities pose a safety risk;

459.4  the KSD presents an increased safety risk to Taylor machines vis-à-vis Taylor machines without the KSD;

459.5  McDonald's and Taylor "recently determined" that the KSD poses a safety risk by product safety testing or other scientific analysis;

459.6  the Kytch Solution "creat[es] potential equipment reliability issues without the restaurant's knowledge or ability to stop it";

459.7  the "potential equipment reliability issues" Kytch creates are materially different or more problematic than those resulting from Taylor machines generally, or from repairs performed by a Taylor-certified technician;

459.8  Taylor planned to release Open Kitchen in the US market … by the end of Q1, 2021";

459.9  Taylor was ready for commercialization and had incorporated the necessary technology to release the "Taylor Shake Sundae Connectivity" by Q1, 2021; and

459.10 the Taylor Shake Sundae Connectivity device would offer similar functionality to the Kytch Solution without the supposed safety or reliability risk.

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**

460.    Taylor's claims are false because they conflict with reality in several ways, as set forth above.

461.    Taylor's claims had the tendency to deceive a substantial segment of the target audience, Taylor intended that they deceive the target audience, and they did in fact deceive the target audience.

462.    Because Taylor's false claims concerned health, safety, and inherent characteristics of the products at issue, consumers necessarily found them to be material.

463.    Further, the facts show that consumers in fact found Taylor's false claims to be material to their purchasing decisions.  Among other things, Kytch's customers started cancelling their subscriptions and returning KSDs immediately following the November 2, 2020 advertisements and Kytch's business collapsed.  Customers also specifically informed Kytch that they credited the representations and found them to be material.  For example, on November 6, 2020, one Kytch customer stated that he was cancelling his subscription because of the "determination" that the Kytch Solution "poses a safety risk."  Another customer explained that Taylor was "actually working out a similar-type-deal in-house," and that he, too, was withdrawing from the Kytch Trial based on Taylor's bogus safety concerns.

464.    Taylor is jointly and severally liable for both its own false claims about Kytch and the similar claims McDonald's disseminated to all U.S. operators because the two companies worked together to develop the false message, and each contributed to the dissemination of the communication.

465.    Taylor's false claims eroded Kytch's goodwill among consumers and caused Kytch's customers and prospective customers to cease doing business with Kytch.

466.    Instead, consumers chose Taylor's and McDonald's forthcoming competing product or chose to continue relying on Taylor's costly replacement parts and repair services.  This led to the virtual destruction of Kytch's business and provided McDonald's and Taylor with ill-gotten gains.

467.    Kytch demands that Taylor be ordered to account for and pay to Kytch all gains, profits, and advantages derived by McDonald's or Taylor from the above-described wrongful acts and that the Court issue an order multiplying or otherwise enhancing any award under the Lanham Act.

**FIFTH CAUSE OF ACTION**

**False Advertising in Violation of Cal. Bus. & Prof. Code § 17500, et seq. (Taylor)**

468.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

469.    Beginning on November 2, 2020, Taylor—working jointly and in concert with McDonald's—arranged for false and deceptive advertising to be distributed via the internet to thousands of McDonald's franchise operators and thousands of Taylor customers, factory-trained technicians, and distributors.  Taylor circulated these false advertisements to thousands of California residents.

470.    Taylor and McDonald's directed these advertisements to consumers.

471.    The advertisements contain false claims about the Kytch Solution and Taylor's own products and services, including:

471.1    "the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine due to its remote operation capability";

471.2    "the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury";

471.3    the Kytch Solution is either not secure or is defectively designed such that its remote operation capabilities pose a safety risk;

471.4    the KSD presents an increased safety risk to Taylor machines vis-à-vis Taylor machines without the KSD;

- 91 -

471.5  Taylor and McDonald's "recently determined" that the KSD poses a safety risk by product safety testing or other scientific analysis;

471.6  the Kytch Solution "creat[es] potential equipment reliability issues without the restaurant's knowledge or ability to stop it";

471.7  the "potential equipment reliability issues" Kytch creates are materially different or more problematic than those resulting from Taylor machines generally, or from repairs performed by a Taylor-certified technician;

471.8  Taylor planned to release Open Kitchen in the US market … by the end of Q1, 2021";

471.9  Taylor was ready for commercialization and had incorporated the necessary technology to release the "Taylor Shake Sundae Connectivity" by Q1, 2021; and

471.10 the Taylor Shake Sundae Connectivity device would offer similar functionality to the Kytch Solution without the supposed safety or reliability risk.

472.    Taylor's claims are false because they conflict with reality in several ways, as set forth above.

473.    Taylor knew or by the exercise of reasonable care should have known that its conduct would cause confusion, mistake, or deception among purchasers, users, and consumers. Taylor's claims had the tendency to deceive a substantial segment of the target audience, Taylor intended that they deceive the target audience, and they did in fact deceive the target audience.

474.    Because Taylor's false claims concerned health, safety, and inherent characteristics of the products at issue, consumers necessarily found them to be material.

475.    Further, the facts show that consumers found Taylor's false claims to be material to their purchasing decisions. Among other things, Kytch's customers started cancelling their subscriptions and returning KSDs immediately following the November 2, 2020 advertisements and Kytch's business collapsed.  Customers also specifically informed Kytch that they credited the

representations and found them to be material. For example, on November 6, 2020, one Kytch customer stated that he was cancelling his subscription because of the "determination" that the Kytch Solution "poses a safety risk."  Another customer explained that Taylor was "actually working out a similar-type-deal in-house," and that he, too, was withdrawing from the Kytch Trial based on Taylor's bogus safety concerns.

476.    Taylor is liable for both its own false claims about Kytch and the similar claims McDonald's disseminated to all U.S. operators because Taylor and McDonald's worked together to develop the false message and each contributed to the dissemination of the communication.

477.    Taylor's false claims eroded Kytch's good will among consumers and caused Kytch's customers and prospective customers to cease doing business with Kytch. Instead, consumers chose Taylor's forthcoming competing product or chose to continue relying on Taylor's costly replacement parts and repair services. This led to the virtual destruction of Kytch's business and provided Taylor with ill-gotten gains.

### SIXTH CAUSE OF ACTION

### Trade Libel (Taylor)

478.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

479.    Taylor issued the following false and deceptive statements of fact about the Kytch Solution:

479.1   Beginning shortly before November 2, 2020, Taylor falsely claimed in advertisements to consumers, franchise operators, Kytch's customers and potential customers, and other players in the "smart kitchen" market, in words or substance, that the Kytch Solution is unsafe, that the Kytch Solution is prone to cause serious human injury, and that the Kytch Solution was unfit for use in smart kitchens.  In making these false claims, Taylor acted in concert with its distributors and McDonald's to promote this disinformation about Kytch.

- 93 -
REDACTED VERSION - FIRST AMENDED COMPLAINT

Exhibit 4
Page 99 of 114

479.2   On November 2, 2020, McDonald's directed and published the following

false and defamatory statements:

We are pleased to share that the McDonald's GSSS-Equipment Team, in partnership with the NSLC Equipment Sub-Team, has been working on a strategic connectivity solution with Taylor for their Shake Sundae machine. This solution will allow operators to receive text updates from their machine when it's down, and provide data on products dispensed, as well as other relevant information, to help restaurants keep the machine running in its optimal condition. This solution is being designed with long term benefits in mind, and would enable future connection with other equipment in the restaurants.

***The Taylor Shake Sundae Connectivity (TSSC) is currently in test [sic] with NSLC operators and the current target for release in the US market is by the end of Q1, 2021.***

**IMPORTANT NOTE:** We have become aware that a few operators may be using an unapproved aftermarket technology, Kytch, on their Shake Sundae machine.  As a reminder, any operator that is using this aftermarket "add-on" to any of their machines, <u>will completely void any existing OEM equipment warranty.</u> Additionally, any machine failures that are associated with the installation of Kytch during or after warranty expires, will be the sole responsibility of the operator, not the OEM supplier.  The Kytch device allows complete access to all aspects of the equipment's controller and confidential data, including areas where only certified technicians should have access, creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it.  Even more concerning, McDonald's has recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may cause the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury. As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use, and is reminding you that any continued use is not approved and is at your sole risk.

479.3   On November 2, 2020, Taylor directed and published the following false and

defamatory statements:

Taylor Shake Sundae Connectivity & Kytch Technology Update

McDonald's US Equipment Team, in partnership with NSLC, has been developing a strategic connectivity solution with Taylor for their Shake Sundae machine.  The solution will allow operators to receive text updates when their machine is down, view number of products dispensed, and get other information to keep the. Machine running on optimal condition.  ***The Taylor Shake Sundae Connectivity (TSSC) is currently in test with NSLC operators and***

- 94 -

***the current target for release to the. US market is by the end of Q1, 2021.***

***IMPORTANT SAFETY NOTE:*** We have become aware that a few operators may be using an unapproved after-market technology, Kytch, on their Shake Sundae machine. This action will completely void any existing OEM equipment warranty. More importantly, McDonald's and Taylor have recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine due to its remote operation capability. ***As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use. Any continued use is not approved and is at your sole risk.***

480.    Taylor made similar statements to RBI, Coca-Cola, and Burger King throughout 2020.

481.    Taylor's statements were intended and did falsely convey that the Kytch Solution is a dangerous product that is known to cause serious human injury, and that it damages the machines without the operators' knowledge.

482.    These accusations are reasonably understood to be statements of fact about Kytch and were understood by people who read them to be statements of fact about Kytch. Kytch has never received a report of "serious human injury" attributed to the Kytch Solution.

483.    Kytch's customers started returning Kytch Solutions immediately. One franchise operator stated that he could not accept "the liability of using [Kytch's] device" because the device poses a serious safety risk.

484.    On November 6, 2020, one Kytch customer stated that he was cancelling his subscription because McDonald's had made the "determination" that the Kytch Solution "poses a safety risk." That same day, another customer explained that Taylor was "actually working out a similar-type-deal in-house," and that he, too, was withdrawing from the Kytch Trial based on Taylor's bogus safety concerns. These customers include Lawrence Miller, Brandon Mayers, Rikesh Patel, Michael Keenan, Peter Rotolo, the Tom Locke group, and Rick Darmody.

485.    Taylor's advertisements are literally false because they say that the Kytch Solution is unsuitable or unsafe for use in commercial kitchens. Kytch is both safe and suitable for use in commercial kitchens; it does not create an incremental risk of injury caused by Taylor's soft-serve

- 95 -

**Exhibit 4**
**Page 101 of 114**

machines.  The Kytch Solution has improved the functioning and effectiveness of Taylor's soft-serve machines.  The Kytch Solution incorporates, utilizes, and is constrained by the soft-serve machines' existing safety protocols and mechanisms.  Kytch's users can remotely monitor and control the soft-serve machines.  Kytch disables automation features when any user is cleaning the interior of the machine or pressing buttons on the control panel.  Kytch cannot remotely engage the soft-serve machines' motors when the freezer door is removed.

486.    Kytch has been approved by the FCC and certified by Intertek—a world renown multinational assurance, inspection, product testing and certification company headquartered in London.

487.    Taylor's claim that consumers are unable to view or control the Kytch Solution is also literally false.  Kytch does not create reliability issues without the knowledge or control of the operator.  The Kytch Rewind allows users to view the functionality of the Kytch Solution.  Users can control their Taylor soft-serve machines remotely, and they can opt-in or opt-out of Kytch's automated features.

488.    These statements are defamatory and libelous as a matter of law.

489.    Taylor's statements were calculated to—and did—provoke outrage and cause the company enormous reputational and financial damage, to Taylor's benefit.

490.    Taylor knew that its statements were false and had actual knowledge that Kytch does not create any incremental risk in Taylor's soft-serve machines.  In February 2020, Taylor met with McDonald's, The Middleby Corporation, Eric Wilson, and Tyler Gamble to discuss infiltrating the Kytch Trial.  The next month, on March 12, 2020, Gamble warned Kytch that McDonald's intended to fabricate safety concerns to drive Kytch out of the marketplace.

491.    When making the statements, Taylor's real motivation was to disrupt Kytch's customer relationships at a crucial time—just after Kytch received the NOA's endorsement and before Taylor had its competing product ready for the market. By branding Kytch's products as unsafe, Taylor bought itself more time to develop its product before Kytch fully penetrated the market.

492.    In October 2020, Taylor received messages that described, in detail, Kytch's safety components and the fact that it incorporates Taylor's existing safety mechanisms.  The messages—and Taylor's independent research—put Taylor on notice that Kytch was certified by Intertek, using the same safety regulations used by Taylor.

493.    Throughout 2020, Taylor received insight from Kytch customers regarding the Kytch Solution and the Kytch Rewind function.  Taylor did not have legitimate concerns about safety—Taylor continued to direct Kytch customers to use the Kytch Solution for months *after* the November 2020 false statements about Kytch.

494.    Taylor's claims are completely uncorroborated, and Taylor intentionally avoided obvious sources of information regarding the Kytch Solution.  Taylor never once contacted Kytch to discuss the manufactured safety issues, and Taylor never tried to corroborate its false accusations because it knew they were baseless.

495.    Kytch sent a retraction demand to Taylor in December 2020.  A copy of that demand letter is attached as **Exhibit 4**.  Kytch informed Taylor that its accusations were demonstrably false and described the myriad reasons that Taylor's defamatory statements were contradicted by the facts.

496.    Taylor refused to retract its statements, and it never provided any justification to support its false claims about the KSD.

497.    The relevant statements are commercial speech, and Taylor had no applicable privilege or legal authorization to make these false and defamatory statements, or if it did, it abused that privilege or authorization.

## SEVENTH CAUSE OF ACTION

### Intentional Interference with Business Expectancy (All Defendants)

498.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

499.    Kytch developed valuable contractual and other business and economic relationships with McDonald's franchise operators. Those franchise operators have engaged in, engage in, are

1  scheduled to engage in, or may engage in business dealings with Kytch, with a probability of future

2  economic benefit.

3      500.    Defendants know and at all relevant times knew of these contractual and other

4  business and economic relationships between Kytch and the McDonald's franchise operators

5  because, among other things, their own documents show that they were paying close attention to

6  McDonald's operators' adoption of the Kytch Solution and that Taylor and TFG used their network

7  of repair technicians to systematically identify machines to which a KSD was attached.

8      501.    Defendants acted intentionally to induce Kytch's customers and prospective

9  customers to discontinue their existing and prospective business relationships with Kytch by (a)

10  making the unlawful statements to all Kytch customers and potential customers; (b) threatening to

11  void the warranties on machines to which a KSD had been attached even though Taylor lacked any

12  legal right to do so and, in fact, never did so; (c) misappropriating Kytch's trade secrets; and (d)

13  inducing Kytch customers to develop Taylor and PHD's competing product by using Kytch's

14  proprietary insights, described above.

15      502.    Defendants knew that their conduct was substantially certain to interfere with

16  Kytch's economic interests, namely its ability to retain existing customers and obtain new

17  customers. Defendants acted knowingly and intentionally and with reckless disregard of the

18  foreseeable consequences of its actions.

19      503.    Defendants' conduct was intended to intimidate and scare Kytch's customers and

20  prospective customers into ceasing to do business with Kytch and/or to instead adopt Taylor's

21  forthcoming competing product or to continue using Taylor's and TFG's costly replacement parts

22  and repair services at an astronomical and unnecessary rate.

23      504.    Defendants' conduct is and was wrongful—independent of any interference with the

24  business and economic relationships discussed here—because it constitutes product disparagement,

25  false advertising, trade libel, extortion, fraud, and trade secrets misappropriation.

26      505.    Taylor's wrongful conduct caused certain of Kytch's customers to cease or curtail

27  their relationships with Kytch.  Kytch's contractual and other business and economic relationships

28

- 98 -

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 104 of 114**

1  with these third parties have been and continue to be disrupted by Taylor' conduct.  As a result of

2  Taylor's conduct, which disrupted Kytch's business relationships, Kytch has suffered injury to its

3  reputation and lost substantial revenue in an amount to be proved at trial.

4                                    **EIGHTH CAUSE OF ACTION**

5            **Negligent Interference with Business Expectancy (All Defendants)**

6        506.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

7        507.    Kytch developed valuable contractual and other business and economic relationships

8  with McDonald's franchise operators. Those franchise operators have engaged in, engage in, are

9  scheduled to engage in, or may engage in business dealings with Kytch, with a probability of future

10  economic benefit.

11        508.    Defendants know and at all relevant times knew of these contractual and other

12  business and economic relationships between Kytch and the McDonald's franchise operators

13  because, among other things, their own documents show that they were paying close attention to

14  McDonald's operators' adoption of the Kytch Solution and that Taylor and TFG used their network

15  of repair technicians to systematically identify machines to which a KSD was attached.

16        509.    Defendants acted, at minimum, negligently when inducing Kytch's customers and

17  prospective customers to discontinue their existing and prospective business relationships with

18  Kytch by (a) making the unlawful statements to all Kytch customers and potential customers; (b)

19  threatening to void the warrantees on machines to which a KSD had been attached even though

20  Taylor lacked any legal right to do so and, in fact, never did so; (c) misappropriating Kytch's trade

21  secrets; and (d) inducing Kytch customers to develop Taylor and PHD's competing product by using

22  Kytch's proprietary insights, described above.

23        510.    By doing so, Defendants failed to act with due care.

24        511.    Defendants knew or should have known that a failure to act with due care would

25  disrupt Kytch's relationships with its customers, including but not limited to McDonald's franchise

26  operators.

27

28

**Exhibit 4**
**Page 105 of 114**

512.    Defendants owed Kytch a duty of care since they knew or should have known of Kytch's relationships with its customers, including but not limited to McDonald's franchise operators, and knew or should have known that its failure to act with due care would disrupt that relationship.

513.    Defendants' conduct was and was wrongful—independent of any interference with the business and economic relationships discussed here—because it constitutes product disparagement, false advertising, trade libel, extortion, fraud, and trade secrets misappropriation.

514.    Kytch's contractual and other business and economic relationships with its customers have and continue to be disrupted by Defendants' conduct.

515.    As a result of Defendants' conduct, Kytch has suffered injury to its reputation and lost substantial revenue in an amount to be proved at trial.

## NINTH CAUSE OF ACTION

### Violation of the California Computer Data Access and Fraud Act (All Defendants)

516.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

517.    In violation of California Penal Code § 502, Defendants knowingly and willfully took multiple specific acts to access the computer networks and data of Kytch without permission. The Defendants' actions include, but are not limited to, the following:

517.1    Knowingly, willfully, and without permission, using Kytch's computer services, in violation of California Penal Code § 502(c)(3).

517.2    Knowingly, willfully, and without permission, accessing Kytch's computers, computer systems, or computer networks, in violation of California Penal Code § 502(c)(7).

517.3    Knowingly, willfully, and without permission, assisting others to provide a means of accessing Kytch's computers, computer systems, or computer networks, in violation of California Penal Code § 502(c)(6).

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 106 of 114**

517.4  Knowingly, willfully, and without permission, accessing Kytch's computers, computer networks, or computer systems to take or copy Kytch's data or supporting documentation, in violation of California Penal Code § 502(c)(2).

517.5  Knowingly, willfully, and without permission, using Kytch's data, computers, computer systems, or computer networks, to wrongfully obtain property and data belonging to Kytch, in violation of California Penal Code § 502(c)(1).

518.    California Penal Code § 502(e) provides a civil cause of action to victims like Kytch who have been harmed by the aforementioned violations.

519.    Pursuant to California Penal Code § 502(e)(1), Kytch is entitled to an award of compensatory damages, injunctive relief, and any other equitable relief deemed appropriate by the Court.

520.    Pursuant to California Penal Code § 502(e)(2), Kytch is entitled to an award of its reasonable attorney's fees incurred in bringing this action.

521.    Because the Defendants acted willfully to violate California Penal Code § 502(c), as described above, and because the Defendants also acted with oppression, fraud, or malice towards Kytch, Kytch is entitled to an additional award of punitive or exemplary damages, pursuant to California Penal Code § 502(e)(4).

## TENTH CAUSE OF ACTION

### Deceptive Trade Practices - Cal. Bus. & Prof. Code § 17200 (All Defendants)

522.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

523.    Defendants have engaged in unlawful, unfair, and otherwise prohibited business acts and practices, as outlined above.

524.    Defendants' conduct was knowing, deliberate, willful, and intended to cause confusion, mistake or to deceive, all in blatant disregard of Kytch's rights.

525.    Further, Taylor has engaged in unlawful, unethical, and wrongful conduct by threatening to void the warranties on machines to which a KSD had been attached even though

Taylor lacked any legal right to do so and, in fact, never did so. Taylor's conduct was intended to intimidate and scare Kytch's customers and prospective customers into ceasing to do business with Kytch and to instead adopt Taylor's forthcoming competing product or to continue using Taylor's costly replacement parts and repair services at an astronomical rate.

526.    As a direct and proximate result of Defendants' wrongful conduct, as alleged herein, Kytch has been and will be deprived of substantial sales of its products and good will among McDonald's franchise operators and other customers and sustained hundreds of millions of dollars in loss.

527.    Kytch seeks restitution in this matter, including an order granting Taylor's profits stemming from its illegal activity, Kytch's actual and compensatory damages, and any other restitution award available by law.

## ELEVENTH CAUSE OF ACTION

### Breach of Contract (TFG)

528.    Kytch repeats and re-alleges every allegation set forth in this Amended Complaint.

529.    Agents for TFG electronically accessed Kytch's online interface, the KSP, where they agreed to Kytch's Terms of Service (attached as **Exhibit 1**). This consent formed valid, enforceable contracts between the parties. Yet, TFG breached those contracts in multiple ways, severely damaging Kytch in the process.

530.    Similarly, Gamble provided TFG his login credentials to the KSP. Using this unauthorized access, TFG's Blaine Martin and Ben Rhodes accessed the password-protected portions of Kytch's online interface, the KSP. At all relevant times, Martin and Rhodes were acting on behalf of their employer, TFG.

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 108 of 114**

531.   As a part of the process to access the KSP, agents for both Taylor and TFG were presented with a log-in screen where they chose to "agree to the terms of service" as shown in the image below.



532.   The phrase "terms of service" was underlined and hyperlinked, leading to a publicly available web page maintained by Kytch and setting forth the full text of Kytch's Terms of Service,[19] which is reproduced in **Exhibit 1.**

533.   Before TFG's agents could successfully log into the KSP, they had to check the circle stating that they agreed to Kytch's Terms of Service.   They did so before clicking the "Sign In" button to access the KSP.   Once the agents agreed to the Terms of Service and clicked the "Sign In" button, they received full access to the KSP.

534.   By agreeing to the Terms of Service, TFG agreed to refrain from using Kytch's trade secrets to "build or support, and/or assist a third party in building or supporting products or services competitive" to Kytch.   (Kytch Terms of Service, § 1(g).)

---

[19] *See Kytch, Inc. Terms of Service,* https://kytch.com/tos.

535.    TFG also agreed that they would not "modify, make derivative works of, disassemble, reverse compile, reverse engineer, reproduce, distribute, [or] republish" any part of the KSP.  (Kytch Terms of Service, § 1(g).)

536.    TFG further agreed that it would not "transfer", "distribute", or "disclose" any part of the KSP to "any third party."  (Kytch Terms of Service, § 1(g).)

537.    TFG agreed that it would not "commercially exploit" any part of the KSP.  (Kytch Terms of Service, § 1(g).)

538.    TFG agreed to these and other contractual provisions set forth in the Kytch Terms of Service.  (*See, e.g.*, Kytch Terms of Service, § 3(e).)

539.    TFG breached material provisions of the Kytch Terms of Service, resulting in damage to Kytch.

540.    In addition to other breaches, TFG breached their contractual obligations by (a) participating in the development of the competing device known as Open Kitchen; (b) assisting in the disassembly, reverse engineering and distribution of KSDs; and (c) by giving McDonald's and other third-parties access to the Kytch Solution Platform.

541.    TFG improperly took and continues to retain Kytch "Proprietary Information" to develop products and to otherwise compete against Kytch.

542.    TFG improperly took and continues to retain Kytch's Confidential Information for the additional purpose of enriching itself and the other Defendants in breach of the Kytch Trial Agreement.

543.    Kytch is entitled to recover from TFG the damages caused by its breaches of the Kytch Terms of Service.

544.    TFG agreed that "Kytch may recover damages from [TFG] for . . . utilizing [the KSP] for purposes other than those contemplated by the [Terms of Service]."  (Kytch Terms of Service, § 1(o).)

545.    Kytch is informed and believes that TFG is continuing to breach the Kytch Terms of Service.

546.    By reason of the ongoing breaches, Kytch has and will suffer great and irreparable harm and damage, which harm and damage will be difficult to ascertain, and Kytch will be without an adequate remedy at law.

547.    TFG acknowledged in the Terms of Service contract that: "Kytch may seek injunctive or other equitable relief to protect its confidential information and intellectual property rights or to prevent loss of data or damage to its servers in any court of competent jurisdiction and You agree that Kytch may do so without the need to post bond or other surety." (Kytch Terms of Service, § 15(c).)

548.    The amount of such damages cannot be determined at this time but will be proven at trial. Kytch is further entitled to recover from TFG the gains, profits, and advantages that it obtained as a result of these breaches. Kytch is currently unable to ascertain the full extent of these gains, profits, and advantages but will prove the value thereof at trial.

549.    Because Kytch's remedy at law is inadequate, Kytch seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Kytch's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE,** Kytch respectfully requests the following relief:

550.    That the Court enter judgment in Kytch's favor and against Defendants on all causes of action alleged herein;

551.    That the Court award injunctive relief, including ordering that:

551.1    Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, be preliminarily and permanently restrained and enjoined from misappropriating, disclosing, or using Kytch's Confidential Information and trade secrets;

REDACTED VERSION - FIRST AMENDED COMPLAINT
**Exhibit 4**
**Page 111 of 114**

551.2   Defendants recall and surrender all material and trade secrets wrongfully misappropriated or converted;

551.3   Defendants, their officers, agents, servants and employees, and all people or entities in active concert and participation with them be preliminarily and permanently enjoined from further disseminating the false and deceptive claims described herein in any form or medium;

551.4   Defendants to withdraw and retrieve all offending communications from the marketplace;

551.5   Defendants to disseminate corrective communications to dispel the false and deceptive messages described herein;

551.6   Defendants be enjoined from further accessing Kytch's computer networks and data without permission;

551.7   Defendants be enjoined from using any information already obtained from accessing Kytch's computer networks and data without permission;

551.8   Other appropriate injunctive relief.

552.    That Kytch recover compensatory damages, consequential damages, restitution, and other compensation for the harm sustained by virtue of Defendants' wrongdoing, in an amount to be established at trial;

553.    That Defendants be ordered to account for and pay to Kytch all gains, profits and advantages derived by Defendants from the above-described wrongful acts;

554.    That the Court award punitive damages or other exemplary damages, as permitted by statute and contract, in an amount to be proved at trial;

555.    That Kytch recover any other damages permitted by statute or contract;

556.    That Kytch recover attorneys' fees and the costs of suit herein;

557.    That Kytch recover pre-judgment and post-judgment interest at the maximum legal rate; and

558.    Such other and further relief as the Court may deem to be just and proper.

1    **DEMAND FOR JURY TRIAL** Kytch hereby demands trial by jury for all causes of action,

2   claims, or issues in this action that are triable as a matter of right to a jury.

3   Dated:        March 21, 2022                        IRELL & MANELLA LLP

4

5                                                       By:   /s/ Jason Sheasby
                                                        Jason Sheasby SBN 205455
6                                                       *Attorneys for Plaintiff Kytch, Inc.*

7                                                       CLARE LOCKE LLP
                                                        Elizabeth M. Locke, P.C. * VA Bar No. 71784
8                                                       Daniel P. Watkins,* VA Bar No. 84592
                                                        Appearance *Pro Hac Vice*
9                                                       *Attorneys for Plaintiff Kytch, Inc.*

10                                                      John C. Kirke SBN 175055
                                                        jkirke@donahue.com
11                                                      Andrew S. Mackay SBN 197074
                                                        amackay@donahue.com
12                                                      DONAHUE FITZGERALD LLP
                                                        1999 Harrison Street, 26th Floor
13                                                      Oakland, California 94612-3520
                                                        Telephone: (510) 451-3300
14                                                      Facsimile:  (510) 451-1527

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED VERSION - FIRST AMENDED COMPLAINT

**Exhibit 4**
**Page 113 of 114**

**<u>VOLUMINOUS DOCUMENT</u>**

**<u>PAGES OMITTED</u>**

**Exhibit 4**
**Page 114 of 114**